WILBUR ENSLEY,
COVEY ANDREWS,
SHAMAR ARCHER,
DEUNTE HUMPHRIES, and
JAMAR GILLIAM,

        Plaintiffs,

                                        Case: 3:17-cv-00024-MHL

v.

                                  **JURY TRIAL DEMANDED**

CITY OF RICHMOND, VIRGINIA,
JASON NORTON,
BRYAN T. NORWOOD,
CHRISTOPHER GLEASON,
CHARLES SIPPLE,
ROGER RUSSELL,
MICHAEL ALSTON,
BRIAN CORRIGAN,
MARTIN HARRISON, and
WILLIAM BLACKWELL,

        Defendants.

## AMENDED COMPLAINT

COMES NOW Plaintiffs Wilbur Ensley, Covey Andrews, Shamar Archer, Deunte

Humphries, and Jamar Gilliam, by counsel, and moves this Court for judgment against

Defendants City of Richmond, Virginia; Jason Norton; Bryan T. Norwood, Christopher Gleason,

Charles Sipple, Roger Russell, Michael Alston, Brian Corrigan, Martin Harrison, and William

Blackwell, and in support of their Amended Complaint, filed pursuant to Federal Rule of Civil

Procedure 15(a)(1)(B), state as follows:

## I.      INTRODUCTION

1.      On January 20, 2009, Detective Jason Norton, an Officer with the Richmond

Police Department, executed a search warrant on 16_ P____ Street in Richmond, Virginia.

While in the house, Officer Norton arrested Wilbur Ensley. Mr. Ensley did not know it at that time, but his arrest was only possible because of fraud committed by Officer Norton, and permitted by other officers and the Police Department itself. Ensley thus should not have spent a single day in jail. Instead, he sat in his cell, separated from his family and friends—indeed, separated from his entire *life*—for over six years, a full 2,265 days.

2. Wilbur Ensley was not the only victim of Norton's lies and the Richmond Police Department's gross failures. Numerous others were victimized in the same way, including Covey Andrews (who spent 2,035 days in prison), Shamar Archer (who spent 1,006 days in prison), Deunte Humphries (who spent over 311 days in prison)[1], and Jamar Gilliam (who spent 603 days in prison). Altogether, Officer Norton and the Richmond Police Department's lawless conduct resulted in these five persons spending a total of 6,220 days in prison.

3. Every single day of those 6,220 days spent in prison was in violation of the United States Constitution and Virginia law. This Complaint seeks to vindicate the rights of Messrs. Ensley, Andrews, Archer, Gilliam, and Humphries by holding the City of Richmond, Jason Norton, and the other Defendants accountable for their extraordinary misconduct.

## II. <u>JURISDICTION</u>

4. This Court has jurisdiction over the federal law claims in this case pursuant to 28 U.S.C. § 1331 because the Plaintiffs claim a right to relief arising under federal law. In particular, the Plaintiffs aver that their unjustified arrest violated the United States Constitution.

---

[1] Humphries was also confined from the date of his arrest, February 24, 2012, to an unknown date in April 2012, when he made bond. Although this time period is relevant to Humphries' claims herein, it has been excluded from all calculations herein pending a definitive determination of the date in April 2012 when Humphries made bond.

5.     This Court has jurisdiction over the state law claims in this case pursuant to 28 U.S.C. § 1367 because the state law claims arise out of the same transactions or occurrences comprising the federal law claims.

### III.  VENUE

6.     Venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in the Eastern District of Virginia.

7.     Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to Plaintiffs claims occurred in the Richmond Division.

### IV.  PARTIES

8.     At the time that the original Complaint was filed, Plaintiff Wilbur Ensley was a citizen of Virginia residing in the City of Richmond, Virginia.  He has since relocated to Maryland.

9.     Plaintiff Covey Andrews is a citizen of Virginia residing in Chesterfield County, Virginia.

10.     Plaintiff Shamar Archer is a citizen of Virginia residing in the City of Richmond, Virginia.

11.     Plaintiff Deunte Humphries is a citizen of Virginia residing in Chesterfield County, Virginia.

12.     Plaintiff Jamar Gilliam is a citizen of Virginia residing in the City of Richmond, Virginia.

13.     Defendant Jason Norton was, at all relevant times, an officer in the Richmond Police Department.  He is sued in his individual capacity.

14.    Defendant City of Richmond is, and at all relevant times, was, a city within the Commonwealth of Virginia.  The City of Richmond operates the Richmond Police Department (sometimes referred to herein as "RPD").  Final decision making for the City of Richmond's policies concerning police operations, however, has been delegated to its Chief of Police, who, during the relevant period, was Defendant Bryan T. Norwood.[2]

15.    Defendant Bryan T. Norwood was, at all relevant times, the Chief of Police of the Richmond Police Department and was responsible for supervising Jason Norton.  Defendant Norwood served as Chief of Police from 2008 through 2013.  He is sued in his individual capacity.

16.    Defendant Christopher Gleason was, at all relevant times, an officer in the Richmond Police Department responsible for supervising Jason Norton.  From 2009 through approximately June 2012, Defendant Gleason served as Norton's Direct Supervisor.  He is sued in his individual capacity.

17.    Defendant Charles Sipple was, at all relevant times, an officer in the Richmond Police Department responsible for supervising Jason Norton.  Defendant Sipple served as Norton's Intermediate Supervisor in or before 2008 through, upon information and belief, April 2011.  He is sued in his individual capacity.

18.    Defendant Roger Russell was, at all relevant times, an officer in the Richmond Police Department responsible for supervising Jason Norton.  From July 2007 through April

---

[2]    The Richmond Police Chief has final control over police policies, training, discipline, and the day-to-day operations of the Department. The City Code grants the Chief of Police "general management and control of the department of police." Richmond City Code § 2-272. The City Code further provides that the Chief of Police shall: assign all members to their respective posts, shifts, details and duties; make rules and regulations concerning the operation of the Department, the conduct and training of the officers; and determine the penalties to be imposed for infractions of such rules.  The City Code further provides that the Chief of Police shall be responsible for the efficiency, discipline and good conduct of the Department. *Id.*

2011, Defendant Russell served as the Head of the RPD's Special Investigations Division. According to his LinkedIn page, from "April 2011 – present (5 years 10 months)," Defendant Russell has served as "Officer in Charge" of the RPD's Internal Affairs Division. He is sued in his individual capacity.

19.     Defendant Michael Alston was, at all relevant times, an officer in the Richmond Police Department responsible for supervising Jason Norton. In 2012 and 2013, Defendant Alston served as Norton's Direct Supervisor. He is sued in his individual capacity.

20.     Defendant Brian Corrigan was, at all relevant times, an officer in the Richmond Police Department responsible for supervising Jason Norton. In 2012 and 2013, Defendant Corrigan served as Norton's Intermediate Supervisor. He is sued in his individual capacity.

21.     Defendant Martin Harrison was, at all relevant times, an officer in the Richmond Police Department responsible for supervising Jason Norton. In or about 2011 through at least March 2013, Defendant Harrison served as the Head of the RPD's Special Investigations Division. The RPD website indicates that Defendant Harrison currently leads the Department's Internal Affairs Division. He is sued in his individual capacity.

22.     Defendant William Blackwell was, at all relevant times, an officer in the Richmond Police Department responsible for supervising Jason Norton. From in or about 2009 through 2011, Defendant Blackwell oversaw the RPD's confidential informant program. He is sued in his individual capacity.

23.     All of the individual Defendants are persons, who, during the relevant period, were acting within the course and scope of their employment/agency with the Richmond Police Department, and under color of state law pursuant to 42 U.S.C. § 1983.

24.     Defendants Norwood, Gleason, Sipple, Russell, Alston, Corrigan, Harrison, and Blackwell will, for ease of reference, be referred to collectively as the "Supervisory Defendants."

## V.     FACTS

### A.  Jason Norton's Troubled Tenure as a Richmond Police Officer

25.     Jason Norton joined the Richmond Police Department in 2004 and over time earned a reputation as a sloppy, dishonest, and corrupt officer.  Indeed, Norton's problems were so well known—and so serious—that, within the Department, it had been a "joke for years that Norton was dirty."  "Dirty," in the field of law enforcement, indicates that an officer is corrupt—that he is flouting the law rather than obeying it.

26.     By mid-2012, Norton's "dirtiness" was so evident that the Federal Bureau of Investigation (FBI) began investigating him.  What the FBI found is a shocking record of misconduct. Although this case chiefly concerns Norton's fraudulent arrests of the Plaintiffs, his misconduct apart from these events evidences his propensity to lie and break the law—a fact that supports the City of Richmond and the Supervisory Defendant's liability in this case.

### 1.  Norton's Unlawful Seizures of Money

27.     One of Norton's most common frauds concerned the seizure of money during an arrest.  Over and over again, Norton would stop a car, search the car, and discover money and perhaps other contraband.  He would seize the money as though it were evidence of a crime, but *would not* arrest the occupants of car, issue a citation, or even, contrary to department policy, provide a receipt to the occupants confirming that he took the money.  The failure to provide a receipt is crucially important, because it allows Norton to deny that he ever took the money.  If he had issued receipts, those who had their money taken could have shown up at the police station demanding their money back and administrators would then have turned to Norton asking

for the money.  By not issuing receipts, therefore, Norton was laying the groundwork for a scheme to unlawfully keep the money.

28.      An example of this behavior is recorded in a statement made to the FBI by "C. R."  According to C.R., "in 2008 or 2009," Norton pulled C.R. and "T. T." over in a North Richmond parking lot.  T. T. was driving but he did not have a valid driver's license.  Norton searched the car and "took $5,000 cash" which was "in a plastic bag in the car."  According to C.R., "[T. T.] was scared and thought he would get locked up."  But instead, "NORTON let [T. T.] and [C. R.] go without giving them a citation or receipt."

29.      "R. A.," a resident of North Richmond, had the same experience in November 2008 and then again in 2009.  According to an FBI interview, Norton pulled R. A. over in November 2008 while R. A. was driving a Dodge Charger on Barton Avenue in Richmond.  "While searching for drugs, NORTON found and took $3,500 from the arm rest of the Dodge Charger.  NORTON did not give [R. A.] a receipt for the money and continued to regularly pull [R. A.] over."  The same thing happened to R. A. in 2009 when he was eating food in his car.  "[R. A.] had spit out a piece of plastic packaging for his utensils.  NORTON took the plastic and placed it inside an evidence bag stating that it was packaging for drugs.  NORTON took $1,000 to $1,500 from [R. A.] . . .  NORTON did not provide [R. A.] with any paper or receipts after NORTON took the money."

30.      Another Richmond resident, "M. S.," encountered this conduct not twice, but three times.  The first time was in November 2008.  M. S. was hanging out with several friends on H_____ ____ Street when, according to FBI records, Norton pulled up and had everybody line up.  Norton then called a canine to smell the lineup for drugs.  "NORTON stated that the canine hit on [M. S.] and two of the others.  [M. S.] didn't observe the canine react to him or the

others and doubted NORTON's statement that the dog 'hit.'" Norton nonetheless called for a police transport vehicle. While waiting for the vehicle, Norton searched [M. S.]'s car and found "a black duffel bag, a weed scale and empty zip lock bags." A bit later, Norton noticed a bulge in [M. S.]'s pocket and asked him what it was.

> "[M. S.] stated that there was money in his pocket. NORTON asked how much [money] to which [M. S.] replied $1,500 or $1,700. NORTON told [M. S.] not to worry about it and 'my kids are going to have a good Christmas off you.'

> NORTON told [M. S.], let me tell you how I work. See that guy with the glasses right there—that's DEA—I can take this money, give it to him, call your probation officer, and have your probation revoked. NORTON then provided the alternative that [M. S.] could get on NORTON's team. [M. S.] responded something to the effect of fuck that money and was released from the paddy wagon. . . .

> NORTON took the $1,700, which had been folded in half in [M. S.]' pocket, but did not take the duffel bag, scale or anything else. NORTON[3] admitted that the $1,700 were proceeds from marijuana that was previously stored in the duffel bag. NORTON did not give [M. S.] any receipt, report or court date but did provide [M. S.] with a Richmond City card that had a phone number on it. [M. S.] threw the card away."

31.     M. S.'s second run in with Norton was in "April or May of 2009." M. S. was in his mother's car when Norton pulled him over, saying that "he hadn't seen this vehicle in his neighborhood and he had to find out who was driving." Norton asked M. S. to get out of the car, patted him down, and found "approximately $1,100 or $1,200 cash in [M. S.]'s pocket." NORTON took the money and stated that he would go in early tonight." At that point, another police officer arrived.

> "NORTON told [M. S.] that he would go talk to the officer and let the officer know that he had already spoken with [M. S.]. [M. S.] got into [his mother's car] and drove off. [M. S.] remembered being mad but felt like NORTON's taking money from [M. S.] would be a routine thing. Although [M. S.] was upset he figured that periodically giving money to

---

[3]     Although FBI records state that "Norton" admitted that the money was the result of marijuana sales, it seems likely that this is a typographical error. More likely it was M. S., not Norton, who admitted this.

NORTON would be a cost of business.  No arrests or court hearings came from this incident."

32.     This same conduct repeated itself for the third time on September 13, 2011.

Norton accosted M. S. while he was in his car, searched it and found contraband.  M. S. was

placed in handcuffs and he expected to be formally arrested.  Instead, Norton's partner, Bruce

Gochenour (who arrived shortly after Norton),

> "provided [M. S. with] a phone number on a sheet of paper or card board and told [M. S.] that he was providing a number so [M. S.] could call, work with GOCHENOUR and NORTON, and they would go from there. GOCHENOUR then took the hand cuffs off [M. S.] and let him go. NORTON told [M. S.] that they don't have snitches . . . [but rather] an all-star team of business partners.  [M. S.] threw the piece of paper with the number on it out his window.  That day, NORTON and GOCHENOUR seized drugs and $5,000 from [M. S.]'s vehicle but did not arrest [M. S.] or provide a receipt or ticket."

M. S. was so confused about this experience that he sought the advice of an attorney.  Soon after

this, Norton and Gochenour met with M. S.  At the meeting,

> NORTON told [M. S.], this is how it goes – every month we pick the place, you make the drop and we pick it up.  [M. S.] understood this to mean that NORTON and GOCHENOUR wanted [M. S.] to deliver them money monthly in exchange for their not going after [M. S.]' drug dealing.  [M. S.] assumed they were willing to make this offer because [M. S.] hadn't gone to the cops about their prior encounters.

33.     A final example of Norton's misconduct concerns "M. T."  On January 6, 2012.

According to an FBI interview,

> "M. T. was driving . . . when NORTON followed him approximately 15 blocks.  NORTON stopped [M. T.] . . . for the tint on this [sic] windows, but then said don't worry about it because he smelled marijuana.  Norton found a tobacco grinder with marijuana residue and a cup with a false bottom containing less than a gram of heroin.  [M. T.] also had approximately $1,300 in his pants.  . . .
>
> NORTON seized the grinder, cup, heroin, $1,300 and a GPS and vacation photographs that were inside the vehicle.  NORTON gave [M. T.] a summons with his phone number on it but no receipt.  [M. T.] showed up for court on the date of the summons only to find that he was not on the docket.  [M. T.] asked about his case and there was no record of a summons or pending court date."

34.     Norton's behavior was not secret.  In FBI interviews, his colleagues reported that "lots of rumors about Norton went around," including "rumors and stories . . . regarding missing money."  In interviews with residents of Highland Park in North Richmond, residents reported that they "heard 'on the street' that Norton takes money," that Norton was a "crooked cop," and that some people had to "pay a tax to Norton."

35.     Indeed, the Richmond Police Department was aware of it as well.  On March 25, 2011, Norton received a formal reprimand for an incident in February 2009 in which Norton seized marijuana and cocaine but failed to make an arrest or charge.  Norton claimed that his decision not to arrest the individual related an "attempt[] to use the individual as an informant." This explanation was unavailing, however, because "the individual was not registered as an informant."  Thus, Norton's reprimand was based on his "fail[ure] to follow proper arrest procedures & procedures using an informant." As will be explained in greater detail later in this Complaint, Norton's intentional lies regarding informants would play a crucial role in his unlawful arrest of the Plaintiffs in this case.

## 2.  Norton's Dishonesty

36.     Aside from his repeated seizure of cash from suspects, Norton had problems with his own colleagues.  Over time, they had come to regard Norton as "flying too fast and too loose," "shaky," or, more grimly, "a sinking ship."  One significant part of this problem was Norton's dishonesty.

37.     First, and perhaps most relevant to the claims in this Complaint, Norton was formally reprimanded on March 25, 2011 for his work with confidential informants in July 2010. RPD officials discovered that its official records of Norton's work with informants contained two alarming problems.  First, some official records contained signatures that were purportedly

made by the same person but did not look consistent. This suggested that at least one of the signatures must have been a forgery—with Norton being the most likely forger. Second, other records contained signatures of persons who were not listed as an informant in the case. This suggested that the informants Norton was telling the court about in his warrant applications were not his actual informants. Norton's dishonest schemes in his handling of informants will be discussed in much greater detail later in this Complaint.

38.     Another example of Norton's dishonesty relates to a missed court date in July 2012. A police officer's failure to make a court dates is quite problematic because it may result in a defendant escaping the charges against him. What made this incident especially concerning, however, was not the missed appearance, but rather Norton's excuse. Instead of just admitting to his mistake, Norton made up a story about his son having a dental appointment. But Norton couldn't keep his story straight. When interviewed by another detective about the incident, Norton "repeatedly provided details related to that appointment in conflict with statements that Norton had just made." Norton's suspicious responses necessitated a second interview where Norton finally admitted that "he had used [the] dental appointment as an excuse for missing court b/c he was afraid he would get in trouble."

39.     On another occasion in November 2012, Norton lied about his work in the field. During a meeting, several officers discussed "options to catch targets located in a specific area of the City." Norton said in the meeting that he had already "knocked on doors and went looking for targets at their addresses." In response to this, Norton's supervisor stated that "this is a team and that would mean that you went out by yourself and did this"—an apparent violation of policy. The supervisor asked Norton who went with him and, instead of admitting the truth,

Norton named an officer. Later, that officer was asked if "he went with Norton and the officer stated no."

40. A month later in December 2012, Norton missed a scheduled training in Martinsville, Virginia. RPD officers had planned to leave from police headquarters at 3:30 a.m. so that they could arrive in Martinsville in time for the training. Norton never showed up. At 3:45 a.m., having heard nothing from Norton, the officers left. At 6:30 a.m., Norton called and said "the power went off," thus preventing his alarm from waking him up. Norton's supervisor was concerned that Norton missed the meeting, but much more concerned about Norton's unlikely "power went off" excuse. The supervisor's suspicions were apparently correct, for Norton later made a written statement in which he backed off his "power went off" excuse. In his statement, he said that he "forgot to switch the alarm button over to the actual alarm."

41. In February 2013, Norton missed another court date. With a court date scheduled for a Wednesday, Norton emailed his supervisor (apparently on a Tuesday) saying that "I have court today at 10 and Friday at 9:30. I also need the day Wed. as I am flying to Boston to be with my best friend and his family as he has very invasive surgery. It was diagnosed with numerous kinds of cancer. I will be flying back Thursday morning at 0615 hours." Then, on Wednesday, Norton sent an email falsely stating "[j]ust wanted to remind you that I am in Boston today and if anyone wants to say a prayer for my buddy Brendan it would be greatly appreciated." Then, on Thursday in the morning, Norton wrote again, "[h]ey just wanted to let you know that I landed safely and a [sic] soon as I get off the plane and get to my car I will be in. Didn't have to check a bag. See you soon." As it turned out, however, Norton never went to Boston and was "observed in the Shockoe Bottom area" on Wednesday afternoon. When asked for proof that he went to Boston, Norton came clean and admitted that he had lied. His excuse

was that he "had a lot of things that have personally been going on in my life over the past year and have had a hard time dealing with them."

42.    In March 2013, Norton was caught in more misconduct that he tried to hide from by lying.  In this instance, Norton was spotted drunk at 2:00 a.m. with his service weapon in Shockoe Bottom, a bar district in downtown Richmond.  When he got into his car, started it, and turned on his headlights, an officer approached him and asked him if he had been drinking.  Norton said "no," but when the officer asked Norton to step out of the car, he could see Norton's bloodshot eyes, that Norton was weaving back and forth, and noticed a "strong odor of alcohol on breath."  Norton was taken back to the station where his weapon was taken from him while he sobered up.  While at the station, Norton tried to explain his behavior.  He admitted drinking "3 beers and 2 red bull vodkas" that night, but stated that he was "not going to drive the car" (even though he had started the car and turned on the headlights).  In the end, however, Norton knew he had made a big mistake and needed to protect his career.  He told his supervisor that night that "he wouldn't mess up anymore and swore on his kids he wouldn't if his supervisor would not report the incident."  A couple days later, Norton wrote a statement concerning the incident that, according to his supervisor, "left several things out." Notably, in his statement, Norton stated that he drank "2 red bull vodkas and 4 beers" not "2 beers and 2 red bull vodkas" as he had reported the night of the incident.

43.    Norton's willingness to lie is evidenced not just in his formal interactions with his supervisors, but also in his informal interactions with his colleagues.  For example, one of Norton's colleagues told the FBI that Norton told lots of "stories."  One of the stories that the co-worker remembered was "30 minute dissertation" Norton gave about how he "pitched on the

baseball team at East Carolina University" and played against "the University of Richmond." All of this was apparently false—and it appears that his colleagues knew it.

### 3. Stepping Across the Thin Blue Line

44.     Seizing money from suspects (but then letting them go free) and lying to his supervisors, were only some of Norton's problems as an officer.  Another issue concerned his efforts on *behalf of the very individuals he was charged with arresting*.

45.     One shocking example of this occurred in April 2010. At that time, several FBI agents were surveilling a residence as part of a Task Force known as "RAVE" (Richmond Area Violent Enterprise).  The Task Force, which was staffed with RPD and federal officers, was specifically focused on uncovering criminal activity by "Gang A," a gang in Richmond.

46.     While surveilling the residence, the FBI agents observed R. A.—a person known to them—dealing cocaine base.  Knowing that R. A. was one of Norton's informants, one of the FBI agents contacted Norton using a cell phone to "notif[y] [him] of the situation involving his Informant."

47.     After attempting several times to reach Norton, the agent eventually made contact and told him of their plans.  According to the Task Force files, Norton responded with "something to the extent of 'Let me take care of it'" and then hung up. Little did the agents realize at the time, but Norton's effort to "take care of it" was to tip off R. A.  According to a later interview of R. A., Norton called R. A.'s after hanging up with the FBI agent and "let [R. A.] know that he was hit"—meaning that he was about to be arrested.

48.     Norton's warning to R. A., however, was not enough.  Before R.A. could get away, another Task Force member, RPD Officer Errol Fenandez, arrested him. Soon after the arrest, Norton called the agents back asking whether R. A. had been arrested.  When agents

informed Norton that the arrest was already "in process," Norton asked if the cocaine could be seized and R. A. released and perhaps indicted later. The FBI agent rejected this suggestion where upon Norton hung up the phone to call Fernandez.

49.     Soon thereafter, Norton called the agent back again. After some discussion, the FBI agent told Norton that arresting R. A. was the best choice at the moment. According to the official report, the agent told "Norton this a couple of times with no response. Detective Norton then hangs up the phone shortly thereafter."

50.     Moments later, the FBI agents spotted R. A. "walking freely down the street without being detained by the patrol officer." When asked, Officer Fernandez said he "did not know why." R. A. was quickly re-arrested. During the arrest, R. A. "stated several times in custody 'why me?'" and then "My man Norton said things are cool."

51.     The events surrounding R. A.'s arrest were so disconcerting to the FBI agents that they wrote out several different reports of what happened. Indeed, one report was specifically focused on Norton's strange behavior, titled "DETECTIVE NORTON REPORT TO [FBI AGENT] RE [R. A.]. The report became part of the Task Force files, which, as noted above, was a joint effort between the FBI and the RPD. Thus, by at least April 2010, RPD supervisors were on notice that Norton had an inappropriate relationship with R. A.—the type of relationship that Norton wanted to hide and protect. This is important, because, as shown later in this Complaint, R. A. was not any informant. He was an informant crucially involved in Norton's fraudulent scheme that led to the unconstitutional arrest and imprisonment of numerous persons.

52.     The evening of R. A.'s arrest is yet notable for another reason. That night, FBI agents were surveilling a residence associated with the activities of "Gang A." In other surveillance of the gang's activities, officials overheard Norton's name. Importantly, the gang

members were not discussing threats *from* Norton, but rather discussing whether Norton would *help* them by "supplying or looking after the guys in the gang."  This is concerning on its own, but is even worse given that, according to FBI files, "NORTON sat on the arrest warrant of a Bloods gang member for a couple of months without entering it into the computer or executing the arrest. Richmond Police Detective SPRINKLE found the warrant in NORTON's desk and arrested the subject." It is not known whether Norton's attempt to prevent R. A.'s arrest was related to any connection he had with Gang A. Nonetheless, RPD supervisors would have known about both events and must have been, or should have been, deeply concerned.

53.    Gang A was not the only gang with which Norton had connections.  Another Richmond gang, "Gang B," was under investigation by the RPD for a variety of criminal activities.  While this investigation was in process, Norton became friends (both online and apparently in person) with "J. B." J. B. would later be arrested for attacking a member of a rival motorcycle gang and breaking his eye socket.  J. B. was no bit player in the gang either; when officers searched his house, they discovered drugs and more than a dozen firearms.

**B. Norton's Misconduct Involving Confidential Informants**

54.    Aside from the dishonesty and corruption described above, Norton also engaged in extensive misconduct in his use of confidential informants.  To understand this misconduct, it is first necessary to understand how police use informants to detect crime and how the RPD in particular manages its informants.

**1.  Warrants and RPD's Confidential Informant Practices**

55.    The United States Constitution protects all persons in the United States from unjustified searches and seizures.  In the circumstances relevant to this case, a search or seizure is justified if it is based on a valid warrant issued by a court.  Courts may issue warrants only

upon a finding that there is "probable cause" to believe that a crime is occurring or has occurred. Thus, if a police officer wants to search or seize something, he must first prove to a court that there is probable cause to believe that a crime is occurring or has occurred.

56.     Officers may prove probable cause to a court in different ways.  For instance, if an officer observes suspicious activity in the vicinity of a particular house and wishes to search that house, the officer may establish probable cause by reporting to the court his own observations. Sometimes, however, the officer has not personally observed suspicious activity, but only heard from others that such activity has occurred.  Where an officer hears about suspicious activity second-hand, the court must make sure that the second-hand reports are nonetheless trustworthy.  If police officers could perform a search or seizure based merely on gossip, our constitutional rights would not amount to much.

57.     To guard against searches and seizures based on mere gossip, the Constitution requires the person providing the second-hand report—often called an "informant"—to be reliable.  If a reliable informant supplies the police officer with information about a crime, a court may issue a search warrant even though the police officer does not have personal knowledge of the crime.  In contrast, if the informant is not reliable, the court may not issue the warrant.

58.     Because reliability is essential to establishing probable cause in cases where a police officer does not have personal knowledge of a crime, applications for a warrant will often contain statements intended to establish the reliability of the informant—sometimes called the informant's "resume." For example, to establish reliability, an officer might state that he has known the informant for 15 months, that informant is experienced in the drug trade, and that the informant has previously provided reliable information to the police, etc.  Of course, if an officer

lies about informant's resume, the informant's reliability has never actually been established and the resulting warrant is invalid. If a warrant is invalid, then so too is any resulting arrest and period of detention—even if it lasts for years. As we shall see, that is exactly what happened in this case.

59.     Before Norton's lies and the invalid warrants in this case are discussed, however, it is important to address another matter: RPD's handling of confidential informants. A confidential informant is someone who provides tips to police officers about recent or ongoing crimes, but whose identity is known only to the police. Police officers often agree to keep an informant's identity secret because, if the identity were known to the public, the informant would be at risk of retaliation for helping the police. Thus, by promising informants confidentiality, the police are able to gather more information from the public.

60.     To preserve an informant's confidentiality, the RPD assigns each informant a "CI number," *e.g.,* "CI #123." ("CI" stands for "Confidential Informant.") When referring to the informant in a document, officers refer only to the informant by his CI number. Thus, if the document were to become public, no one could discern the true identity of the informant. A separate file—called the "master file"—contains a record of each informant's CI # and name.

61.     An informant will sometimes share information with the police without any expectation of personal gain, but more frequently, the informant seeks a benefit for his services. For example, if the police arrest somebody for a crime, that person might obtain a reduction in his charges (or avoid charges altogether) if he is willing to provide information to the police that will lead to the detection of an important crime. If an informant has not already been implicated in a crime, however, then the reduction or avoidance of charges would be of no interest to the

informant.  In these cases, police departments often offer cash payments to informants for providing useful information.

62.     The RPD maintains a supply of cash to pay informants.  If an officer believes that an informant has information that would be useful in solving a crime, the officer may negotiate a fee with the informant and then, using RPD cash, pay the informant.  In Richmond, fees tend to range from approximately $100 to $500.

63.     Obviously, if a police department is handing out hundreds of dollars of cash to police officers who then pay it to informants, it is important to maintain close controls on when and how the money is distributed.  In the Richmond Police Department, these controls take the form of a "Report of Expenditure of Special Investigative Funds."  Within the Department, this report is more commonly known as a "N-10 form."

64.     The RPD's N-10 form requires officers who work with informants to provide the CI number of informant being paid as well as the amount of money paid to the informant.  The N-10 form also requires that (1) the informant himself acknowledge receipt of the funds by signing his name and (2) a witness verify that the informant did in fact receive the funds and sign his name on the form. The witness's verification is indicated by the witness's own signature on the N-10 form.

65.     In addition to these requirements, the N-10 form requires the officer working with the informant to sign his or her own name and declare that "the information [contained in the N-10 form] is true and accurate."

66.      In sum, officers who desire to execute a search or seizure must, in circumstances relevant to this case, first obtain a warrant from a court. To obtain a warrant, the officer must demonstrate to the court that there is probable cause to believe that a crime is occurring or has

occurred. When an officer does not have personal knowledge of criminal activity, he or she may seek a warrant based on information provided by an informant—but only if the informant is *reliable*. If the informant is not reliable, or the officer has misrepresented the informant's identity, any resulting warrant is invalid. Informants that provide information to RPD officers may be paid for their services, but only after an N-10 form has been completed. The N-10 form contains the informant's CI number, the informant's signature, a witness's signature, and the officer's own signature.

### 2. Jason Norton's Fraudulent Warrant Scheme

67. Jason Norton had a reputation in the RPD for "producing"—i.e., for making lots of drug arrests. Norton's reputation, however, was not well earned. His reputation was based on a pack of lies.

68. Norton's lies involved his use of confidential informants. To obtain a court warrant, Norton routinely told courts that his knowledge of criminal activity derived from an informant. Norton knew, of course, that a warrant could only issue if he could establish the informant's reliability. Norton was apparently so eager to make arrests, and so unconcerned with people's rights, that he frequently lied when establishing his informants' reliability.

69. Norton's lies were of two types. In some warrant applications, he attempted to establish the *same informant's reliability using entirely different sets of facts* and in other warrant applications, he attempted to establish *different informants' reliability using the exact same set of facts*. The *Richmond Times-Dispatch*, in its coverage of Norton's misconduct described the problem thus: Norton's warrant applications had "differing résumés . . . for the same informant and identical résumés . . . for purportedly different informants."

70.     The inconsistencies were not isolated.  For example, Norton relied on the same informant in seven different warrant applications.  If the informant is the same, the facts establishing the informant's reliability should also be the same or nearly the same.  But the facts supporting the same informant—at least according to Norton's statements—were "wholly inconsistent." As Assistant Commonwealth Attorney Patrick Dorgan explained, "Generally speaking, this guy's résumé on the seven search warrants should be consistent. But you lay them out across the table and they're wholly inconsistent."

71.     In other instances, Norton did not give different "résumés" for the same informant; he gave "the exact same résumé for two completely different individuals."  As Dorgan explained during his investigation into Norton's scheme, "[y]ou put them side by side and it's exactly the same, to a T."  It is simply inconceivable that different informants would have the exact same indicia of reliability.  As one of Norton's colleagues put it, incredulously, "'[w]hat are the chances it's the exact same?'"

72.     In sum, Norton repeatedly lied in his applications for search warrants.  His lies concerned the identity and/or reliability of the confidential informants he offered to the court as evidence of probable cause.  In some cases, Norton provided different résumés for the same informant and in other instances provided the same résumé for different informants.  In either case, Norton was lying about identify or reliability of his informants.  As a result, warrants based on his lies were completely invalid, as were the arrests and detentions of the Plaintiffs in this case: Wilbur Ensley, Covey Andrews, Shamar Archer, Deunte Humphries, and Jamar Gilliam.

### C. Jason Norton's Fraudulent Arrest of Wilbur Ensley

73.     On January 20, 2009, state and federal officers arrested Wilbur Ensley at 16__

P____ Street in Richmond, Virginia. Ensley did not know it at the time, but his arrest was the

result of blatant lies by Jason Norton and thus completely unconstitutional.

74.     Earlier that day, Norton applied for and obtained a warrant to search 16__ P_____

Street.  In applying for the warrant, Norton swore to the court that a "reliable confidential

informant" told him that he "was inside 16__ P____ Street apartment A" and "observed two

black males" allegedly engaged in criminal activity.

75.     As required by the Constitution, Norton further explained to the court why his

informant was reliable.  As stated by Norton in his application,

> The confidential informant mentioned in this affidavit is considered reliable to this affiant
> based on information they have provided this affiant for the past six months. The
> confidential informant has provided this affiant with information regarding criminal
> activity that has been proven though independent police investigation. This confidential
> informant has provided this affiant information that led to the arrest of two (2) individuals
> wanted on outstanding warrants in the City of Richmond. The confidential informant has
> given information that had led to the arrest of three (3) individuals that were involved in
> the illegal drug trade. The confidential informant has provided this affiant with
> information that has led to the obtaining of three search warrants.  The search warrants
> have led to the arrest of five individuals and the seizure of illegal narcotics.  The
> confidential informant has made several controlled narcotic purchases.  Finally, the
> confidential informant has recognized individuals known to this affiant that sell illegal
> narcotics. The confidential informant has used cocaine and heroin in the past and is
> familiar with the way cocaine and heroin is packaged for street-level distribution. In
> addition, the confidential informant is familiar with the methods used by those who
> distribute street-level drugs.

76.     It is uncertain at this point who, if anyone, told Norton about alleged criminal

activity at 16__ P____ Street.  What is certain is that Norton attributed the information to "CI

#933," who, according to RPD records, is R. A.  What is also certain is that R. A. did *not* provide

any information to Norton about 16__ P_____ Street.  According to an FBI interview of R. A. in

connection with an investigation of Norton,

"[R. A.] was shown three photographs of a house at 16__ P_____ Street, Richmond, Virginia. . . . [R. A.] stated that he does not know who lives at 16___ P____ Street, does not go there, and does not associate with the individuals at that location. [R. A.] stated that he never called NORTON about drugs being stored inside 16__ P_____ Street and has never been there. [R. A.] stated that he never gave NORTON information on any houses for warrants."

77. Further evidence of Norton's fraud is evidenced on the N-10 form itself. The N-10 form associated with the search of 16__ P_____ Street indicates that "CI #933" provided Norton with information about criminal activity at the house. As noted above, an informant who receives payment for his assistance must sign an N-10 form acknowledging the payment. According to an FBI investigation, the informant's signature on the N-10 "did not look anything like" R. A.'s signature and, when R. A. was asked whether he signed the form, he responded plainly, "'no sir.'"

78. Another suspicious aspect of the N-10 form is the witness's verification of the payment. The witness on the N-10 form is Officer Brandon Black. When shown the form, Officer Black stated that the signature was his but that the date and time were not his. This information was probably filled in later, which, as we shall see, was apparently a common and troubling practice at the RPD. As another RPD officer told the FBI during an investigation into Norton's frauds, **"all the officers in the RPD Narcotics Department have [signed the N-10] form without being present during the payment of money to the source."** (Emphasis added.) Thus, because Black did not appear to witness the payment of money to the informant, and the informant's signature is forged, it is unclear who actually received the $500 payment indicated on the N-10 form. Indeed, it is quite possible that Norton simply pocketed the money himself. When the FBI asked one of Norton's fellow officers whether Norton might keep a payment instead of passing it on to an informant, the officer replied "I totally believe that could happen."

79.     Beyond these problems lies the additional problem that large portions of CI

#933's resume in the warrant application for 16__ P_____ Street were identical to the resume of

at least one other informant. The chart below compares the resume for CI #933, as stated by

Norton on January 20, 2009, with the resume for CI #757, as stated by Norton on October 9,

2009.  Different informants should have different resumes, but as the chart below shows, Norton

provided almost the exact identical resume for both informants.  The only difference (the length

of the relationship) is underlined and bolded.

| Norton's description of CI #933's reliability on January 20, 2009 | Norton's description of CI #757's reliability on October 8, 2009 |
|---|---|
| The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant for the past **six months**. | The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant for the past **ten months**. |
| The confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. | The confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. |
| This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. | This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. |
| The confidential informant has given information that has led to the arrest of three (3) individuals that were involved in the illegal drug trade. | The confidential informant has given information that has led to the arrest of three (3) individuals that were involved in the illegal drug trade. |
| The confidential informant has provided this affiant with information that has led to the obtaining of three search warrants. | The confidential informant has provided this affiant with information that has led to the obtaining of three search warrants. |
| The search warrants have led to the arrest of five individuals and the seizure of illegal narcotics. | The search warrants have led to the arrest of five individuals and the seizure of illegal narcotics. |
| The confidential informant has made several controlled narcotic purchases. | The confidential informant has made several controlled narcotic purchases. |

| Finally, the confidential informant has recognized individuals known to this affiant that sell illegal narcotics. | Finally, the confidential informant has recognized individuals known to this affiant that sell illegal narcotics. |
|---|---|
| The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. | The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. |
| In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs. | In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs. |

80.     Finally, not only did Norton describe CI #933 in ways substantially similar to other informants, he also described CI #933 in different ways in different warrant applications. For example, in a warrant application on September 11, 2009—about 8 months after the Ensley warrant application—Norton stated that CI #933 provided him information about illegal activity. In describing CI #933's reliability, however, Norton stated that he had relied on the informant "for over two years."  If this was true, however, it would have meant that his relationship with the informant at the time of Ensley's warrant application had lasted over sixteen months, not "six months," which is what Norton stated in the warrant application.  Additionally, in the September 11, 2009 warrant application, Norton stated that his informant had provided information leading to the arrests of 16 persons and the searches of "fourteen dwellings."  But 8 months earlier in the Ensley warrant application, Norton stated that his informant had only provided information leading to the arrests of five persons and a search of three dwellings.  Finally, in the September 11, 2009 warrant application, Norton stated that the informant provided information leading to "the arrest in two homicide cases."  No such information was included in the warrant application leading to Ensley's arrest.

81.     One might wonder whether the additional warrants and arrests listed on CI #933's resume in September 2009 simply reflected the passage of time, not lies and exaggerations by

Norton.  That is, perhaps the informant's more robust resume in September reflected his significant assistance over the previous eight months.  The problem with this inference, however, is that, during those eight months, CI #933 is listed on only two warrants, one on July 28, 2009 for 58__ B_____ Ct. (which yielded one arrest) and another on September 4 for 32__ __ Ave. (which yielded one arrest).  Thus, there are no records whatsoever establishing such extensive assistance.  Moreover, the signatures on the N-10 of the July 28 and September 4 warrants are most definitely not R. A.'s—they appear to be that of "J. C.", who will be addressed later in this Complaint.

82.     Knowing nothing about all these misrepresentations, the judge granted Norton's request for a search warrant of 16__ P_____ Street.  Norton and other Richmond Police Officers, as well as some federal officials with the Bureau of Alcohol, Tobacco and Firearms, executed the search warrant late in the evening of January 20, 2009. While executing the warrant, they discovered contraband and arrested Wilbur Ensley, who was present during the search and resided at the address.

83.     Federal criminal proceedings were soon instituted against Ensley.  During the course of these proceedings, Norton never told anyone about his lies.  Had he done so, the case against Ensley would have immediately fallen apart.  Indeed, once Norton's lies were discovered, that is exactly what happened.

84.     Having no knowledge that his constitutional rights had been violated, Ensley pled guilty in federal court on April 13, 2009.

85.     Because the crimes to which he unnecessarily pled guilty carried a long prison sentence, Ensley sought to cooperate with the federal government in return for the government's recommendation of a reduced sentence.  During an interview with Ensley, federal prosecutors

asked Ensley to confirm that he knew the informant listed on Norton's affidavit—C.I. # 933 or R. A.  Ensley told federal officials that he did not know R. A.  Tragically, and ironically, the prosecutors concluded that Ensley's denial was a lie because Norton had sworn under oath that R. A. was the informant.  Believing Ensley to be dishonest, the prosecutors refused to recommend a reduction in Ensley's sentence.  Soon thereafter, United States District Judge Henry E. Hudson sentenced Ensley to 262 months in prison with a 5-year term of supervised release to follow.

86.     Some time later, Norton's lies were discovered by officials outside of the Richmond Police Department. What came to light was a vast and long-standing fraud in Norton's applications for search warrants as well as extraordinary failures in RPD's management of the search-warrant process and process of rectifying the wrongs that had already been committed.

87.     Using this information, an attorney for Ensley filed a habeas corpus petition.  In the petition, Ensley's attorney argued that his guilty plea was the product of fraud and thus invalid.  The evidence was so clear in Ensley's favor that the federal government not only *did not contest* Ensley's petition but actually *joined* in his request.  As Judge Henry Hudson explained it in his opinion:

> The United States, after conducting a thorough investigation, offers no objection to the relief sought by Ensley. The government concedes that there is a high probability that critical information contained in the search warrant affidavit is false and that it is material to a finding of probable cause. The government therefore joins in Ensley's motion to withdraw his guilty plea in this case.

88.     In his opinion, Judge Hudson did not discuss whether Ensley was, in fact, guilty of the charges against him.  Ensley's guilt, if any, was immaterial given the fact that his arrest

was based on a pack of lies by Norton. Ensley's arrest was unconstitutional, Judge Hudson observed, and the Constitution thus requires his release.

89.     On or about April 2, 2015, Wilbur Ensley finally walked out of prison a free man. Were it not for Jason Norton's willful and malicious lies on January 20, 2009, his continual failure to disclose the truth over the succeeding years, and the Richmond Police Department's woeful mismanagement, Ensley's unconstitutional arrest and detention would have never occurred. Instead, he spent 2,265 days in jail.

### D. Jason Norton's Fraudulent Arrest of Covey Andrews

90.     In September 2009, while Wilbur Ensley was sitting in jail in violation of his constitutional rights, Jason Norton was still working as a detective for the RPD and, as we shall see, perpetrating the same unconstitutional frauds.

91.     On or about September 11, 2009, Norton came to believe that contraband was located in a silver Mercedes Benz parked at 30_ J_____ St. in Richmond. But just as in Wilbur Ensley's case, Norton had a problem. He apparently lacked a credible informant to whom to attribute his knowledge. According to the Constitution and state law, this meant that Norton could not obtain a search warrant.

92.     But this did not stop Norton. As in Ensley's case, Norton simply lied to the judge. Norton told the judge that a "reliable" informant told him about the contraband in the car. To evidence this reliability, Norton further stated that:

> "The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided to this affiant. The confidential informant has been deemed reliable to this affiant for over two years. The confidential informant has provided this affiant with information that has been proven through independent police investigation. This confidential informant has provided this affiant with information regarding the location of illegal drugs that has led to the seizure of those drugs. The confidential informant has also provided this affiant with information regarding the location of firearms that were recovered and seized by this affiant. The

confidential informant has provided this affiant with information that led to the arrest of six (6) individuals wanted on outstanding warrants in the City of Richmond. The confidential informant has provided information that has led to the obtaining of search warrants for ten individuals. Those search warrants have led to the seizure of illegal narcotics and arrests of all ten individuals. The confidential informant has given information that has led to the obtaining of search warrants for fourteen dwellings. Those search warrants have led to the seizure of illegal narcotics and firearms. The arrests that have been made as a result of the warrants have gained convictions in Richmond General District, Richmond Circuit and Federal Courts. The confidential informant has purchased and distributed illegal narcotics in the past. The confidential informant can identify the way that illegal narcotics are packaged. The confidential informant has provided information that has led to the arrest in two homicide cases."

These statements would tend to establish the reliability of the informant, *if they were true.* But they were not true; they were intentional lies.

93.     The false nature of these statements is evidenced in many ways. First, on the N-10 form signed by Norton the same day as the request for a search warrant, Norton stated that his informant was "CI #933," who, as noted above, is R. A. But the informant's signature on the N-10 form is most certainly *not* R. A.'s. Rather, the signature (which is legible) appears to be that of "J. C." But when the FBI interviewed J. C., "[J. C.] stated that he did not provide information on a silver Benz in Brookland Park. [J. C.] stated, 'that's not me,' that he did not sign the N-10 form on 9/16/2009."

94.     It is unclear at this point who, if anyone, provided Norton with information about the silver Mercedes Benz identified in the warrant application. What is known is that (1) Norton attributed his knowledge to R. A., (2) stated on the N-10 form that he paid J. C. (though J. C. denies providing information to Norton or receiving money), and (3) somebody forged J. C.'s signature.

95.     Further evidence of the falsity of the warrant application leading to Andrew's arrest is the fact that Norton described CI #933 in dramatically different terms than he had

previously described him in his January 20, 2009 warrant application (which led to the arrest of

Wilbur Ensley).  As explained above (see paragraph 80),

- In the January 2009 warrant application, Norton stated that he had been working
  with the informant for six months, but in the September 2009 warrant application,
  he stated that he had been working with the informant for over two years.

- In the January 2009 warrant application, Norton stated that the informant had
  provided information leading to the issuance of three search warrants and five
  arrests, but in the September 2009 warrant application, he stated that the
  informant had provided information leading to the issuance of fourteen search
  warrants and the arrest of sixteen persons. The additional warrants and arrests
  cited in the September 2009 warrant application are unsupported by any RPD
  records.  Those records show that CI #933 provided information leading only to
  two warrants and two arrests during this eight-month period.

- In the January 2009 warrant application, Norton did not indicate that the
  informant had provided any information leading to arrests in homicide cases, but
  in the September 2009 warrant application, he stated that the informant had
  provided information leading to two arrests in homicide cases.  There are no
  available records confirming the informant's assistance in homicide cases
  between January 2009 and September 2009.

96.    Because these frauds were unknown to the court considering Norton's request for

a warrant, the court issued the warrant on September 11, 2009.  Norton searched the Mercedes

that same day and allegedly discovered contraband.  Covey Andrews, who was in possession of

the Mercedes, was arrested that same day.  On October 19, 2009, federal prosecutors indicted

Andrews on several charges in United States District Court in Richmond.  Andrews, never

knowing about the fraudulent nature of his arrest, pleaded guilty on December 22, 2009 and then

was sentenced to 90 months in jail on March 22, 2010.

97.    Some time after his fraudulent arrest, federal officials discovered inconsistencies

in Norton's descriptions of his confidential informants.  An investigation ensued and Covey,

through a court-appointed attorney, filed a petition for habeas corpus on August 12, 2014.  In his

petition, Andrews made the same argument as Ensley—namely, that his guilty plea was the

product of fraud and thus invalid. Also similar to Ensley's case, the federal government found the evidence so compelling that it did not contest Andrews petition. Instead, the government "join[ed] in Andrews's motion" and explicitly "concede[d] that there is a high probability that critical information contained in the search warrant affidavit is false and that it is material to a finding of probable cause."

98.     On April 1, 2015, U.S. District Court Judge Henry Hudson granted Andrews's request to withdraw his guilty plea. The next day, April 2, 2015, after spending 2,035 days in jail in violation of his constitutional rights, Covey Andrews walked out of jail a free man. Were it not for Jason Norton's lies on September 11, 2009, his continual failure to disclose the truth over the succeeding years, and the failures of others in the Richmond Police Department, Andrews would not have suffered this egregious and lengthy violation of his rights.

### E. Jason Norton's Fraudulent Arrest of Shamar Archer

99.     On October 8, 2009, while Wilbur Ensley and Covey Andrews were both sitting in jail in violation of their constitutional rights, Jason Norton was still out on the street. On this particular day, he was again seeking a search warrant and, again, lying to get it.

100.     This time, Norton wished to search a dwelling located at 72_ A_____ Ave. Like he had done before, Norton applied for a search warrant based on information he allegedly received from a confidential informant. In his application for a warrant, Norton attempted to establish the reliability of his informant by stating the following:

> The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant for the past ten months. The confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. The confidential informant has given information that has led to the arrest of three (3) individuals that were involved in the illegal drug trade. The confidential informant has

provided this affiant with information that has led to the obtaining of three search warrants. The search warrants have led to the arrest of five individuals and the seizure of illegal narcotics. The confidential informant has made several controlled narcotic purchases. Finally, the confidential informant has recognized individuals known to this affiant that sell illegal narcotics. The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs.

101. As with his prior statements in other warrant applications, these statements to establish the reliability of his informant were intentional lies. The N-10 form associated with this warrant states that the informant is CI# 757, who is "J. D." Unlike the N-10 forms discussed in Ensley and Andrews's cases, above, the informant's signature on this N-10 form does appear to say "[J. D.]" It turns out, however, the signature was forged.

102. When the FBI interviewed J. D., however, he flatly denied any involvement in the case or signing the form. According to FBI notes of an interview with J. D.,

[J. D.] was shown a photograph of [72_ A_____ Avenue], Richmond, Virginia. [J. D.] stated that, "naw" that he had never been inside the home. [J. D.] stated that he does not know anyone who ever lived at that location. [J. D.] stated that he never provided information that someone was dirty inside the house. [J. D.] knew of the general location of the house. [J. D.] was shown a photograph of the intersection at [A_____ Ave.] and [L_____ Avenue]. [J.D.] stated that [N_____ Avenue] is behind [A_____ Avenue].

[J. D.] was shown a RPD N-10 form, Report of the Expenditure of Special Investigative Funds, dated 10/16/2009. [J. D.] stated that he did not remember the document. [J. D.] stated that the signature on the form did not look like his signature. [J. D.] could not remember being paid $250 on 10/16/2009.

[J. D.] stated that most of the information he provided to NORTON was regarding activity occurring on street corners. [J. D.] does not remember giving any information on specific houses. [J. D.] gave information to NORTON on guys driving in certain cars.

103. J. D.'s statements are not the only reason to doubt the veracity of Norton's application for a warrant to search 72_ A_____ Ave. Norton's description of his informant's reliability reveals two deeply troubling problems.

104.     First, Norton's description of J. D.'s reliability in his October 9, 2009 warrant application is *significantly similar* to Norton's descriptions of *at least one other informant's reliability*.  These similarities were recounted in a chart above, but bear repeating here.  If a resume pertains to a real person, it should be different from other resumes.  But the resume Norton provided for CI #757 on October 9, 2009 was almost exactly the same as the resume Norton provided for CI #933 on January 20, 2009.

| Norton's description of CI #757's reliability on October 8, 2009 | Norton's description of CI #933's reliability on January 20, 2009 |
|---|---|
| The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information that they have provided this affiant for the past **ten months**. | The confidential informant mentioned in this affidavit is considered reliable to this affiant based on the information they have provided to this affiant for the past **six months**. |
| The confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. | The confidential informant has provided this affiant with information regarding criminal activity that has been proven though independent police investigation. |
| This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. | This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. |
| The confidential informant has given information that has led to the arrest of three (3) individuals that were involved in the illegal drug trade. | The confidential informant has given information that has led to the arrest of three (3) individuals that were involved in the illegal drug trade. |
| The confidential informant has provided this affiant with information that has led to the obtaining of three search warrants. | The confidential informant has provided this affiant with information that has led to the obtaining of three search warrants. |
| The search warrants have led to the arrest of five individuals and the seizure of illegal narcotics. | The search warrants have led to the arrest of five individuals and the seizure of illegal narcotics. |
| The confidential informant has made several controlled narcotic purchases. | The confidential informant has made several controlled narcotic purchases. |
| Finally, the confidential informant has recognized individuals known to this affiant | Finally, the confidential informant has recognized individuals known to this affiant |

| | |
|---|---|
| that sell illegal narcotics. | that sell illegal narcotics. |
| The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. | The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. |
| In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs. | In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs. |

105.    Second, consider the *dissimilarity* between two warrant applications allegedly involving the same informant.  The same informant should have the same resume, or at least a resume that logically changes over time.  The chart below shows how Norton described CI #757 on three different occasions over 2 ½ years.

| Norton's description of CI #757's reliability on October 8, 2009 | Norton's description of CI #757's reliability on March 30, 2010 | Norton's description of CI #757's reliability on February 23, 2012 |
|---|---|---|
| The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant for the past **ten months**. | The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant for the past **two years**. | The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant for the past **two years**. |
| The confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. | The confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. | The confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. |
| This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. | This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. | This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. |
| The confidential informant has | The confidential informant has | The confidential informant |

| | | |
|---|---|---|
| given information that has led to the arrest of **three (3)** individuals that were involved in the illegal drug trade. | given information that has led to the arrest of **thirteen (13)** individuals that were involved in the illegal drug trade. | has given information that has led to the arrest of **six (6)** individuals that were involved in the illegal drug trade. |
| The confidential informant has provided this affiant with information that has led to the obtaining of **three** search warrants. | The confidential informant has provided this affiant with information that has led to the obtaining of **three** search warrants. | The confidential informant has provided this affiant with information that has led to the obtaining of **two** search warrants. |
| The search warrants have led to the arrest of **five** individuals and the seizure of illegal narcotics. | The search warrants have led to the arrest of **five** individuals and the seizure of illegal narcotics. | The search warrants have led to the arrest of **three** individuals and the seizure of illegal narcotics. |
| | **Those arrests have gained convictions in Federal and State Courts.** | **Those arrests have gained convictions in Federal and State Courts.** |
| The confidential informant has made several controlled narcotic purchases. | The confidential informant has made several controlled narcotic purchases. | The confidential informant has made several controlled narcotic purchases. |
| Finally, the confidential informant has recognized individuals known to this affiant that sell illegal narcotics. | Finally, the confidential informant has recognized individuals known to this affiant that sell illegal narcotics. | Finally, the confidential informant has recognized individuals known to this affiant that sell illegal narcotics. |
| The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. | The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. | The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. |
| In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs. | In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs. | In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs. |

106.     The similarities and differences among the resumes are telling.  First, according to the October 2009 resume, Norton had a 10-month relationship with the informant, but just six months later, according to the March 2010 resume, that relationship had suddenly increased to two years.  And somehow, 23 months later, according to the February 2012 resume, the

relationship had not lengthened at all, but was still only two years in duration. Second, the October 2009 resume states CI #757 provided information that led to the arrest of three individuals involved in the illegal drug trade, but just six months later, the March 2010 resume states that CI #757 had provided information leading to the arrest of thirteen such individuals. Somehow, however, CI #757's resume had deteriorated by the time Norton applied for a warrant in February 2012. At that time, CI #757 had only provided information leading to the arrest of six individuals. Third, according to the October 2009 and March 2010 resumes, CI #757 provided information leading to the obtaining of three search warrants, but by February 2012, CI #757 had only provided information leading to the obtaining two search warrants. Fourth, according to the October 2009 and March 2010 resumes, CI #757's assistance in obtaining warrants led to the arrest of five individuals, but according to the February 2012 resume, written 23 months later, CI #757's assistance in obtaining warrants only led to the arrest of three individuals.

107. The unexpected similarities and dissimilarities in warrant applications, combined with J. D's denial that he had anything to do with the warrant to search 72_ A_____ Ave., strongly suggests that Norton, like he had done on prior occasions, simply made up the identity and/or resume of his informant—if an informant even existed. Such misconduct unequivocally violated the United States Constitution and state law.

108. Not knowing anything about Norton's constitutional violations, the court granted Norton's request for a search warrant. The warrant was executed on October 9, 2009 and Shamar Archer, who resided at the address, was arrested during the execution of the warrant.

109. Archer was indicted in the United States District Court for the District of Richmond on December 14, 2009 and pled guilty to several drug crimes on March 26, 2010. On June 25, 2010, Archer was sentenced Archer to 37 months in prison.

110. As occurred in the cases of Wilbur Ensley and Covey Andrews, problems with Norton's warrant applications were later discovered. Although Archer had been released October 21, 2012, he was still subject to various legal restrictions on his liberty. To void these restrictions and clear his record of prior charges, an attorney for Archer asked a federal court on September 18, 2014 to void Archer's guilty plea. As the court did with regard to Ensley's and Andrews' convictions, the federal court voided Archer's plea on April 1, 2015.

111. On April 2, 2015, restrictions on Archer's liberty were finally removed and his record was cleared of his March 26, 2010 guilty plea. This justice came too late for Archer, however, who had served 1,006 days in prison—all in violation of his constitutional rights. Were it not for Jason Norton's lies on October 8, 2009, his continual failure to disclose the truth over the succeeding years, and the failures of others in the Richmond Police Department, Archer would not have suffered this egregious and lengthy violation of his rights.

**E. Jason Norton's Fraudulent Arrest of Deunte Humphries and Jamar Gilliam**

112. On February 23, 2012, while Wibur Ensley, Covey Andrews, and Shamar Archer were all still subject to unconstitutional restrictions on their rights, Detective Norton was still free and collecting a paycheck from the Richmond Police Department. On this particular day, he was seeking a warrant to search a dwelling located at 33__ __ Ave. in Richmond, Virginia. As in the instances described above, Norton lied to the court to obtain a search warrant. This time, his lies led to the arrests of Deunte Humphries and Jamar Gilliam.

113.    To search the dwelling located at 33__ ___ Ave., Norton swore to a judge that an informant told him that he (the informant) was inside the dwelling in the past several days and observed three persons engaged in the unlawful sale of drugs.  Of course, to obtain a search warrant based on the informant's tips, Norton was required to establish the informant's reliability.  To do so, Norton stated as follows:

> The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant for the past two years.  The confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond.  The confidential informant has given information that has led to the arrest of six (6) individuals that were involved in the illegal drug trade.  The confidential informant has provided this affiant with information that has led to the obtaining of two search warrants.  The search warrants have led to the arrest of three individuals and the seizure of illegal narcotics.  Those arrests have gained convictions in Federal and State Courts. The confidential informant has made several controlled narcotic purchases.  Finally, the confidential informant has recognized individuals known to this affiant that sell illegal narcotics.  The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution.  In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs.

As in the other warrant applications discussed above, this application was also based on deliberate falsehoods.

114.    The most glaring evidence of falsity, as with Norton's previous frauds, lies in an analysis of his descriptions of his informant's resume.  In this case, Norton indicated on the N-10 form that his informant for the warrant was CI #757.  But Norton's description of his informant in this warrant application was (1) inconsistent with other descriptions of CI #757 and (2) unexpectedly consistent with descriptions of other informants.

115.    When CI #757's February 23 resume is compared to other CI #757 resumes, it is revealed as a fraud. This problem has already been described in paragraphs 105-106, but to reiterate, that comparison shows that (1) the length of the relationship with the informant is very

likely false, (2) the number of arrests facilitated by the informant is very likely false, (3) the number of search warrants facilitated by the informant is very likely false, and (4) the number of arrests stemming from the search warrants is very likely false.

116.    Not only is CI #757's February 23, 2012 resume inconsistent with other CI #757 resumes, it is unexpectedly consistent with at least one other informant's resume.  Consider the chart below, which compares CI #757's resume on February 23, 2012 with CI #1166's resume on July 7, 2012.

| Norton's description of CI #757's reliability on February 23, 2012 | Norton's description of CI #1166's reliability on July 7, 2012 |
|---|---|
| The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant for the past two years. | The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant for the past two years. |
| The confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. | The confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. |
| This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. | This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. |
| The confidential informant has given information that has led to the arrest of six (6) individuals that were involved in the illegal drug trade. | The confidential informant has given information that has led to the arrest of six (6) individuals that were involved in the illegal drug trade. |
| The confidential informant has provided this affiant with information that has led to the obtaining of two search warrants. | The confidential informant has provided this affiant with information that has led to the obtaining of two search warrants. |

| | |
|---|---|
| The search warrants have led to the arrest of three individuals and the seizure of illegal narcotics. | The search warrants have led to the arrest of three individuals and the seizure of illegal narcotics. |
| Those arrests have gained convictions in Federal and State Courts. | Those arrests have gained convictions in Federal and State Courts. |
| The confidential informant has made several controlled narcotic purchases. | The confidential informant has made several controlled narcotic purchases. |
| Finally, the confidential informant has recognized individuals known to this affiant that sell illegal narcotics. | Finally, the confidential informant has recognized individuals known to this affiant that sell illegal narcotics. |
| The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. | The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. |
| In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs. | In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs. |

117. As the above chart reveals, the two resumes are *exactly* the same. But two different informants should never have the exact same resume. Thus, not only is CI #757's resume in the February 2012 affidavit inconsistent with other versions of #757's resumes, but it is also entirely consistent (which it should not be) with CI #1166's resume several months later.

118. Having no idea that the warrant application before him was fraudulent, a magistrate granted Norton's request for a warrant on February 23, 2012. Norton and others executed the warrant late that night or the following morning and, in the process, arrested Deunte Humphries and Jamar Gilliam, both of whom resided at the address.

119. Humphries and Gilliam were soon charged with various crimes in state court. On September 28, 2012, Humphries pled guilty to certain crimes. On November 19, 2012, a

Virginia court sentenced Humphries to 14 months in jail.  Gilliam also pled guilty to certain crimes, though his plea was on October 2, 2013.  A court sentenced Gilliam to 24 months in jail on November 6, 2013.  Had they known that the case against them was based on Norton's fraud, they would have never pled guilty.

120.    As noted above, Norton's frauds were eventually discovered and, on July 6, 2015, prosecutors took the uncommon step of asking the court to vacate Humphries' conviction. Richmond Circuit Court Judge W.R. Marchant granted this request on August 3, 2015 and Humphries, though already released from jail on June 12, 2013, had his record cleared of this unconstitutional arrest.  Still, having his record cleared did not undo the 311 days he spent in jail in violation of his rights.  In Gilliam's case, prosecutors asked the court to vacate his conviction on July 1, 2015 and the court granted this request on the same day.  The vacation was a welcome relief for Gilliam, but it did not give him back a single day of the 603 days he was unlawfully detained in jail.  Were it not for Jason Norton's lies on February 23, 2012, his continual failure to disclose the truth over the succeeding years, and the failures of others in the Richmond Police Department, Humphries and Gilliam would not have suffered this egregious and lengthy violation of their rights.

**F. The Richmond Police Department's Involvement in Norton's Misconduct**

121.    Jason Norton was a bad cop, but not all bad cops wreak the havoc that Norton did. If a police department is operating properly, misconduct like Norton's will quickly be addressed and amends made.  But the RPD was not operating properly when it came to Norton. The Supervisory Defendants knew or should have known that Norton posed a serious risk of constitutional injury.  They had the opportunity to prevent or limit these harms but yet failed to

intervene in a timely and/or effective manner.  As a result of this failure, the Plaintiffs in this case suffered significant injury.

### 1.  Norton's Misconduct was Widely Known in the RPD.

122.　　Jason Norton, as has already been noted, was an officer with serious problems. He was corrupt, dishonest, and apparently unconcerned with the Constitution.  Norton's problems were not secret, however; they were known throughout the department.  Officer David Philips, for example, told the FBI that he "had heard rumors about NORTON from many people," and that "a lot of rumors about NORTON went around."  These rumors included the report "that NORTON would make up affidavit verbiage" to obtain search warrants.  But not all of Philip's knowledge came from others. In particular, he told the FBI that "NORTON's paperwork was, and always had been, **garbage**. NORTON's 'labs' would not come back in time and he lacked attention to detail." (Emphasis added.)

123.　　Regarding Norton's interactions with informants, Philips also reported that "NORTON was buddies with his informants."  Philips told FBI agents that he "had locked up 12 of his former informants but NORTON was too 'buddy' with informants."  As further evidence of Norton's misconduct, Philips stated to the FBI that "sometimes NORTON would pay sources years later."

124.　　NORTON's failure to follow procedure was known to other colleagues as well. In particular, Officer Gouchenour stated to the FBI that "NORTON failed to utilize a required RPD form when writing search warrants for people's cavities.  NORTON had never used the form before."  Additionally, Officer Jenkins told the FBI about an illegal search performed by Norton. According to Jenkins, "NORTON and a young officer went to the Days Inn on Dickens Road" to track down some suspects. Although Norton had no warrant, he "got the hotel manager to open a

door to one of the hotel rooms." Once the door was opened, "NORTON rushed the room and seized $55 and 2 ounces of marijuana without any "paper" (search warrant). No one was charged but the money and marijuana was put into evidence."

125. Similarly, Officer Brandon Black, another of Norton's colleagues, told the FBI about rumors swirling through the department. Black stated that he had "heard rumors and stories about NORTON regarding missing money, NORTON informing on other RPD officers to subjects, and NORTON being drunk at Shockoe Bottom."

126. Another example of how rumors spread about Norton involves his possible connection with Gang A. As noted above, while conducting surveillance of the gang, RPD detectives heard Norton's name mentioned as someone who could "supply[] or look[] after the guys in the gang." When Detective Juan Romero learned of this, he told Don Davenport, a supervisor, but the information spread further. Another officer, Paul Jenkins learned it as well. Jenkins then "told his Lieutenant that they [i.e., members of the gang unit] can't share information freely once NORTON is in the Gang Unit." An additional officer, David Philips, reported hearing this same information from Jenkins.

127. Further evidence of how Norton's problems were widely known involves Norton's long-time partner, Tommy O'Connell. According to FBI records, O'Connell "asked to stop working with NORTON because he was a sinking ship." This request, of course, would be made to a supervisor at some level above Norton and O'Connell. Thus, according to FBI records, at least one of Norton's supervisors was told of some of Norton's various problems—problems that were serious enough to characterize him as a "sinking ship."

128. Another important piece of information contained in the FBI reports concern Major Steve Drew, an RPD officer having significant supervisory responsibility within the

Department. During an FBI interview, Officer Paul Jenkins stated that he "heard second hand that Major STEVE DREW mentioned NORTON being salvageable." Norton, of course, was never "salvaged," but this information, combined with the evidence of rumors swirling through the department, confirms that Norton and his problems were widely known not just throughout the Department, but known to officers at the highest levels of the Department as well.

129.    A particularly powerful example of RPD's knowledge of Norton's troubles involves an RPD interview of R. A., one of Norton's informants. (As explained above, Norton had a relationship with R. A. and, after learning of a Task Force's plan to arrest him, tipped R. A. off of the planned arrest. Also, in the year prior to tipping R.A. off, Norton had fraudulently claimed that R. A. had informed him of criminal activity, thus allowing Norton to obtain a search warrant.) The interview was conducted by RPD Officer Tim Wyatt and occurred while R. A. was in the hospital. The interview concerned "[R. A.'s] relationship with Norton," was audio recorded, and then "given to 'IAD' (Internal Affairs Department)." This shows RPD officials understood the interview to raise serious concerns about Norton.

130.    In fact, it appears likely that an IAD officer or officers were involved in the interview. In a subsequent statement to the FBI, RPD Officer Paul Jenkins stated that he and "Detective Christina Kenney waited outside" the hospital room "since they weren't part of IAD." Jenkins went on to reveal, alarmingly, that "KENNEY was told by a Sergeant with [RPD] to keep information about [R. A.] and Norton to herself."

131.    The exact date of this hospital interview is not yet certain, though it almost certainly occurred well before July 2012 because Officer Tim Wyatt, who conducted the interview, was transferred out of the Norton's department at that point. Indeed, there is good reason to think it occurred much earlier. In his November 2012 statement to the FBI regarding

the hospital interview, Officer Jenkins stated that he learned about Norton's relationship with R. A. "[l]ast year," and then, in the very next paragraph, explained the hospital interview. This leads to the reasonable inference that the interview happened in 2011.

132.    There is yet more reason to think that RPD supervisors knew of Norton's corrupt relationship with R.A. by 2011 or even earlier. As explained above in the Complaint, FBI agents had observed highly suspicious conduct by Norton with regard to R. A. in April 2010. Norton appeared to FBI agents at the time to be reluctant to arrest R. A., who had been observed selling cocaine. Indeed, R. A. expressed his surprise at the arrest, telling the arresting officers that "My man Norton said things are cool." Importantly, these events were recorded in the files of the RAVE Task Force, which was a joint task force between the FBI and the RPD. Thus, these disturbing events, upon information and belief, were thus made part of official RPD files in April 2010. Further, if the officers saw reason to record the events in such detail, there is a very strong likelihood that such matters were discussed with one or more of Norton's supervisors.

### 2.    Norton's Formal Reprimands

133.    Beyond all of this evidence, there is still additional evidence that Norton's misconduct was known by his supervisors. As noted above, on March 25, 2011, Norton was formally reprimanded for misconduct involving informants. One reprimand related to misconduct in February 2009 in which Norton observed a "hand to hand" drug buy, detained the individuals involved in the buy, and confiscated the drugs (marijuana and cocaine). In violation of Department policy, however, Norton did not arrest or seek charges against the persons. This behavior, of course, is consistent with the misconduct recounted above involving Norton's seizure of drugs and money, but not arresting those persons or providing a receipt to the persons for the items seized.

134.     What is especially troubling about this reprimand is Norton's explanation for his misconduct. Norton "stated that he may have been attempting to use the individual as an informant." Informants can, and are, used in such situations, but informants must first be registered with the RPD. As noted above, informants must be established as "reliable" to pass constitutional muster. According to the reprimand, neither of those two individuals were "registered as an informant." This reprimand thus shows that, as early as 2009, Norton was attempting to use informants who had not been established as reliable.

135.     The above reprimand was not the only one issued on March 25, 2011, however. Norton was also reprimanded that day for misconduct related to the handling of informants in July 2010. Norton's misconduct came to light when forged signatures were found on several N-10 forms. According to an internal investigation conducted by the RPD, the informant signatures on two N-10 forms "did not match" the signatures on the rest of the N-10 forms for that informant. Just as troubling, a signature on at least one N-10 form had a "name that did not match up" with the informant listed on the form. Thus, as of March 2011, the RPD knew of Norton's involvement in forged signatures on N-10 forms, and thus, also knew that Norton had likely lied about his sources in applying for warrants.

136.     The misconduct noted in these two reprimands would have been known to the Chief of Police at some point before March 25, 2011. According to RPD General Order 1-16, a reprimand is a "Disciplinary Action" and "the Chief of Police is the final decision maker on all discipline." Thus, in 2011 when the reprimand was issued, Defendant Norwood would have known that Norton had, as far back as 2009, been attempting to use unregistered informants. Even if the reprimand was not brought to Defendant Norwood's attention pursuant to General Order 1-16, it is reasonable to conclude that Defendant Norwood and the other Supervisory

Defendants were aware or should have been aware of such misconduct. Lies of the sort perpetrated by Norton are some of the most serious violations that a law enforcement officer can commit. They amount to intentional violations of the fundamental rights officers are sworn to uphold. Any police department that takes seriously its duty to protect citizens from lawless behavior would certainly make sure that misconduct like Norton's was closely evaluated at the highest levels of departmental leadership. Were the Supervisory Defendants to contend that they were unaware of the misconduct identified in the March 25, 2011 reprimands, it would be a shocking admission that Norwood and his closest advisors were unable to protect the citizens of Richmond from lawless conduct like Norton's.

137.     Further evidence of RPD's knowledge—and tolerance—of Norton's problems comes from Norton's partner, Bruce Gochenour. Like many of Norton's other colleagues, Gochenour thought that Norton was "flying too fast and too loose." "NORTON had a lot of informants," Gochenour told FBI investigators. "NORTON's desk was littered with notes of information he received from informants," causing Gochenour to wonder how Norton "could track all the reporting." (This same problem was noted by Officer David Philips, who told the FBI that "NORTON's paperwork was, and always had been, garbage.") Gochenour tried to help Norton by giving him a spreadsheet, but Gochenour thought the real problem probably lied with management. According to the FBI investigation, Gochenour "blamed RPD management for NORTON's situation. GOCHENOUR stated that NORTON was producing for management so they let him hang himself."

138.     Additional evidence of the Supervisory Defendant's knowledge is the fact that the FBI began investigating Norton by at least October 2012, and probably several months earlier. This investigation included interviews with RPD officers about the misconduct detailed in this

Complaint. Because of this, the Supervisory Defendants either knew or should have known by sometime in the late summer or early fall of 2012 that evidence of Norton's misconduct was so significant that the federal government had begun an investigation into Norton. Yet, for whatever reason, no state-level investigation of Norton was apparently begun until *after* the federal investigation had concluded in the spring of 2015.

### 3. Systemic Problems in RPD's Confidential Informant Program

139. Beyond Norton's widespread (and well-earned) reputation for corruption and dishonesty, as well as his two reprimands for lying about informants, is another factor contributing to RPD's liability for the injuries in this case: the Supervisory Defendants actual or constructive knowledge of egregious problems in RPD's confidential informant program.

140. As explained above, the RPD tracked officer payments to informants using an N-10 form. To prevent corruption, the RPD requires that payments to informants be witnessed by a second officer. That officer must sign the N-10 form, thus indicating that he or she witnessed the payment. If officers sign the form without actually witnessing a payment, a fundamental check on the integrity of the use of informants is lost. Without this check, violations of law would be bound to happen. And that is exactly what happened within the RPD.

141. For example, in 2009, Norton alleged seven different times that his informant was C.I. # 933, also known as "R. A." Norton sought funds to pay R. A. and thus had to complete N-10 forms. To complete the form, Norton had to obtain a signature from R. A. acknowledging receipt of the funds, a signature of a fellow officer (acting as witness) and a third signature of a police supervisor. However, the N-10 forms Norton submitted regarding R. A. contain signatures of individuals other than R.A. and some signatures were of the same name but in different handwriting styles. And yet, the forms were apparently witnessed by a fellow officer

and approved by Norton's supervisor.  It thus appears that Norton could practically conjure up his informants out of thin air.

142.    During its investigation, the FBI discovered that this problem with N-10 forms was widespread.  In an interview with FBI agents, Officer David Philips, "stated that **all the officers in the RPD Narcotics department have done what PHILIPS did**, where he signed a form without being present during the payment of money to the source.  PHILIPS stated that the RPD has changed this practice since NORTON.  . . .  PHILIPS stated that more times than naught, NORTON just gave PHILIPS paper and PHILIPS would sign the document without witnessing the payment to the source."  (Emphasis added.)  This practice is confirmed by Brandon Black, another officer who worked with Norton and confidential informants.  When asked about his signature on a particular N-10 form, Black told the FBI that "the signature on the N-10 payment form was his but the date and time do not appear to be BLACK's handwriting.  BLACK stated that he puts '01' for January instead of just '1' and Black has a dash in the middle of his 7s."  In Black's opinion, therefore, he signed the form but *did not enter a date or time.* Of course, if the would-be "witness" signs the N-10 before any payment has been made, he would have no way of knowing the correct date and time to put on the form.  The date and time would have to be filled in later by someone other than the witness.  That explains why Black believed the signature was his own but not the date and time.

143.    What Philips identified (and Black provided an example of) was a **systematic failure in the integrity of RPD's confidential informant program.**  Philips did not say that one or two officers had done what he did; rather, he stated that "*all the officers* in the RPD Narcotics department have . . . signed a form without being present during the payment of money to the source." (Emphasis added.) A failure of this magnitude would have been known to the

Supervisory Defendants.  Indeed, Philips noted that "The RPD has changed this practice since NORTON," which suggests that the Supervisory Defendants knew a change was necessary. Even if the systemic failure was not actually known, however, it should have been known to these supervisors.  A practice engaged in by such a large number of officers would have been noticeable to any reasonable supervisor.

144.     The widespread custom of lying on N-10 forms (i.e., of signing the form without witnessing a payment) was not RPD's only problem related to informants.  According to Defendant Brian Corrigan, who was asked to clean up the RPD's confidential information program in August 2012, there were serious problems in the program. The problems chiefly related to the RPD's failure to maintain accurate records of informants and the assistance they provided.

145.     For example, one way in which the RPD purported to attempt to keep track of informants was through "resume sheets."  If an informant provided assistance in a particular circumstance (e.g., provided information leading to a search warrant), the assistance was supposed to be added to the informant's resume by the creation of a "resume sheet."  Resume sheets were thus the key way in which the RPD was supposed to be able to verify whether its officers presented accurate resumes to courts in warrant applications.  When asked about the actual use of resume sheets in real practice, however, Corrigan testified that when placed in charge of the program in August 2012, "I found that resume sheets weren't being utilized, so I implemented them right away."  Thus, the RPD's confidential informant program systematically failed to keep track of how informants assisted police officers and thus did not provide basic checks on officer integrity.

146.     Corrigan's requirement that resume sheets actually be used in real practice was not his only reform.  After he arrived, he testified that he "tightened the reigns" on the program, making other reforms.  Elaborating on this, he stated:

> "I mean, I audit the CIs monthly which means if the CI is inactive and hasn't done anything for a six-month period, I make them inactive which means they're eligible to be used, but I declare them inactive. I have a locked storeroom of file folders, CI master files that are listed as active, inactive and deactivated.  And I will declare them inactive. And I think one of the things was that there were so – there's an abundance of informants, and I wanted to narrow the number of active informants down.  And I've gotten – I mean, I'm on No. 1602 right now.  That's how many informant numbers have been put out.  And I have I would say a little over a hundred active informants right now."

Thus, before Corrigan began "tighten[ing] the reins" in August 2012, there was a vast array of active informants with incomplete or non-existent resumes.  Moreover, the records that did exist were not secured under lock and key.

147.     Given the breadth of the problems, the Supervisory Defendants could not help but to be aware of them.  Indeed, evidence of their awareness lies in the fact that *Lieutenant Corrigan was specifically brought in to clean up the informant program*.  Corrigan's transfer into this position was not a routine promotion or transfer, but a targeted effort by RPD leadership to fix serious problems. This strongly suggests that RPD leadership, including the Supervisory Defendants, had, before August 2012, actual knowledge of the widespread lack of recordkeeping and oversight in the confidential informant program.  Even if such actual knowledge was missing, however, the Supervisory Defendants should have known of these problems.

### 4. The RPD's Slow Response

148.     Evidence of Norton's misconduct surrounded the Supervisory Defendants for some time.  Widespread rumors and a longstanding custom of ignoring the N-10 requirements forms easily put the Supervisory Defendants on actual or constructive notice that Norton's

warrant affidavits could not be trusted.  Further, in April 2010, a report of Norton's suspicious activity with regard to R. A. was written and entered into the files of the RAVE Task Force—a task force co-managed by the RPD.  Then, in March 2011, Norton was formally reprimanded for lying about informants as early as 2009.  And there is strong reason to believe that, because of the interview conducted by the RPD Internal Affairs Department with one of Norton's informants, R. A., RPD leadership was actually or constructively aware of Norton's misconduct sometime in 2011. Beyond that, there can be no doubt that RPD supervisors were actually or constructively aware of Norton's misconduct in 2012. The hospital interview with R. A. occurred by July 2012 at the latest (when Officer Tim Wyatt was transferred out of the Special Investigations Division).  Additionally, Lieutenant Corrigan was put in charge of the confidential informant program in August 2012.  Thereafter, the FBI began a formal investigation of Norton in the early fall of 2012.

149.    Despite the wealth of indications during 2009-12 that Norton had engaged in serious misconduct, Plaintiffs Ensley, Andrews, Archer, Humphries and Gilliam remained in jail. Indeed, it was not until 2015 that they were released or exonerated.  Not only were the Plaintiffs' initial arrests and incarcerations intolerable, but so too was the extraordinary delay in processing the Plaintiffs' releases and exonerations. While the Plaintiffs sat in prison in violation of their constitutional rights, the RPD instead sat on its hands, and failed to respond to troubling information about Norton's actions and the basis for his previous statements.  According to public statements, an RPD investigation into Norton's unlawful actions was delayed, for no apparent reason, until *after* the federal government conducted its own investigation.  Thus, *even if* the RPD was not actually or constructively aware of Norton's frauds when he first committed them, it was *certainly aware of them three, four or even close to five years* before the Plaintiffs

were finally given relief.  That actual or constructive awareness, however, did not inspire the

Supervisory Defendants to act.

## COUNT I

*Violation of the Fourth Amendment of the United States Constitution*
(All Plaintiffs Against Defendant Norton)

150.    The foregoing paragraphs are herein incorporated and re-alleged.

151.    Officer Jason Norton intentionally or recklessly misrepresented material

information to courts in his applications for search warrants.

152.    As a direct and proximate cause of these misrepresentations, the Plaintiffs were

seized, detained and imprisoned pursuant to legal process unsupported by probable cause.

153.    The criminal proceedings instituted against each Plaintiff ultimately terminated in

favor of each Plaintiff when courts of law voided each criminal conviction.

## COUNT II

*Violation of Fourteenth Amendment Right to Make a Voluntary and Intelligent Plea*
(All Plaintiffs Against Defendant Norton)

154.    The foregoing paragraphs are herein incorporated and re-alleged.

155.    Each Plaintiff in this case was sentenced to prison after pleading guilty.

156.    The United States Constitution guarantees to criminal defendants, including the

Plaintiffs in this case, the right to make a voluntary and intelligent decision as to whether to

plead guilty.

157.    Defendant Norton, by not revealing to anybody the fatal errors in his warrant

affidavits, engaged in egregious impermissible conduct.  Had Norton revealed the fatal errors in

his warrant affidavits, the Plaintiffs almost certainly would not have pled guilty.

158. As a direct and proximate result of Norton's actions, the Plaintiffs were deprived of their constitutional rights to make a voluntary and intelligent plea and suffered long period of unnecessary confinement.

## COUNT III

*Deprivation of Fourteenth Amendment Right and/or Eighth Amendment Right*
(All Plaintiffs Against Defendant Norton)

159. The foregoing paragraphs are herein incorporated and re-alleged.

160. As evidenced by the vacation of the Plaintiffs' sentences, the Plaintiffs should not have spent any time in jail.

161. While the Plaintiffs were in jail, Defendant Norton knew or should have known that the Plaintiffs' imprisonment was unwarranted.

162. Despite this actual or constructive knowledge, Defendant Norton negligently, recklessly or intentionally did not take reasonable steps to secure, or assist in securing, the Plaintiffs' release from jail.

163. Had Norton taken such steps, the Plaintiff's would have been released from jail before they were actually released.

164. As a direct and proximate result of Defendant Norton's failure to take such steps, the Plaintiffs spent significant periods of time in jail in violation of their Fourteenth Amendment right to liberty and/or their Eighth Amendment right to be free from cruel and unusual punishment.

## COUNT IV

*Supervisory Claim for Constitutional Violations Committed by Norton*
(Plaintiffs Ensley, Archer and Andrews Against Defendants Gleason, Sipple, Russell, Alston, Corrigan, Harrison, Blackwell, and Norwood in their Individual Capacities)

165. The foregoing paragraphs are herein incorporated and re-alleged.

166.     Defendants Gleason, Sipple, Russell, Alston, Corrigan, Harrison, Blackwell, and Norwood had actual or constructive knowledge that (1) Jason Norton posed a pervasive and unreasonable risk of committing constitutional violations identified above in Counts I, II and III, and/or (2) Jason Norton was committing constitutional violations identified above in Counts I, II and III, and/or (3) Jason Norton had committed constitutional violations identified above in Counts I, II and III, and/or (4) customs within the RPD that would give rise to constitutional injury of the sort suffered by the Plaintiffs.

167.     These Defendants' response (or lack thereof) to that knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices and/or constitutional violations.

168.     An affirmative causal link exists between the Defendants' responses (or lack thereof) and the constitutional injury suffered by Plaintiffs Ensley, Archer and Andrews.

## COUNT V

*Supervisory Claim for Constitutional Violations Committed by Norton*
(Plaintiffs Humphries and Gilliam Against Defendants Gleason, Alston, Corrigan, Harrison, Blackwell, and Norwood in their Individual Capacities)

169.     The foregoing paragraphs are herein incorporated and re-alleged.

170.     Defendants Gleason, Alston, Corrigan, Harrison, Blackwell, and Norwood had actual or constructive knowledge that (1) Jason Norton posed a pervasive and unreasonable risk of committing constitutional violations identified above in Counts I, II and III, and/or (2) Jason Norton was committing constitutional violations identified above in Counts I, II and III, and/or (3) Jason Norton had committed constitutional violations identified above in Counts I, II and III, and/or (4) customs within the RPD that would give rise to constitutional injury of the sort suffered by the Plaintiffs.

171.     These Defendants response (or lack thereof) to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices and/or constitutional violations.

172.     An affirmative causal link exists between the Defendants' responses (or lack thereof) and the constitutional injury suffered by Plaintiffs Humphries and Gilliam.

### COUNT VI

*Supervisory Claim for Constitutional Violations Committed by Norton*
(All Plaintiffs Against Defendant City of Richmond)

173.     The foregoing paragraphs are herein incorporated and re-alleged.

174.     Bryan T. Norwood was, at times relevant to this action, a policymaker for the City of Richmond with regard to the activities of the Richmond Police Department.

175.     Norwood had actual or constructive knowledge that (1) Jason Norton posed a pervasive and unreasonable risk of committing constitutional violations identified above in Counts I, II and III, and/or (2) Jason Norton was committing constitutional violations identified above in Counts I, II and III, and/or (3) Jason Norton had committed constitutional violations identified above in Counts I, II and III, and/or (4) customs within the RPD that would give rise to constitutional injury of the sort suffered by the Plaintiffs.

176.     Norwood's response (or lack thereof) to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices and/or constitutional violations.

177.     An affirmative causal link exists between Norwood's responses (or lack thereof) and the constitutional injury suffered by the Plaintiffs.

### COUNT VII

*Deprivation of Fourteenth Amendment Right and/or Eighth Amendment Right*

178.    The foregoing paragraphs are herein incorporated and re-alleged.

179.    As evidenced by the vacation of the Plaintiffs' sentences, the Plaintiffs should not have spent any time in jail.

180.    While the Plaintiffs were in jail, Defendants Gleason, Sipple, Russell, Alston, Corrigan, Harrison, Blackwell, and Norwood knew or should have known that the Plaintiffs' imprisonment was unwarranted.

181.    Despite this actual or constructive knowledge, these Defendants negligently, recklessly, or intentionally failed to take reasonable steps to secure, or assist in securing, the Plaintiffs' release from jail.

182.    Had these Defendants taken such steps, the Plaintiffs would have been released from jail before they were actually released.

183.    As a direct and proximate result of these Defendants' failure to take such steps, the Plaintiffs spent significant periods of time in jail in violation of their Fourteenth Amendment right to liberty and/or their Eighth Amendment right to be free from cruel and unusual punishment.

## COUNT VIII
*Deprivation of Fourteenth Amendment Right and/or Eighth Amendment Right*
(Plaintiffs Humphries and Gilliam Against Defendants Gleason, Alston, Corrigan, Harrison, Blackwell, and Norwood in their Individual Capacity)

184.    The foregoing paragraphs are herein incorporated and re-alleged.

185.    As evidenced by the vacation of the Plaintiffs' sentences, the Plaintiffs should not have spent any time in jail.

186.     While the Plaintiffs were in jail, Defendants Gleason, Alston, Corrigan, Harrison, Blackwell, and Norwood knew or should have known that the Plaintiffs' imprisonment was unwarranted.

187.     Despite this actual or constructive knowledge, these Defendants negligently, recklessly, or intentionally failed to take reasonable steps to secure, or assist in securing, the Plaintiffs' release from jail.

188.     Had these Defendants taken such steps, the Plaintiffs would have been released from jail before they were actually released.

189.     As a direct and proximate result of these Defendants' failure to take such steps, the Plaintiffs spent significant periods of time in jail in violation of their Fourteenth Amendment right to liberty and/or their Eighth Amendment right to be free from cruel and unusual punishment.

## COUNT IX

*Deprivation of Fourteenth Amendment Right and/or Eighth Amendment Right*
(All Plaintiffs Against Defendant City of Richmond)

190.     The foregoing paragraphs are herein incorporated and re-alleged.

191.     As evidenced by the vacation of the Plaintiffs' sentences, the Plaintiffs should not have spent any time in jail.

192.     Bryan T. Norwood was, at times relevant to this action, a policymaker for the City of Richmond with regard to the activities of the Richmond Police Department.

193.     While the Plaintiffs were in jail, Norwood knew or should have known that the Plaintiffs' imprisonment was unwarranted.

194.    Despite this actual or constructive knowledge, Norwood negligently, recklessly, or intentionally failed to take reasonable steps to secure, or assist in securing, the Plaintiffs' release from jail.

195.    Had Norwood taken such steps, the Plaintiffs would have been released from jail before they were actually released.

196.    As a direct and proximate result of these Defendants' failure to take such steps, the Plaintiffs spent significant periods of time in jail in violation of their Fourteenth Amendment right to liberty and/or their Eighth Amendment right to be free from cruel and unusual punishment.

## <u>COUNT X</u>

*Malicious Prosecution in Violation of Virginia Law*
(All Plaintiffs Against Defendant Norton)

197.    The foregoing paragraphs are herein incorporated and re-alleged.

198.    Officer Jason Norton intentionally misrepresented material information to courts in his applications for search warrants.

199.    As a direct and proximate cause of Norton's intentional misrepresentation, the Plaintiffs were seized, prosecuted and imprisoned pursuant to legal process unsupported by probable cause.  The legal process was instituted by or with the cooperation of Jason Norton.

200.    Officer Norton's misrepresentations were malicious, or could reasonably be inferred to be malicious due to the absence of probable cause.

201.    The criminal proceedings instituted against each Plaintiff ultimately terminated in a manner not unfavorable to the plaintiff.

THE DEFENDANTS' AFORESAID ACTIONS and omissions constitute a willful, wanton, reckless, and conscious disregard of Plaintiffs' rights, by reason of which Plaintiffs are entitled to recover punitive damages.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, joint and severally, in an amount *in excess of* $5 million ($5,000,000.00) each, and collectively in an amount *in excess of* $25 million ($25,000,000.00), or in such greater amount to be determined at trial, as well as costs, pre-judgment interest and attorneys' fees, or in such greater amount to be determined at trial, and grant such other and further relief that the Court may deem appropriate. Plaintiffs also respectfully request that the Court enter a judgment in their favor and against all Defendants except for the City of Richmond, jointly and severally, for punitive damages in the amount of $5 million ($5,000,000.00) each, and collectively in the amount of $25 million ($25,000,000.00) or in such greater amount to be determined at trial, and grant such other and further relief that the Court may deem appropriate.

**TRIAL BY JURY IS DEMANDED.**

WILBUR ENSLEY,
COVEY ANDREWS,
SHAMAR ARCHER,
DEUNTE HUMPHRIES and
JAMAR GILLIAM

By:   /s/ Mark J. Krudys

_____

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
Web: www.krudys.com

John Frederick Preis (VSB# 45764)
7719 Rock Creek Road
Henrico, VA 23229
Phone: (804) 289-8682
Email: jpreis@richmond.edu

Amy L. Austin (VSB# 46579)
THE LAW OFFICE OF AMY L. AUSTIN, P.L.L.C.
101 Shockoe Slip, Suite M
Richmond, VA  23219
Phone: (804) 343-1900
Fax: (804) 343-1901
Email: amyaustinlawyer@gmail.com

*Counsel for Plaintiffs Wilbur Ensley, Covey Andrews, Shamar Archer, Deunte Humphries, and Jamar Gilliam*

**CERTIFICATE OF SERVICE**

I certify that on March 24, 2017, I electronically filed the foregoing document with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to all

registered users.

By: /s/ Mark J. Krudys

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
Web: www.krudys.com