**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**WILBUR ENSLEY, et al.,**

       **Plaintiffs,**

                             **Civil Action No. 3:17-CV-024-MHL**

**v.**

**CITY OF RICHMOND, et al.,**

       **Defendants.**

**PLAINTIFFS' OPPOSITION TO DEFENDANT**
**BRYAN T. NORWOOD'S MOTION TO DISMISS**

As the motions before the Court reveal, there are many points of dispute in this case.  But there is one point that is most certainly *not* in dispute: that the Plaintiffs should not have spent a single day in jail but instead spent a total of 6,220 days in jail. The question before this Court is, in the broadest sense, what should happen now?  That is, should persons unlawfully imprisoned for this enormous length of time be entitled to a remedy, or should the people responsible for the unlawful imprisonment be allowed to walk away?  As explained below, our Constitution is not nearly as callous and unjust as Defendant Norwood would have this Court believe.  The Plaintiffs are entitled to relief and this Court should deny Norwood's motion in its entirety.

**STATEMENT OF FACTS**

The underlying facts of this case are no doubt familiar to the Court by now.  Jason Norton, an officer with the Richmond Police Department ("RPD") from 2004 through 2013, lied in numerous applications for search warrants by attributing his knowledge of alleged criminal activity to an incorrect informant that did not exist or was not reliable.  Lacking knowledge of these lies, a state judge issued the warrants. Norton later executed the warrants and arrested the

Plaintiffs during the searches. Because the searches were unconstitutional, any charges against the Plaintiffs should have been immediately dismissed. This did not happen, however. Instead, the charges remained and the Plaintiffs, facing the risk of long prison sentences, pled guilty. Years later, after Norton continued to lie and defraud the justice system, and Norwood and the other defendants continued to do nothing despite their constitutional duties, someone outside the RPD discovered Norton's lies. Eventually, due to this outside investigation (not any defendant action) Plaintiffs' convictions were voided and the Plaintiffs who were still jailed were released.

The harm resulting from Norton's misconduct did not occur in a vacuum, however. Others, including Defendant Norwood, played a role. What follows is a discussion of Norwood's involvement, including (1) his knowledge of these events and (2) his failure to act upon that knowledge. Thereafter, this section explains Plaintiffs' claims against Norwood.

**A. Defendant Norwood's Knowledge**

Whether Norwood violated the Constitution depends in significant part on what he knew and when he knew it. Thus, what follows is a chronological review of the events and circumstances that would establish his knowledge. In evaluating such, it is important to keep in mind the type of knowledge that matters in this case. Under *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994), what matters is whether Norwood had "knowledge that [Norton] . . . engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]." Importantly, the law does not require Plaintiffs to show that Norwood knew *for sure* that Norton had lied on search warrants and caused the unlawful detention of numerous persons, but simply that Norwood knew that Norton engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury. The information below strongly supports the reasonable inference that ***Norwood knew that Norton regularly lied about his dealings with***

*informants, which, because informants are regularly used to obtain warrants, posed a*

*"pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]."*

### 1. Norton's Tip Off and the RAVE Report – April 2010

In April 2010, federal officers on the street in Richmond witnessed R.A., one of Norton's informants, selling cocaine. ¶ 46. The officers planned to arrest R.A. but wanted to alert Norton because they were aware of Norton's relationship with R.A. When the officers contacted Norton, he tried mightily to dissuade them from arresting R.A. and when they would not relent, Norton hung up in apparent dissatisfaction. ¶ 47. Although the federal officers did not know it, when Norton hung up, *he immediately called R.A. to warn him about the impending arrest*. But Norton was too late—at least initially. By the time Norton got in touch with R.A., R.A. was unable to evade arrest. For some reason, however (very likely a call from Norton), the RPD officer making the arrest suddenly let R.A. go. When the federal officers saw R.A. walking away, they were shocked. R.A. was quickly re-apprehended, and said, surprisingly, "My man Norton said things are cool." ¶ 50. This statement is entirely consistent with the opinion of Norton's colleagues who thought "NORTON was too 'buddy' with informants." ¶ 123.

The FBI agents who witnessed these events thought them so suspicious that they wrote a report focused specifically on Norton's behavior—which was made part of the official files of the RAVE Task force, a joint task force between the FBI and the RPD of which Norwood, as Chief of Police, would have had significant knowledge and responsibility. ¶ 132. If federal officials thought it was important to formally record this event in the RAVE files, there can be little doubt that the event was shared and/or discussed among supervisors like Norwood—thus putting him on notice that Norton had suspicious and deceitful dealings with informants. In particular, an eminently reasonable inference from Norton's conduct is that he was scared that

R.A., when arrested, would say something that he wasn't supposed to—something about his illicit dealings with Norton. That "something" might have been R.A.'s *lack of involvement* in warrant applications that Norton had previously sworn to a magistrate R.A. was involved in. *See* ¶¶ 76, 93, 129-132. In short, Norton needed R.A. to keep secrets, and if R.A. was under arrest, he might fail to keep them, whether by mistake or for a reduction in his charges or sentence.

This line of reasoning does not require sophisticated police work. It would have been obvious to anyone in the field of criminal investigation that Norton's behavior indicated he had something to hide, whether in relation to R.A. in particular or something broader. Given this, a reasonable jury could easily conclude that, in April 2010, Norwood would have had knowledge sufficient to believe, and did in fact believe, that Norton was at risk of lying about his relationship with informants, thus creating the substantial risk persons like the Plaintiffs could have been wrongfully imprisoned.

### 2. Norton's Reprimands for Misconduct with Informants – March 2011

Roughly a year later, Norton's misconduct with informants would have again come to Norwood's attention. On March 25, 2011—a full four years before most Plaintiffs were released from jail and over two years before two of the Plaintiffs were even arrested—Norton was **reprimanded for deceit in his handling of informants**. In particular, Norton was reprimanded for his involvement in forged signatures on forms used to verify payments to confidential informants (so-called "N-10 forms") and his attempt to use informants who had not yet been established as reliable—the exact behavior that underlies the wrongful detentions in this case. ¶¶ 37; 133-36. Because these were formal disciplinary actions, they undoubtedly would have come to Norwood's attention. *See* ¶ 136. Not only would such disciplinary measures put a reasonable officer in Norwood's position on notice of serious problems with Norton's handling of

informants, but, when the disciplinary measures are seen against the backdrop of Norton's suspicious conduct in April 2010, the inference that Norton was engaging in deceitful conduct in relation to informants becomes much stronger. Thus, a reasonable jury could easily conclude that, in March 2011, Norwood would have had knowledge sufficient to believe, and did in fact believe, that Norton regularly lied about his relationship with informants, thus creating the substantial risk persons like the Plaintiffs could have been wrongfully imprisoned.

### 3. IAD's Investigation of Norton – Probably In The Last Quarter of 2011

Not long after Norton's reprimands, he was again the subject of a formal inquiry into his misconduct with informants. Sometime well before July 2012 and likely in 2011, *see* ¶ 131, one of Norton's informants mentioned above—R.A.—was subjected to a recorded interview while he was in the hospital, the tape of which was later "given to 'IAD' (Internal Affairs Department)." ¶ 129. The interview concerned R.A.'s relationship with Norton, and was conducted by an RPD officer as well as, likely, a member of IAD. Thus, Norton was on RPD's disciplinary radar in 2011. Given the seriousness of the investigations into his conduct, Norwood would have very likely been privy to the serious problems surrounding Norton. When combined with Norton's suspicious behavior in 2010 (which specifically involved R.A.) and Norton's disciplinary actions in 2011 (which specifically concerned his deceitful practices with informants), a reasonable jury could easily find that, in late 2011, Norwood would have had knowledge sufficient to believe, and did in fact believe, that Norton regularly lied about his relationship with informants, thus creating the substantial risk persons like Plaintiffs could have been wrongfully imprisoned.

### 4. Norwood's Attempt to Reform the Informant Program – Mid-2012

In August 2012, Defendant Corrigan was placed in charge of RPD's confidential informant program. His task was, quite simply, to clean it up. And as Corrigan has admitted,

there was lots of cleaning to do.  In particular, there were two enormous problems.  First, there was a widespread custom in the RPD of lying on N-10 forms, which are forms used to verify the identity of informants receiving payment.  As one of Norton's colleagues reported to the FBI, "**all the officers** in the RPD Narcotics department" have signed an N-10 form indicating that they witnessed a payment ***without actually witnessing the payment***.  ¶ 142. The importance of witnessing a payment cannot be overemphasized.  Requiring such witnessing not only prevents financial corruption (such as the officer pocketing the fee), *but it also prevents officers from lying about the existence of informants to begin with*.  The second major problem was the program's complete failure to maintain "resume sheets."  ¶ 145.  An informant's "resume sheet" lists the assistance he/she has provided in the past, thus allowing supervisors to verify that an officer's statement- for example, that "Informant X has previously provided reliable information leading to five arrests"- was actually *true*. *Id*.  Obviously, if an informant program is not using resume sheets, it lacks any serious commitment to accuracy and preventing fraud.

Defendant Norwood, as the Chief of Police, would have very likely been responsible for placing Corrigan in charge of the confidential informant program. Moreover, given that Corrigan's installation coincided with the opening of a federal investigation into Norton's fraudulent practices involving informants, a reasonable jury could easily conclude that Norwood was aware of major problems with the program, and that, if reforms were not quickly made, federal investigators would discover more problems that would deeply embarrass RPD. When this knowledge is combined with Norwood's other knowledge (Norton's suspicious behavior with R.A. in 2010; Norton's reprimands in March 2011; and an IAD investigation into Norton relating his work with an informant in late 2011), a reasonable jury could easily find that, in August 2012, Norwood would have had knowledge sufficient to believe, and did in fact believe,

that Norton regularly lied about his relationship with informants, thus creating the substantial risk that persons like the Plaintiffs could have been wrongfully imprisoned.

### 5. The Initiation of the Federal Investigation – Mid-2012 or Fall 2012

At around the same time as Norwood put Corrigan in charge of the confidential information program, Norwood was also undoubtedly aware that federal officials were investigating Norton's misconduct with informants. FBI files show interviews with RPD officials as early as October 2012, but it is quite likely that the investigation was initiated well before these recorded interviews. ¶¶ 26, 138. Without a doubt, therefore, Norwood would have had knowledge sufficient to believe, and did in fact believe, that Norton lied about his informants, thus causing persons like Plaintiffs to remain in jail in violation of law. The initiation of the federal investigation is thus one of the most important events in this case. It shows that, without a doubt, (1) there was strong reason to doubt the veracity of Norton's affidavits and (2) Norwood would have certainly been made aware of this investigation.[1] A reasonable jury thus could easily decide that, by mid- to late-2012 *at the latest*, Norwood believed Norton lied on warrant applications about the identity of his informants, thus creating the substantial risk persons like the Plaintiffs had been wrongfully imprisoned.

### 6. Knowledge Gained Informally – Probably between Mid-2010 and Mid-2012

Beyond the five events described above, Defendant Norwood very likely gained knowledge of Norton's problems in the way that many of us gain such knowledge—by hearing it from others. Although it is difficult to date some of these widely circulated statements about

---

[1]     Not only would a Chief of Police be made aware of such an investigation as a matter of course, but the fact that the federal investigators interviewed numerous RPD officers further permits the inference that Chief Norwood was aware of the investigation, as well as its basis.

Norton, it is nonetheless reasonable to assume that these statements would have generally coincided with the events described above—dating from mid-2010 through mid-2012.

Norton's problems were well known by his peers. According to FBI records, Norton's fellow officers had "heard rumors about NORTON from many people" and reported that "a lot of rumors about NORTON went around." ¶¶ 122-26. These rumors indicated that Norton's paperwork was "garbage," ¶ 122; that Norton had a cozy relationship with his informants, ¶ 123; that Norton performed flagrantly illegal searches, ¶ 124; and that Norton was connected to a gang that the RPD was investigating, ¶ 126.

Although not every rumor will make its way to the top of an organization (though some certainly do), the widespread knowledge about Norton's problems was not confined to front line officers. For example, Major Steve Drew—a person with significant managerial powers in the RPD during Norton's employment—reportedly "mentioned NORTON as salvageable." ¶ 128. Because Drew opined to the FBI that Norton was "salvageable," Drew must have known that Norton had significant problems. Supervisory knowledge of these problems is also established by the statement of Officer Tommy O'Connell, Norton's one-time partner. O'Connell "asked to stop working with Norton because he was a sinking ship." ¶ 127. Of course, O'Connell's request would have gone to a supervisor—someone with the authority to make such a change.

Further evidence that knowledge of Norton's problems climbed the chain of command comes in the form of comments by Bruce Gochenour, one of Norton's colleagues. Gochenour told the FBI that "NORTON's desk was littered with notices of information he received from informants," and that Norton was "flying too fast and too loose." ¶ 137. Gochenour "blamed RPD management for NORTON's situation." ¶ 137. "NORTON was producing for management," Gochenour reported, "*so [management] let him hang himself.*" Gochenour's

statements show without a doubt that Norton's problems were well known to management, which a reasonable jury could conclude included Norwood himself. Such knowledge, when combined with the numerous other bases for knowledge discussed above, would have led to the reasonable conclusion that persons like the Plaintiffs could have been wrongfully imprisoned.[2]

In sum, given the events and circumstances described above, a reasonable jury could easily find that Defendant Norwood believed Norton lied on warrant applications about the identity of his informants, thus creating the substantial risk persons like the Plaintiffs had been wrongfully imprisoned. The question becomes, therefore, what did Norwood do about it?

**B. Norwood's Insufficient Response**

The Amended Complaint shows that, in the face of Norwood's likely knowledge of the unconstitutional harm suffered by Plaintiffs, he failed to take reasonable steps to prevent or alleviate that harm. Most fundamentally, Norwood's insufficient response is shown by the fact that Plaintiffs' convictions were not overturned until the spring and summer of 2015. This means that, even though Norwood likely had knowledge sometime between 2010 and 2012 (and certainly 2013 at the very latest) that Norton caused unlawful detention, *the Plaintiffs remained in jail for three, four or even close to five more years.* A reasonable person in Norwood's position could have, and would have, done something about this.

---

[2]      Beyond all of this, the Complaint contains additional evidence of Norton's habit of deceit, including five different lies to his supervisors between July 2012 (when the federal investigation of Norton was likely getting started) and his separation from the RPD in mid-2013. ¶¶ 39-42. All of these lies were uncovered soon after Norton told them and two of them were part of an effort to avoid appearances in court. The attempt to avoid court dates is particularly disturbing because it suggests that Norton wanted to avoid proceedings in which he would be required to testify under oath. Given that Norton left the Department in mid-2013 under a cloud of suspicion, there can be little doubt that Norwood would have been aware of these final, deceitful acts by Norton, and have further cause to doubt the legitimacy of arrests tied to him.

A fuller discussion of Norwood's insufficient response is developed in the Argument section, but briefly, Norwood's chief failure was failing to respond to growing evidence of Norton's record of deceit regarding informants.  By early 2012 at the latest, Norwood's knowledge was sufficient to require a serious intervention, whether it be a prohibition on Norton's work with informants, or, at a minimum, a prohibition on his reliance on informants in warrant applications.  By late in 2012, however, Norwood's failures were even more pronounced.  In particular, he passed off the matter of Norton's misconduct to the FBI rather than addressing it in his own department. The FBI's interests and Norwood's own constitutional obligations were not well aligned, and, as a result, Plaintiffs' constitutional rights were sacrificed to an FBI investigation that was less concerned with their rights than discovering Norton's crimes. The FBI's scrutiny was no doubt warranted and should have been exhaustive, but there is little reason Plaintiffs should have remained jailed when grounds for their release was known.

In sum, the Amended Complaint shows that Norwood had both knowledge of harms suffered by Plaintiffs as well as an opportunity to prevent or alleviate those harms.  As explained below, and contrary to his arguments, these allegations state a claim for relief.

## ARGUMENT

Norwood offers several arguments why he should not be held liable for Plaintiff's harm. Each argument is addressed below, but, before addressing them, it will be helpful to first explain Plaintiffs' theory of the case as manifested in their Amended Complaint.  Such will significantly assist the Court in seeing why Plaintiffs have stated a claim for relief against Norwood.

### A. The Plaintiffs' Theory of the Case Against Norwood

The statement of facts in the previous section evinces the heart of the Plaintiffs' grievances against Norwood, which is that he likely knew that Norton lied about informants, but

did nothing, despite the fact that persons in Plaintiffs' positions would be unlawfully detained. This misconduct translates into two types of claims: (1) supervisory claims and (2) non-supervisory claims.

### 1. The Supervisory Claims

The supervisory claims against Defendant Norwood are contained in Counts IV and V. In those claims, the Plaintiffs allege that Norwood failed to supervise Defendant Jason Norton with regard to his commission of the constitutional violations in Counts I, II and III.  This, in turn, requires an understanding of what is alleged in Counts I, II and III, which is as follows:

- **Count I**: **Fourth Amendment Malicious Prosecution Claim**.  Under this claim, Plaintiffs seek relief for the periods of their detentions beginning with their indictments and ending with their releases, because, as a result of Norton's lies in seeking a search warrant, Plaintiffs were detained without probable cause and the criminal proceedings against them were terminated in their favor.
- **Count II**: **Knowing and Intelligent Plea Claim.**  Under this claim, Plaintiffs seek relief for the periods of their detentions beginning at their pleas and ending when the criminal proceedings against them were terminated in their favor. This claim is based on Norton's failure to disclose his lies during the plea process, thus depriving Plaintiffs of the right to make a knowing and intelligent plea under *Brady v. United States*, 397 U.S. 742 (1970).
- **Count III**: **Liberty Claim under the Fourteenth and/or Eighth Amendment.**  Under this claim, Plaintiffs seek relief for the period of their detentions beginning just after their pleas and ending when the criminal proceedings against them were terminated in their favor.  This claim is based on Norton's failure to disclose his lies after Plaintiffs pled guilty, thus depriving Plaintiffs of the right to be free from unlawful detention.

Thus, in the supervisory claims alleged in Counts IV and V, Plaintiffs allege that Norwood failed to take reasonable steps to prevent or alleviate the harms suffered by Plaintiffs, despite Norwood's actual or constructive knowledge that Norton would violate, was violating, or had violated the Plaintiffs' rights to (1) be free from malicious prosecution, (2) make knowing and intelligent pleas and (3) enjoy liberty under the Fourteenth and/or Eighth Amendment.

There are two additional points about the supervisory claims that are significant.  First, although most supervisory claims involve an allegation that the supervisor knew or should have

known that the subordinate would commit a violation *in the future*, Plaintiffs have also alleged

here that Norwood failed to supervise *during or after* the violations. *See* ¶¶ 166-167. The reason

for these "during or after" allegations is that the constitutional violations committed by Norton

began at the time of the searches *and continued until Plaintiffs were released years later*. Thus,

Norwood is liable to Plaintiffs not only because he failed to supervise Norton *before* the

violations occurred, but also during the period in which the violations were occurring or had

occurred.[3]

Second, the supervisory claims all refer back to Counts I, II and III *as a group*, rather

than separately, because it is generally unimportant to Plaintiffs' case against Norwood which

constitutional violation(s) Norton actually committed.[4] If Norton committed the violation

specified in Count I, but not in Counts II or III, Norwood would be just as liable to Plaintiffs had

Norton committed the violation in Count II but not Counts I and III. It is Plaintiffs' position, of

course, that Norton committed the violations named in all Counts I, II and III, but because

Norwood's liability does not hinge on which one of those Counts Norton violated, it was not

necessary to separately allege Norwood's liability on a count-by-count basis. Consequently, *if*

*Plaintiffs state a claim in* <u>any of</u> *Counts I, II or III against Norton, they state a claim for relief in*

---

[3]        There is no reason to think that a supervisory claim only extends to prospective constitutional violations, rather than ongoing constitutional violations. Indeed, it is nonsensical to think that a supervisor could be held liable for failing to interrupt a foreseeable constitutional violation, but escape liability for failing to intervene while the violation *was actually occurring*. To the extent that this understanding of supervisory liability overlaps with bystander liability, the Plaintiffs have stated a claim on that ground as well. This issue is more fully discussed, infra, pp. 25-28.

[4]        The only slight difference between the claims would be the length of incarceration that would be actionable against Defendant Norwood. As the explanation of Counts I, II and III, above, shows, the length of unlawful incarceration differs slightly between the Counts.

*Counts IV and V as long as they can show that Norwood, in the face of sufficient knowledge of the violation, failed to respond appropriately.*

### 2. The Non-Supervisory Claims

In addition to the supervisory claims in Counts IV and V, Plaintiffs also allege in Counts VII and VIII that Norwood deprived them of their rights to liberty under the Fourteenth and/or Eighth Amendments. These counts are similar to Counts IV and V in that they are based on Norwood's failure to act upon his likely knowledge, but are different in an important respect: Courts VII and VIII are *not* supervisory claims. That is, Norwood's liability in this respect does not depend on his role as a supervisor, but simply on his failure to act given his knowledge that Norton's misconduct would likely have caused persons like the Plaintiffs to be unlawfully jailed.

### B. The Plaintiffs State a Plausible Claim for Supervisory Liability Against Norwood With Regard to the Fourth Amendment Violations.

In his motion to dismiss, Defendant Norwood makes four arguments why he is not liable as a supervisor for the Fourth Amendment violations. Each of these arguments is meritless.

### 1. The Plaintiffs Have Stated a Plausible Fourth Amendment Claim.

Norwood first argues that he cannot be liable as a supervisor for the Fourth Amendment claim because Norton is not liable in the first instance. In this respect, he advances the same argument as Norton- that Norton did not *cause* Plaintiffs' incarcerations because the fruit of the poisonous tree doctrine, which would taint the arrests with the poison of his searches, does not apply in the civil setting. As explained at length in an accompanying brief, the Court should reject this argument. *See* Plaintiffs' Opposition to Defendant Norton's Motion to Dismiss at 2-8.

### 2. The Plaintiffs' Fourth Amendment Claims Are Not Time Barred.

Defendant Norwood also argues that the Plaintiffs' Fourth Amendment claims are time-barred because "Plaintiffs have been on notice of all their claims [for] more than two years." Br.

at 4. As with the merits of the Fourth Amendment claim, this claim, too, has been fully addressed in an accompanying brief, and the Court should reject it. *See* Plaintiffs' Opposition to Defendant Norton's Motion to Dismiss at 22-27.

### 3. *Ashcroft v. Iqbal* Does Not Bar the Supervisory Claims Alleged Here.

Defendant Norwood alternatively argues that, even if Plaintiffs state a Fourth Amendment malicious prosecution claim, he may not be held liable as a supervisor because the Supreme Court held in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) that supervisors can only be liable for their intentional constitutional violations. Norwood's argument fails because it misreads *Iqbal* as well as the Fourth Circuit's reading of *Iqbal*.

*Iqbal* arose from Javaid Iqbal's claim that Attorney General John Ashcroft (among other defendants) engaged in invidious discrimination by detaining him on the basis of his race and religion. Because Ashcroft obviously did not personally arrest and detain Iqbal, one issue in the case was whether Iqbal had to plead Ashcroft himself engaged in purposeful discrimination, or simply that Ashcroft *supervised others* who engaged in purposeful discrimination. The Court held that, because "purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities." *Id*. at 677. Thus, in requiring Iqbal to plead discriminatory purpose, the Court was *not* holding that supervisors can only commit constitutional violations by acting with purpose; it was simply holding that the mental state for a supervisor in a supervisory claim must mirror the mental state required of the subordinate. Indeed, this is exactly the interpretation that circuits across the country have given it. *See Barkes v. First Corr. Med., Inc*., 766 F.3d 307, 319 (3d Cir. 2014), reversed on unrelated grounds, 135 S. Ct. 2042 (2015); *Starr v. Baca,* 652 F.3d 1202, 1207 (9th Cir. 2011); *Dodds v.*

*Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010); *Whitson v. Stone County Jail,* 602 F.3d 920, 922, 927–28 (8th Cir. 2010); *Sandra T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010); *Sanchez v. Pereira–Castillo,* 590 F.3d 31, 49 (1st Cir. 2009).

Finally, and perhaps most relevantly, *Danser v. Stansberry*, 772 F.3d 340 (4th Cir. 2014) strongly suggests that the Fourth Circuit sees *Iqbal* and supervisory liability as compatible. In *Danser,* a prisoner by the name of David Danser claimed that prison officials violated his Eighth Amendment rights by failing to protect him from an attack by fellow prisoners. Most relevant here, Danser sued not only the guards on duty, but also the guards' supervisors, men by the names of Stansberry and Roy. The court held that Stansberry and Roy could not be held liable under *Iqbal* because "all that is present in the record before us is the mere fact that Stansberry and Roy were . . . supervisors, and under *Iqbal* that is insufficient as a matter of law . . . ." *Id*. at 349. In other words, the court applied the exact interpretation of *Iqbal* stated above—which is that *Iqbal* is a pleading case, not a supervisory liability case. If the Fourth Circuit thought *Iqbal* meant more than that, then it would have had no reason to, *in the very next sentence*, evaluate Danser's supervisory liability theory under *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994)—the Fourth Circuit's quintessential supervisory liability case. The court explained that Danser's supervisory claim failed *not* because of *Iqbal*, but because Danser failed to allege facts sufficient to show the supervisor's "tacit authorization" of the attack. If *Iqbal* did away with "tacit authorization" as a sufficiently culpable mental state, then *Danser* makes absolutely no sense.

In sum, *Iqbal* did not do away with supervisory claims. It simply established that a supervisor may not be held liable unless the supervisor possessed the same mental state as the subordinate that committed the underlying constitutional violation. The Court should therefore reject Norwood's *Iqbal* argument.

### 4. The Plaintiffs Have Adequately Alleged Supervisory Liability Based on the Fourth Amendment Violation

Norwood additionally argues that, even if *Iqbal* does not change the law of supervisory liability, Plaintiffs fail to state a claim for relief under the existing law of supervisory liability. As explained below, Norwood's argument is without merit.

To state a claim for supervisory liability, a plaintiff must plausibly plead:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994). In keeping with *Iqbal*, a supervisor cannot be held liable unless he or she possessed a mental state sufficient to state a claim on the underlying claim. The underlying claim here is the malicious prosecution claim, which requires the plaintiff to "allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Evans v. Chalmers*, 704 F.3d 636, 647 (4th Cir. 2012). Fourth Circuit law is clear that a plaintiff can state a malicious prosecution claim by pleading that the false statement leading to prosecution was "made deliberately or with a reckless disregard for the truth, which may be proved by showing that when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Massey v. Ojaniit*, 759 F.3d 343, 357 (4th Cir. 2014); *see also Miller v. Prince George's Cty*, 475 F.3d 621, 627 (4th Cir. 2007) (plaintiff bringing malicious prosecution claim against a police detective must show that the detective "deliberately or with a reckless disregard for the truth made material false statements in his affidavit"). By combining the

mental state required of a malicious prosecution claim with the supervisory liability standard, it becomes clear that Plaintiffs state a claim against Norwood if they have plausibly allege that:

> (1) Norwood "entertained serious doubts as to the truth of [Norton's] statements or had obvious reasons to doubt the accuracy of the information [Norton] reported" (2) that [Norwood's] response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between [Norwood's] inaction and the particular constitutional injury suffered by the plaintiff[s].

As explained below, the Plaintiffs have plausibly alleged each of these three elements.

First, Plaintiffs have adequately alleged that Norwood either "entertained serious doubts as to the truth of [Norton's] statements or had obvious reasons to doubt the accuracy of the information [Norton] reported." *Massey,* 759 F.3d at 357. The statement of facts contains numerous grounds for a reasonable jury to conclude that Norwood had "reason to doubt the accuracy" of the information in Norton's warrant applications. In particular, Norwood would have had reason to doubt Norton's reliance on confidential informants because he would have reasonably known that (1) Norton engaged in highly suspicious activity with a confidential informant—including tipping the informant off to an likely arrest—in April 2010; (2) Norton was reprimanded in March 2011 for multiple deceits with regard to confidential informants, (3) a confidential informant was interviewed about his relationship with Norton in late 2011 as part of an IAD investigation, (4) the RPD's confidential informant program in mid-2012 and prior lacked basic checks on integrity that would keep an officer from lying about the identity of an informant, (5) the FBI was investigating Norton for lying about the identity of his informants on warrant applications filed as early as 2009, and (6) Norton's colleagues and other supervisors thought he played "too fast and too loose," had encountered him lying on numerous occasions, and believed that "management" was letting Norton "hang himself" because he was "producing."

Given all these allegations, a reasonable jury could easily find that, long before Plaintiffs were released from jail, Norwood had "reason to doubt the accuracy" of Norton's search warrant applications which, if inaccurate, would render the Plaintiffs' incarcerations unlawful. It is difficult to pinpoint, of course, *exactly when* Norwood would have developed "reason to doubt the accuracy" of Norton's warrant affidavits. In the end, however, is it unnecessary for the Plaintiffs to pinpoint that exact date. To state a plausible claim for relief, Plaintiffs need only show that Norwood had "reason to doubt the accuracy" of Norton's affidavits sometime *before* a reasonable person would have taken steps to intervene. Put differently, the exact moment in which Norwood would have had "reason to doubt the accuracy" of Norton's warrant affidavits would impact the *quantity* of the remedy, not the *availability* of a remedy. The quantity of the remedy is, like in any ordinary personal injury suit, a matter to be worked out at trial. As long as Plaintiffs can show *some* injury at this stage, they have stated a claim for relief.

Second, Plaintiffs have also adequately alleged "that [Norwood's] response to [his] knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices." Once Norwood had "reason to doubt the accuracy" of Norton's affidavits by the end of 2012 at the latest (and likely much earlier), he apparently did nothing while most Plaintiffs remained in jail for another 2.5 years. This was an insufficient response.

Consider first Plaintiffs Gilliam and Humphries, who were arrested on February 23, 2012. By this time, Norwood would have reasonably known from (1) Norton's suspicious activity recorded in the RAVE records in April 2010, (2) Norton's double-reprimand for deceit involving informants in March 2011 and (3) IAD's investigation of Norton regarding his work with an informant in late 2011, that Norton posed a significant risk to persons in Gilliam and Humphries' circumstances—*i.e.*, persons arrested pursuant to information provided by a

confidential informant working with Norton. The reasonable response to this risk would be to prohibit Norton from working with informants, or, at the very least, prohibit him from relying on informants in applying for search warrants. This, *on its own*, would have prevented the harm suffered by Gilliam and Humphries. Even after their arrests, however, Norwood could have taken appropriate steps to minimize the periods of their incarcerations. As Norwood's knowledge of Norton's troubles grew in mid-2012, Norwood could certainly have instituted an internal investigation to determine whether persons like Gilliam and Humphries had been caught up in Norton's schemes. But Norwood did not do that. In particular, he either directed or allowed his department to delay any investigation into the wrongful detention of persons like Gilliam and Humphries until *after* federal authorities had concluded their investigation. ¶ 149. That investigation began, as noted above, in mid-2012 and did not terminate until the early spring of 2015. Once that investigation concluded, state officers sought the vacatur of Gilliam and Humphries' convictions and were able to procure them by the summer of that same year. If Norwood had, as he certainly could have, ordered an investigation into Norton's state court convictions, persons like Gilliam and Humphries would have been released far sooner. There is simply no reason why Gilliam and Humphries should have had to wait for relief when Norton's misconduct would have been known to Norwood years earlier.

Turning to Plaintiffs Ensley, Archer and Andrews, one sees the same general problem: Norwood failed to take reasonable steps to alleviate the unlawful detention of persons in their shoes. Although these Plaintiffs were arrested on three separate occasions in 2009 and prosecuted in federal court, the factors relevant to Norwood's liability are still the same. Just as with Gilliam and Humphries, Norwood would have known between 2010 and late 2011 that Norton was engaged in deceitful activities related to confidential informants. And then by mid-

2012, Norwood would have known even more—*i.e.*, that the RPD's confidential informant program had serious integrity problems and had for some time, and that federal investigators believed Norton had lied to obtain warrants, thus putting people in jail in violation of law.

Instead of initiating an investigation in 2010, 2011, or 2012, Norwood did nothing. As a result, Ensley, Archer and Andrews had to wait until the *spring of 2015 to be released.* Although it may be tempting to want to let Norwood off the hook because federal agents were already performing an investigation, this would not be an appropriate response. First of all, the existence of a federal investigation does not in any way relieve Norwood of his *own* duty to help persons wrongfully put in jail by one of his *own* officers. Indeed, that is the very premise of supervisory liability: supervisors cannot hide from liability by simply saying "it wasn't my job." *See Slaken v. Porter,* 737 F.2d 368, 373 (1984) (stating that supervisory liability can reach the "highest levels of state government," including anyone "in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked").

Second, the federal investigation was almost certainly not aimed solely at the restoration of Plaintiffs' liberty. Rather, it was to uncover the entire scope of Norton's misconduct and determine whether to file criminal charges/take other action- with a side effect of, if appropriate, restoring certain persons' liberty. Thus, although Ensley's incarceration (based on information wrongfully attributed to R.A.) was exposed as unlawful very early on in the investigation, Ensley remained in jail until investigators had completed the *entire investigation.* Why should Ensley have remained in jail after it was determined that Ensley should not be in jail?

Third, even if there were some reason to defer to federal investigators in this situation, a jury could reasonably conclude that Norwood *deferred for far too long*. If federal investigators spent a decade investigating this matter, would Norwood be justified in deferring for that long?

Certainly not. A 2.5 year investigation is obviously much shorter than that, but in the eyes of Plaintiffs Ensley, Archer and Andrews, it was intolerably—and with regard to Norwood's decisions, unconstitutionally—too long. A focused review of Norton's search warrant affidavits would have, *on its own*, revealed the warrants' flaws. The Plaintiffs' attorneys were able to perform much of the analysis simply by using an ordinary word processing tool that compares different versions of the same document and highlights the differences. There can be no doubt FBI officials had that same expertise (if not considerably more) but yet continued their investigation because they wanted to know the *full story* about Norton—not simply enough of the story to justify the Plaintiffs' release from jail.

A final observation about the federal investigation is in order. The Plaintiffs are well aware that, to preserve the integrity of an investigation, an investigating officer may elect to continue the investigation even after conduct has been uncovered justifying a prisoner's release from jail. It might sometimes be in the public interest to delay the release of information obtained during an investigation if doing so would compromise the obtaining of further information. If this is so, however, and at all relevant to Norwood's inaction, it would seem entirely appropriate to *at least compensate persons who have remained in jail in the service of the public interest*. Analogously, the Constitution allows state and federal governments to take "private property" for "public use"—but only with payment of "just compensation." U.S. Const., amend V. It would be an extraordinary irony here were the Court to hold that, although a government must compensate a person when it takes the person's *property* for public use, it need not compensate a person when it takes his or her *liberty* for public use. Obviously, Plaintiffs do not allege a Takings claim here, but the illustration may help the Court see the true nature of Plaintiffs' claims. If, for some overriding reason, the federal investigation could not be

interrupted, there is no reason that Plaintiffs should be denied compensation for their contributions to the investigation.[5]

Third and finally, Plaintiffs have plausibly alleged that "there was an affirmative causal link between [Norwood's] inaction and the particular constitutional injury suffered by the [Plaintiffs]." On this issue, there can be little debate. Had Norwood, after forming "reason to doubt the accuracy" of Norton's warrant affidavits, taken reasonable steps, the Plaintiffs would have been released from jail sooner than they were. It is immaterial at this stage in the proceedings whether the Plaintiffs would have been released a week earlier or three years earlier because being unlawfully detained for even a week is still a constitutional violation worthy of compensation. *See* the discussion *supra.* Thus, there can be little doubt that the Plaintiffs have adequately alleged causation here.

## C. The Plaintiffs State a Plausible Claim for Supervisory Liability Against Norwood Regarding Their Right to Make a Knowing and Intelligent Plea.

Defendant Norwood also argues that the Plaintiffs' knowing and intelligent plea claim must be dismissed for two reasons. Both arguments are meritless.

### 1. The Plaintiffs Have Adequately Stated a Knowing and Intelligent Plea Claim.

Norwood argues in his brief that the "Fourth Circuit has rejected" the Plaintiffs' knowing and intelligent plea argument under *Brady v. United States*, 397 U.S. 742 (1970). Br. at 9. In a subsequent notice submitted to the Court, Norwood admitted that *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013), "may affect" his argument. ECF 50 at 1. He does not go so far as to admit that *Fisher* grants Plaintiffs a right to relief, but to the extent that Norwood resists that

---

[5]     Of course, the Amended Complaint does not provide any ground to infer such an overriding reason, much less *require* a jury to accept that reason and reject any contrary inference. The Plaintiffs simply note the point to provide the Court with context.

conclusion, Plaintiffs have fully explained their right to relief on this claim in an accompanying brief. *See* Plaintiffs Opposition to Jason Norton's Motion to Dismiss at 8-12.

    **2. The Plaintiffs Have Adequately Stated a Supervisory Claim Against Norwood with Regard to the Knowing and Intelligent Plea Violation.**

    Defendant Norwood also seeks dismissal of this claim because, even if an underlying violation can be stated, he claims Plaintiffs have failed to plead a supervisory violation by Norwood. This is incorrect.

    First, in keeping with the instructions in *Iqbal*, the Court must first determine the proper mental state to demand of Norwood before finding him liable. Plaintiffs are claiming a violation of their right to make a knowing and intelligent plea as established in *Brady v. United States*, 397 U.S. 742 (1970). Under *Brady*, a plea is constitutionally valid only if it is a "voluntary expression of [the defendant's] own choice." *Id*. at 748. Furthermore, a plea is only truly "voluntary" if the defendant has "sufficient awareness of the relevant circumstances and likely consequences." *United States v. Moussaoui*, 591 F.3d 263, 278 (4th Cir. 2010 (quoting *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005)). These standards, however, speak only to the validity of a plea in a criminal setting, not a defendant's liability for causing an involuntary plea in a civil setting. It is appropriate therefore to look to the closest analogue to the claims presented here: § 1983 claims alleging involuntary confessions. In such claims, a violation can be established through either intentional or reckless conduct. *See Washington v. Buraker*, 322 F. Supp. 2d 702 (W.D. Va. 2004) (permitting § 1983 coerced confession claim to proceed on showing of recklessness because "[t]he officers involved did not face pressure to make snap decisions"). In the § 1983 setting, an officer behaves recklessly if he responded to a known risk of harm with deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 824 (1994). Plaintiffs thus have stated a supervisory claim against Norwood in this context if they plausibly plead that:

(1) [Norwood] had actual . . . knowledge[6] that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that [Norwood's] response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between the [Norwood's] inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994). The Plaintiffs have met this standard.

The Plaintiffs' allegations state a claim for relief under this standard for the same reasons discussed above in relation to their malicious prosecution claim. Indeed, the two standards are, in effect, nearly identical. The malicious prosecution standard required the Plaintiffs to plausibly plead that Norwood "entertained serious doubts as to the truth" of Norton's statements, which is functionally identical to the requirement that Norwood know of the risk that Norton's statements would be false. Thus, for the reasons stated above in Part B, Plaintiffs have stated a plausible supervisory claim against Norwood regarding their rights to make knowing and intelligent pleas.

**D. The Plaintiffs State a Plausible Claim for Supervisory Liability Against Norwood Regarding Their Right to Liberty under the Fourteenth and/or Eighth Amendment.**

Defendant Norwood also argues that the Plaintiffs' liberty claim under the Fourteenth and/or Eighth Amendments must be dismissed. Norwood's first argument is that he is not liable under the bystander liability doctrine. Br. at 10. "To succeed on a theory of bystander liability, a

---

[6]      To show actual knowledge, the Plaintiffs need not adduce "direct evidence." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). Rather, the Plaintiffs can show such knowledge through "circumstantial evidence." *Id*. (quoting *Farmer*, 511 U.S. at 842). For example, where a Plaintiff can show that his injury resulted from a problem that was "longstanding, pervasive, well documented, or expressly noted by . . . officials in the past," a jury can reasonably conclude that the state official "'must have known' about it." *Id*. (quoting Farmer, 511 U.S. at 842). Additionally, even if long standing problems are not shown, there will be instances in which the risk of injury will "be so obvious that the factfinder could conclude that the [official] did know of it because he could not have failed to know of it." *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (citations omitted).

plaintiff must demonstrate that a law-enforcement officer (1) knew that a fellow officer was violating an individual's constitutional rights; (2) had a reasonable opportunity to prevent the harm; and (3) chose not to act." *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 417 (4th Cir. 2014) (internal quotation marks and modifications omitted). Although the Plaintiffs have framed their allegations as supervisory claims, the doctrines substantially overlap[7] and, not surprisingly, the Plaintiffs' allegations also state a claim for bystander liability.[8] As explained in the previous sections, the Complaint contains numerous allegations that would allow a reasonable jury to infer that Defendant Norwood had actual knowledge that Norton had lied in his application for search warrants—especially once the federal investigation was underway. Such lies rendered the Plaintiffs' incarcerations unlawful, thus imposing on Norton a duty to come clean about his frauds. Norton's failure to come clean amounted to a violation of the Plaintiffs' Fourteenth and/or Eighth Amendment rights—a violation of which Norwood would have been aware of as a bystander. Norwood had a "reasonable opportunity to prevent the harm" but "chose not to act." As such, even if the Plaintiffs' supervisory claim is framed as a bystander claim, it still states a claim upon which relief can be granted.

Norwood also argues that the Eighth Amendment is not implicated on the facts of this case. As explained in an accompanying brief, Fourth Circuit precedent recognizes that incarcerating a person without lawful authority constitutes cruel and unusual punishment. *See*

---

[7] *See, e.g., Morrison v. Jordan*, No. CIV.A 7:08-CV-00643, 2009 WL 4363922, at *5 (W.D. Va. Dec. 1, 2009) (treating allegations against supervisor as "claims of bystander liability and supervisory liability").

[8] It is irrelevant whether the Plaintiffs used the magic words "bystander liability" in the Amended Complaint because the elements of the action were nonetheless plead in the Complaint. *See Stevenson*, 743 F.3d at 418 (holding that a plaintiff need not "recite expressly the elements of bystander liability" to properly allege a bystander liability claim).

Plaintiffs Opposition to Norton's Motion to Dismiss at 12-16.  For the reasons stated in that Brief, Norwood's argument is without merit.

Norwood finally argues that Plaintiffs do not state a supervisory claim against him for the violation of their Fourteenth and Eighth Amendment rights.[9]  As with the other supervisory claims, it is first necessary to determine the mental state required of a subordinate committing a deprivation of liberty in violation of the Fourteenth and/or Eighth Amendment.  As the Fourth Circuit explained in *Golson v. Department of Corrections*, 914 F.2d 1491 (4th Cir. 1990), the Fourteenth Amendment violation requires "something more than mere negligence"[10] and the Eighth Amendment violation can be stated if "the defendants acted with deliberate indifference." *Golson*, 914 F.2d 1491.  Integrating the required mental state into the supervisory liability standard, it becomes clear that Plaintiffs state a supervisory claim against Norwood if they plausibly allege that:

> (1) [Norwood] had actual . . . knowledge that [Norton] was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that [Norwood's] response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between [Norwood's] inaction and the particular constitutional injury suffered by the plaintiff[s].

---

[9]    In Counts VII and VIII, the Plaintiffs allege that Norwood violated their Eighth and Fourteenth Amendment rights in a non-supervisory capacity.  Defendant Norwood has not contested these allegations in any way. As such, that issue is not before the Court at this time. *See Baker v. Patterson Med. Supply, Inc.*, No. 4:11CV37, 2011 WL 2731259, at *3 (E.D. Va. July 13, 2011) (stating that, because defendant raised "argument for the first time in its reply brief" the "court will not consider it" on a motion to dismiss, though the defendant is free, of course, to raise the issue at a later time") (citing *Clawson v. FedEx Ground Package System, Inc.,* 451 F.Supp.2d 731, 734 (D. Md. 2006) and *United States v. Williams,* 445 F.3d 724, 736 n. 6 (4th Cir.2006)).

[10]    As explained in the Plaintiffs' Opposition to Norton's Motion to Dismiss, the mental state "greater than negligence" required in this context is likely recklessness, which is similar to the deliberate indifference standard applied in the Eighth Amendment context.  *See* Plaintiffs' Opposition to Norton's Motion to Dismiss, at 13, n.11.

*Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994).

As with the other supervisory claims, the Plaintiffs have met this standard. As explained above, a reasonable jury could easily find that Norwood had actual knowledge that Norton's deceitful practices with informants created a significant risk that persons situated as the Plaintiffs were would be placed in jail in violation of law. A reasonable jury could also find that Norwood failed to reasonably respond to this knowledge and that, as a result, the Plaintiffs were incarcerated longer than they should have been. Because a reasonable jury could reach these three conclusions based on the facts alleged, the Plaintiffs have stated a plausible supervisory claim against Norwood with regard to violations of their liberty rights.

### E. Defendant Norwood Is Not Entitled to Qualified Immunity.

In a cursory, one-paragraph argument, Defendant Norwood argues that he is entitled to qualified immunity because "an objectively reasonable officer in his position would not have known that his actions violated Plaintiffs' rights." Br. at 12. This argument is without merit because, although qualified immunity protects officers from liability where they make "bad guesses in gray areas," *Wilson v. Kittoe,* 337 F.3d 392, 403 (4th Cir. 2003) (internal quotation marks omitted), Norwood was not at all acting in a gray area. Each and every claim against him in this suit plausibly alleges that he had ***actual knowledge of a significant risk that persons in the Plaintiffs' circumstances were unlawfully in jail, but yet did not reasonably act to prevent or alleviate their harm.*** Failing to act in such circumstances is not a bad guess in a gray area; it is the wrong call in a black and white circumstance.

With regard to the malicious prosecution claim, Norwood is not entitled to qualified immunity. On this claim, the question before the Court is whether Norwood acted in a "gray area" when, despite "obvious reasons to doubt the accuracy of the information" leading to an

unlawful incarceration, he was "deliberate[ly] indifferen[t]" to that knowledge by failing to take steps to prevent or shorten the incarceration. *See infra* at 12, 16-23 (stating the supervisory liability standard applicable to the malicious prosecution claim). When there are "obvious reasons" to doubt someone's incarceration, officials hardly face a close call in determining what to do. The *obvious* thing to do is to initiate an investigation to determine whether the incarceration is lawful or not. Norwood did not do that.

*Golson v. Department of Corrections*, 914 F.2d 1491 (4th Cir. 1990) demonstrates that clear law existed on this issue at the time of Norwood's violations. The court in *Golson* stated as clearly as possible that, when a person has reason to believe that someone is in jail but ought not to be, that person has a duty to act. It is unimportant whether a case specifically illustrates this point, for "'the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity.'" *Id*. at 403 (internal quotation marks omitted). This is because the goal of qualified immunity is to "ensure that before they are subjected to suit, officers are on *notice* their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (emphasis added) (quoting *Saucier v. Katz,* 533 U.S., at 206); *see also Ridpath v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 313 (4th Cir.2006) ("the lodestar for whether a right was clearly established is whether the law 'gave the officials 'fair warning' that their conduct was unconstitutional'") (quoting *Hope*, 536 U.S. at 741); see also *Wilson*, 337 F.3d at 403 (quoting *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001) (Michael, J., concurring)). ("[Q]ualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations."). It is a certainly a "familiar legal principle[]" that, where a police officer lies and persons are detained as a result of those lies, the Constitution has been violated, and a police chief in Norwood's circumstances

would hardly find him or herself in uncharted terrain if he or she discovered those lies.  Finally,

to the extent that Norwood might argue that the application of the fruit of poisonous tree doctrine

to the Plaintiffs' claims entitles him to qualified immunity, that issue is fully discussed in an

accompanying brief.  *See* Plaintiffs' Opposition to Defendant Norton's Motion to Dismiss at 2-8.

Second, Norwood cannot claim qualified immunity for the knowing and intelligent plea

claim.  On this claim, the question again before the Court is whether Norwood acted in a "gray

area" when, despite Norwood's "actual . . . knowledge" that one of his subordinates engaged in

conduct (*i.e.*, the misrepresentation of information relevant to a guilty plea) that "posed a

pervasive and unreasonable risk of constitutional injury to citizens" like the Plaintiffs, Norwood

failed to take reasonable steps to prevent or shorten the incarceration.  This is most certainly not

a "grey area."  *Brady v. United States*, 397 U.S. 742 (1970), clearly holds that an officer's

misrepresentation can render a guilty plea invalid and *Fisher v. United States*, 711 F.3d 460 (4th

2013) makes plain the obvious implication of this, which is that, by withholding lies underlying a

search warrant, an officer engaged in misrepresentation under *Brady*.  Given this, Norwood is

not entitled to qualified immunity.[11]

Third and finally, Norwood cannot claim qualified immunity on the Plaintiffs' liberty

claim in violation the Fourteenth and Eighth Amendments. On this claim, the question before the

Court is much like the others, namely whether Norwood acted in a "gray area" when, despite his

"actual . . . knowledge" that one of his subordinates engaged in conduct that "posed a pervasive

and unreasonable risk of constitutional injury to citizens" like the Plaintiffs, he failed to take

---

[11]     To the extent that Norwood might contend that *Fisher* established new law, and thus that
there was no clearly established law *prior to Fisher*, Norwood would still lack qualified
immunity for failing to take reasonable steps *after Fisher,* which was decided in April 2013.

reasonable steps to prevent or shorten the incarceration.  For the reasons already stated, Norwood

may not claim qualified immunity here because it is hardly a "gray area."

## **CONCLUSION**

For the reasons stated above, the Plaintiffs respectfully request that the Court deny

Defendant Norwood's Motion to Dismiss in its entirety.

Respectfully submitted,

WILBUR ENSLEY,
COVEY ANDREWS,
SHAMAR ARCHER,
DEUNTE HUMPHRIES and
JAMAR GILLIAM

By: _____/s/ Mark J. Krudys_____
Counsel

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Email: mkrudys@krudys.com

John Frederick Preis (VSB# 45764)
7719 Rock Creek Road
Henrico, VA 23229
Phone: (804) 289-8682
Email: jpreis@richmond.edu

Amy L. Austin (VSB# 46579)
THE LAW OFFICE OF AMY L. AUSTIN, P.L.L.C.
101 Shockoe Slip, Suite M
Richmond, VA  23219
Phone: (804) 343-1900
Email: amyaustinlawyer@gmail.com

*Counsel for Plaintiffs Wilbur Ensley, Covey Andrews, Shamar Archer, Deunte Humphries, and Jamar Gilliam*

## CERTIFICATE OF SERVICE

I certify that on May 12, 2017, I electronically filed the foregoing document with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to all

registered users.

By: /s/ Mark J. Krudys

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
Web: www.krudys.com