**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**WILBUR ENSLEY, et al.,**

        **Plaintiffs,**

                             **Civil Action No. 3:17-CV-024-MHL**

**v.**

**CITY OF RICHMOND, et al.,**

        **Defendants.**

**PLAINTIFFS' OPPOSITION TO DEFENDANTS**
**GLEASON, SIPPLE, AND RUSSELL'S RULE 12(b)(6) MOTION TO DISMISS**

In their Memorandum of Law in Support of their Rule 12(b)(6) Motion to Dismiss ("Defendants' Memorandum"), Defendants Christopher Gleason, Charles Sipple, and Roger Russell (collectively referred to as "the Defendants") attempt to sell to this Court a patently offensive idea. That is, they peddle the notion that Plaintiffs' *having wrongfully spent a total of 17 years in jail* as a result of disgraced former detective Norton's deliberate lies to judges under oath—and the complete inaction of themselves and the other Defendants—equates to Plaintiffs having "*already benefitted* from Norton's alleged misconduct." Br. at 12 (emphasis added). Respectfully, if citizens should feel "benefited" for being the victims of illegal, perjury-backed police vendettas to invade private spaces and arrest targeted persons they cannot arrest lawfully, the Constitution is dead and the residents of Richmond are in trouble. This Court should not sanction such thinking. It does a disservice to the public, and it does a disservice to the majority of the men and women in police uniform who hold close the grave responsibility that comes with their service. In their Memorandum, Defendants seek to discount the Constitutional import of repeatedly and purposefully lying to judges in support of search warrants; incorrectly claim that Norton did not violate the U.S. Constitution; inaccurately state the applicable statute of

limitations; falsely contend that a Section 1983 claim for supervisory liability has not been adequately pled against them; and mistakenly claim that they are shielded from liability in this matter by the doctrine of qualified immunity. The Defendants are wrong in their claims.

Further, the Defendants may not whitewash their constitutional failures by pointing to any alleged illegal conduct by the Plaintiffs. Constitutional search warrant mandates apply to all citizens at all times; they do not disappear merely when the police contend that a citizen is, in fact, guilty of a crime. Had the Constitutional protections enacted by the Founders been followed, the Plaintiffs would not have been arrested, and would not have spent any time in jail. Lying to judges in order to secure pleas can never be condoned, and the effects of such cannot be ignored, if we are truly to live in a constitutional republic. Defendants' constitutionally proscribed conduct resulted in the Plaintiffs spending a total of 17 years in jail. The Plaintiffs are entitled to relief. This Court should deny Gleason, Sipple, and Russell's motion in its entirety.

## **STATEMENT OF FACTS**

Norton, an officer with the Richmond Police Department ("RPD") from 2004 through 2013, deliberately and consciously lied in numerous applications for search warrants by attributing supposed knowledge of alleged criminal activity to an incorrect informant who either did not exist or was not reliable. He knowingly falsified the applications, and knowingly went before judges and lied. Lacking knowledge of these lies, state judges issued the warrants. Norton later executed the bogus warrants and arrested the Plaintiffs during the illegal searches he had expressly set up for that purpose. Because the searches were unconstitutional, any charges against the Plaintiffs should have been immediately dismissed. This did not happen, however. Instead, because Norton continued to lie and the moving Defendants (and others) disregarded their constitutional duties to step in, the charges remained, and the Plaintiffs, facing the risk of

long prison sentences, pled guilty. Years later, after Norton continued to lie and defraud the justice system, and the moving Defendants (and others) continued to do nothing despite their constitutional duties, someone outside the RPD discovered Norton's lies. Eventually, due to this outside investigation (and not any action of any defendant in this case, despite their misguided argument that they somehow conveyed "benefit" on Plaintiffs), the Plaintiffs' convictions were voided and the Plaintiffs who were still in jail were released.

Defendants Gleason, Sipple, and Russell served as Norton's supervisors. The Plaintiffs have adequately pled that the Defendants had "knowledge that [Norton] . . . engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]." *See Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994). Importantly, the law does not require Plaintiffs to show that the Defendants knew *for sure* that Norton had lied on search warrants and caused the unlawful detention of many persons, but simply that they knew that Norton engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury. The facts laid out in the Amended Complaint strongly support the reasonable inference that Defendants Gleason, Sipple, and Russell ***knew that Norton regularly lied about his dealings with informants, which, because informants are regularly used to obtain warrants, posed a "pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]."***

The Amended Complaint states that during the period from 2009 through approximately June 2012, Defendant Gleason served as Norton's Direct Supervisor. ¶16. Defendant Sipple served as Norton's Intermediate Supervisor during the period from in or before 2008 through, upon information and belief, April 2011. ¶17. Defendant Russell was also responsible for supervising Jason Norton. From July 2007 through April 2011, Russell served as the Head of the

RPD's Special Investigations Division. ¶18. Per his LinkedIn page, from April 2011 to the present, Defendant Russell has served as "Officer in Charge" of the RPD's Internal Affairs Division. *Id.*

The Amended Complaint asserts that Defendant Norton had a well-deserved reputation as a sloppy, dishonest, and corrupt officer. According to FBI records, Norton's fellow officers had "heard rumors about NORTON from many people" and reported that "a lot of rumors about NORTON went around." ¶ 122; *see also* ¶¶ 123-26. These rumors indicated that Norton's paperwork was "garbage," ¶ 122; that Norton had a cozy relationship with his informants, ¶ 123; that Norton performed flagrantly illegal searches, ¶ 124; and that Norton was connected to a gang that the RPD was investigating, ¶ 126. FBI records indicate that it had been a "joke for years that Norton was dirty." ¶ 25. By mid-2012, Norton's "dirtiness" was so evident that the Federal Bureau of Investigation (FBI) began investigating him. What the FBI found is a shocking record of misconduct. ¶ 26. It is plausible for a jury to conclude that the Defendants, who were Norton's supervisors, and, therefore, responsible for ensuring Norton's compliance with Constitutional protections, knew of Norton's dishonest and corrupt practices.

Supervisory knowledge of Norton's dishonest and corrupt practices is further established by the statement of Officer Tommy O'Connell, Norton's one-time partner. Officer O'Connell "asked to stop working with Norton because he was a sinking ship." ¶ 127. Of course, O'Connell's request would have gone to a supervisor—someone with the authority to make such a change.

Further evidence that knowledge of Norton's problems climbed the chain of command comes in the form of comments by Bruce Gochenour, one of Norton's colleagues. Officer Gochenour told FBI investigators that "NORTON's desk was littered with notices of information

he received from informants," and that Norton was "flying too fast and too loose." ¶ 137. Gochenour "blamed RPD management for NORTON's situation." ¶ 137. "NORTON was producing for management," Gochenour reported, "*so [management] let him hang himself.*" Gochenour's statements show without a doubt that Norton's problems were well known to management, which a reasonable jury could reasonably conclude included Defendants themselves. Such knowledge, when combined with the numerous other bases for knowledge discussed above, would have led to the reasonable conclusion that persons like the Plaintiffs could have been wrongfully imprisoned. Surely, a reasonable jury could conclude that Defendants – Norton's Direct Supervisor, Intermediate Supervisor, and the Head of the RPD's Special Investigations Division who later became the "Officer in Charge" of the RPD's Internal Affairs Division – would be part of the "management" that would know about Norton's problems.

In addition to the foregoing documented statements concerning Norton's corrupt and dishonest nature, the Amended Complaint details flagrant and repeated abuses that had to have been known by Norton's supervisors. The Amended Complaint states that one of Norton's most common frauds concerned the seizure of money during an arrest. ¶ 27. Over and over again, Norton would stop a car, search the car, and discover money and perhaps other contraband. He would seize the money as though it were evidence of a crime, but *would not* arrest the occupants of car, issue a citation, or even, contrary to department policy, provide a receipt to the occupants confirming that he took the money. *Id.* By not issuing receipts, Norton was laying the groundwork for a scheme to unlawfully keep the money.

In addition to the foregoing, Norton repeatedly lied in his applications for search warrants. ¶ 54. His lies concerned the identity and/or reliability of the confidential informants

he offered to the court as evidence of probable cause. ¶ 72. In some cases, Norton provided different résumés for the same informant and in other instances provided the same résumé for different informants. In either case, Norton was lying about the identities or reliability of his informants. As a result, warrants based on his lies were completely invalid, as were the arrests and detentions of the Plaintiffs in this case: Wilbur Ensley, Covey Andrews, Shamar Archer, Deunte Humphries, and Jamar Gilliam. *Id.* As a result of the Defendants' lawless conduct, the five Plaintiff spent a total of 6,220 days in prison. ¶¶ 1-3.

Norton's lies in connection with search warrant applications were aided by extremely slipshod and corrupt RPD practices. It is reasonable to infer that the Defendants would have known of these practices. The Amended Complaint asserts that there was a widespread custom in the RPD of lying on N-10 forms, which are forms used to verify the identity of informants receiving payment for information. As one of Norton's colleagues reported to the FBI, "***all the officers*** in the RPD Narcotics department" have signed an N-10 form indicating that they witnessed a payment ***without actually witnessing the payment***. ¶ 142.

Further, the Amended Complaint states that RPD failed to maintain "resume sheets." ¶ 145. An informant's "resume sheet" lists the assistance that the informant has provided to officers in the past, thus allowing RPD supervisors to verify that an officer's statement - for example, that "Informant X has previously provided reliable information leading to five arrests" - *was actually true*. ¶ 145. Obviously, if an informant program is not using resume sheets, it lacks any serious commitment to accuracy and preventing fraud.

The Amended Complaint details with specificity the nature of Norton's dishonest practices in connection with obtaining warrants. Norton's corrupt actions were later discernible to prosecutors from a simple review of documents, and would similarly have been discernible to

the Defendants during the relevant period.  A reasonable inference may be made that supervisors who signed off on Norton's activities knew of his corrupt practices, but chose to do nothing because "NORTON was producing for management." ¶ 137.

The Amended Complaint specifies false warrant applications made by Norton while under the supervision of the Defendants.  The Amended Complaint states that on January 20, 2009, state and federal officers arrested Wilbur Ensley at 16__ P___ Street in Richmond, Virginia.  As the Amended Complaint details, Ensley's arrest was the result of blatant lies by Jason Norton and thus completely unconstitutional.  ¶ 73. Earlier that day, Norton applied for and obtained a warrant to search 16__ P_____ Street. ¶ 74.  In applying for the warrant, Norton swore to the court that a "reliable confidential informant" told him that he "was inside 16__ P____ Street apartment A" and "observed two black males" allegedly engaged in criminal activity. *Id.* As required by the Constitution, Norton further explained to the court why his informant was reliable.  ¶ 75.  Norton attributed the information to "CI #933," who, according to RPD records, is R. A.  However, R. A. did *not* provide any information to Norton about 16__ P_____ Street. ¶ 76.  According to an FBI interview of R. A. in connection with an investigation of Norton,

> "[R. A.] was shown three photographs of a house at 16__ P_____ Street, Richmond, Virginia. . . . [R. A.] stated that he does not know who lives at 16___ P____ Street, does not go there, and does not associate with the individuals at that location.  [R. A.] stated that he never called NORTON about drugs being stored inside 16__ P_____ Street and has never been there.  [R. A.] stated that he never gave NORTON information on any houses for warrants."

*Id.*

Further evidence of Norton's fraud is evidenced on the N-10 form itself. The N-10 form associated with the search of 16__ P_____ Street indicates that "CI #933" provided Norton with information about criminal activity at the house.  As noted above, an informant who receives

payment for his assistance must sign an N-10 form acknowledging the payment. According to an FBI investigation, the informant's signature on the N-10 "did not look anything like" R. A.'s signature and, when R. A. was asked whether he signed the form, he responded plainly, "'no sir.'" ¶ 77.

On or about September 11, 2009, Norton came to believe that contraband was located in a silver Mercedes Benz parked at 30_ J_____ St. in Richmond, a car in which Covey Andrews had a possessory interest. ¶ 91. But just as in Wilbur Ensley's case, Norton had a problem. He apparently lacked a credible informant to whom to attribute his knowledge. But this did not stop Norton. As in Ensley's case, Norton simply lied to the judge. ¶ 92. Norton told the judge that a "reliable" informant told him about the contraband in the car. *Id.* To evidence this reliability, Norton provided specific information to the judge to buttress his claim that he had information from a reliable informant. Norton's statements to the judge were not; they were intentional lies.

The false nature of these statements is evidenced in many ways. First, on the N-10 form signed by Norton the same day as the request for a search warrant, Norton stated that his informant was "CI #933," who, as noted above, is R. A. But the informant's signature on the N-10 form is most certainly *not* R. A.'s. ¶ 93. Rather, the signature (which is legible) appears to be that of "J. C." *Id.* But when the FBI interviewed J. C., "[J. C.] stated that he did not provide information on a silver Benz in Brookland Park. [J. C.] stated, 'that's not me,' that he did not sign the N-10 form on 9/16/2009." *Id.*

Further evidence of the falsity of the warrant application leading to Andrew's arrest is the fact that Norton described CI #933 in dramatically different terms than he had previously described him in his January 20, 2009 warrant application (which led to the arrest of Wilbur Ensley). ¶ 95.

On October 8, 2009, Norton wished to search a dwelling located at 72_ A_____ Ave. Plaintiff Shamar Archer lived in the house. Norton applied for a search warrant based on information he allegedly received from a confidential informant. ¶ 100. In his application for a warrant, Norton described the reliability of his informant. As with his prior statements in other warrant applications, these statements to establish the reliability of his informant were intentional lies. ¶ 101. The N-10 form associated with this warrant states that the informant is CI# 757, who is "J. D." *Id.* Unlike the N-10 forms discussed in Ensley and Andrews's cases, the informant's signature on this N-10 form does appear to say "[J. D.]" It turns out, however, the signature was forged. *Id.* When the FBI interviewed J. D., however, he flatly denied any involvement in the case or signing the form. ¶ 102. According to FBI notes of an interview with J. D., was shown a RPD N-10 form, Report of the Expenditure of Special Investigative Funds, dated 10/16/2009. [J. D.] stated that he did not remember the document. [J. D.] stated that the signature on the form did not look like his signature. [J. D.] could not remember being paid $250 on 10/16/2009." *Id.*

J. D.'s statements are not the only reason to doubt the veracity of Norton's application for a warrant to search 72_ A_____ Ave. Norton's description of his informant's reliability reveals two deeply troubling problems. First, the resume Norton provided for CI #757 on October 8, 2009 was almost exactly the same as the resume Norton provided for CI #933 on January 20, 2009. ¶ 104. Second, the same informant should have the same resume, or at least a resume that logically changes over time, however, Norton provided radically different information for CI #757 on three different occasions over 2 ½ years. ¶ 105.

In February 2012, when Norton lied on affidavits leading to the arrest of Plaintiffs Deunte Humphries and Jamar Gilliam. Documents indicate that "as of" November 20, 2012, Gleason was no longer serving as one of Norton's supervisors, but it is unclear when after June

21, 2012, he was reassigned. However, Defendants Gleason, Sipple, and Russell's failure to intervene to prevent further abuses by Norton directly led to the false statements by Norton to a judge that led to their unconstitutional arrests.

On March 25, 2011, when all three Defendants were supervising Norton, Norton was formally reprimanded for his deceit in working with confidential informants in July 2010 and February 2009 – time periods when all three Defendants were also charged with supervising Norton. ¶¶ 37; 133-36. With regard to the July 2010 matter, RPD officials discovered that the official records of Norton's work with informants contained two alarming problems. *Id.* First, some official records contained signatures that were purportedly made by the same person but did not look consistent. *Id.* This suggested that at least one of the signatures must have been a forgery—with Norton being the most likely forger. Second, other records contained signatures of persons who were not listed as informants in the case. *Id.* This suggested that the informants Norton was telling the court about in his warrant applications were not his actual informants- *the exact thing that occurred in Plaintiffs' cases*. Concerning the February 2009 matter, Norton had attempted to use informants who had not yet been registered or established as reliable (in connection with his witnessing of a drug buy wherein he also corruptly did not arrest the persons involved). *Id.* This reprimand thus shows that, as early as 2009, Norton was attempting to use informants who had not been established as reliable. A reasonable jury could conclude that where Defendants were not only Norton's supervisors at the time of the reprimands themselves, but also at the times of the underlying misconduct, they certainly knew about the conduct involved. Because such conduct specifically involved deceit regarding informants, a reasonable jury could also conclude that Defendants would have had knowledge sufficient to believe, and

did in fact believe, that Norton regularly lied about his relationship with informants, thus creating the substantial risk persons like the Plaintiffs could have been wrongfully imprisoned.

Not long after Norton's above reprimands, Norton was again the subject of a formal inquiry into his misconduct with informants. In this instance, which likely occurred in 2011, *see* ¶ 131, one of Norton's informants mentioned above—R.A.—was subjected to a recorded interview while he was in the hospital. The tape of the interview was later "given to 'IAD' (Internal Affairs Department)." ¶ 129. The interview concerned R.A.'s relationship with Norton and was conducted by an RPD officer as well as, in all likelihood, a member of the IAD. Therefore, Norton was on RPD's disciplinary radar in 2011, and, given the seriousness of the investigations into his conduct, Defendants would have very likely been privy to the serious problems surrounding Norton. Indeed, Gleason was Norton's Direct Supervisor at the time and Sipple may have still been Norton's Intermediate Supervisor; persons in such positions would certainly know if an officer under their charge was being investigated by the IAD. Moreover, Defendant Russell, in addition to being responsible for supervising Norton, was either the Head of the RPD's Special Investigations Division, which likely could have been involved in such an investigation, or the "Officer in Charge" of the RPD's *Internal Affairs Division, which was the department for which the interview was conducted.* Additionally, even if Sipple, for example, was not Norton's supervisor at the time, he would have been Norton's supervisor until mere months before and it is therefore reasonable that he would have been aware of this investigation.

As supervisors of Norton, a detective working with confidential informants, it is reasonable for a jury to conclude that Defendants would have known about the widespread problems that pervaded the informant program. When combined with the other knowledge Defendants had about Norton, a reasonable jury could also find that Defendants would have had

knowledge sufficient to believe, and did in fact believe, that Norton regularly lied about his relationship with informants, thus creating the substantial risk that persons like the Plaintiffs could have been wrongfully imprisoned.

## ARGUMENT

Defendants Gleason, Sipple, and Russell offer a number of arguments as to why they should not be held liable for the harm suffered by Plaintiffs. Each of these arguments is addressed below, but, before addressing them, it will be helpful to first explain the Plaintiffs' theory of the case as manifested in their Amended Complaint. Such will significantly assist the Court in seeing why Plaintiffs have stated a claim for relief against Defendants Gleason, Sipple, and Russell.

### A. The Plaintiffs' Theory of the Case Against Defendants

The statement of facts in the previous section evinces the heart of the Plaintiffs' grievances against Defendants, which is that Defendants likely knew that Norton lied about informants, but did nothing, despite the fact that persons in the Plaintiffs' positions would be unlawfully detained. This misconduct translates into two types of claims: (1) supervisory claims and (2) non-supervisory claims.

#### 1. The Supervisory Claims

The supervisory claims against Defendants are contained in Counts IV and V. In those claims, the Plaintiffs allege that Defendants failed to supervise Defendant Jason Norton with regard to his commission of the constitutional violations in Counts I, II and III. This, in turn, requires an understanding of what is alleged in Counts I, II and III, which is as follows:

- **Count I**: **Fourth Amendment Malicious Prosecution Claim**. Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning with their indictments and ending with their releases, because, as a result of Norton's lies in seeking search

warrants, Plaintiffs were detained without probable cause and the criminal proceedings against them were terminated in their favor.

- **Count II**: **Knowing and Intelligent Plea Claim.** Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning at their pleas and ending when the criminal proceedings against them were terminated in their favor. This claim is based on Norton's failure to disclose his lies during the plea process, thus depriving the Plaintiffs of the right to make a knowing and intelligent plea under *Brady v. United States*, 397 U.S. 742 (1970).

- **Count III**: **Liberty Claim under the Fourteenth and/or Eighth Amendment.** Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning just after their pleas and ending when the criminal proceedings against them were terminated in their favor. This claim is based on Norton's failure to disclose his lies after the Plaintiffs pled guilty, thus depriving the Plaintiffs of the right to be free from unlawful detention.

Thus, in the supervisory claims alleged in Counts IV and V, Plaintiffs allege that Defendants failed to take reasonable steps to prevent or alleviate the harms suffered by Plaintiffs, despite Defendants' actual or constructive knowledge that Norton would violate, was violating, or had violated the Plaintiffs' rights to: (1) be free from malicious prosecution, (2) make knowing and intelligent pleas, and (3) enjoy liberty under the Fourteenth and/or Eighth Amendment.

There are two additional points about the supervisory claims that are significant. First, although most supervisory claims involve an allegation that the supervisor knew that the subordinate would commit a violation *in the future*, Plaintiffs have also alleged here that Defendants failed to supervise *during or after* the violations. *See* ¶¶ 166-167. The reason for these "during or after" allegations is that the constitutional violations committed by Norton began at the time of the searches *and continued until Plaintiffs were released years later*. Thus, Defendants are liable to Plaintiffs not only because they failed to supervise Norton *before* the violations occurred, but also during the period in which the violations were occurring or had occurred.[1]

_____

[1] There is no reason to think that a supervisory claim only extends to prospective constitutional violations, rather than ongoing constitutional violations. Indeed, it is nonsensical to think that a supervisor could be held liable for failing to interrupt a foreseeable constitutional

Second, the supervisory claims all refer back to Counts I, II and III *as a group*, rather than separately, because it is generally unimportant to Plaintiffs' case against Defendants which constitutional violation(s) Norton actually committed.[2]  If Norton committed the violation specified in Count I, but not in Counts II or III, Defendants would be just as liable to the Plaintiffs as they would had Norton committed the violation in Count II, but not Counts I and III. It is the Plaintiffs' position, of course, that Norton committed the violations named in all of Counts I, II and III, but because Defendants' liability does not hinge on which one of those Counts Norton violated, it was not necessary to separately allege Defendants' liability on a count-by-count basis.  Consequently, *if the Plaintiffs state a claim in <u>any of</u> Counts I, II or III against Norton, they state a claim for relief in Counts IV and V against Defendants as long as they can show that Defendants, in the face of sufficient knowledge of the violation, failed to respond appropriately.*

### 2.  The Non-Supervisory Claims

In addition to the supervisory claims in Counts IV and V, the Plaintiffs also allege in Counts VII and VIII that Defendants deprived them of their rights to liberty under the Fourteenth and/or Eighth Amendments.  These counts are similar to Counts IV and V in that they are based on Defendants' failures to act upon their likely knowledge, but are different in an important respect: Courts VII and VIII are *not* supervisory claims.  That is, Defendants' liability in this respect does not depend on their roles as supervisors, but simply on their failures to act given

---

violation, but escape liability for failing to intervene while the violation *was actually occurring*. To the extent that this understanding of supervisory liability overlaps with bystander liability, the Plaintiffs have stated a claim on that ground as well. This issue is more fully discussed, *infra*, p. 24.

[2]    The only slight difference between the claims would be the length of incarceration that would be actionable against Defendants.  As the explanation of Counts I, II, and III, above, shows, the length of unlawful incarceration differs slightly between the Counts.

their knowledge that Norton's misconduct would likely have caused persons like the Plaintiffs to be unlawfully jailed.

**B. The Plaintiffs State Plausible Claims Against Norton, thus Providing a Basis for Supervisory Liability.**

In their motion to dismiss, Defendants first argue that they cannot be liable as supervisors for Norton's misconduct because the allegations against Norton do not state a claim for relief. This arguments are with merit.

### 1. The Plaintiffs State a Plausible Fourth Amendment Claim

The Defendants offer three arguments why the Fourth Amendment claim against Norton is without merit: (1) the Plaintiffs' arrests were supported by probable cause, (2) Norton's misconduct was the proximate cause of their incarceration, and (3) any claim for false arrest is time barred. None of these arguments is with merit. Each of these arguments is meritless.

### a. There is a Causal Link Between the Norton's Arrest the Plaintiffs' Detentions.

The first two arguments offered by the Defendants are actually just a variant of the same issue, which is that Norton's misconduct was not the legal cause of the Plaintiff's ultimate detention. This issue is fully addressed in an accompanying brief, but in short, the Defendants arguments all stem from the fact that the exclusionary rule, which contains the fruit of the poisonous tree doctrine, does not normally apply in § 1983 actions. In § 1983 actions based on an officers' willful deceit to a magistrate, however, there are strong reasons to apply the doctrine. Thus, the Defendants' assertion is incorrect.

### b. The Plaintiffs' Fourth Amendment Claims Are Not Time Barred.

The Defendants also argue that "any claim for false arrest is time barred." The Plaintiffs' Fourth Amendment claims are malicious prosecution claims, however, not false arrest claims.

The statute of limitations in malicious prosecution claims accrues at a different time than in false arrest claims. *See Wallace v. Kato*, 549 U.S. 384 (2007). Nonetheless, to the extent that the Defendants argue that the Plaintiffs' *malicious prosecution* claims are time barred, that argument has been fully addressed in an accompanying brief and should be rejected. *See* Plaintiffs' Opposition to Defendant Norton's Motion to Dismiss at 22-27.

**2. The Plaintiffs State a Plausible Claim for a Violation of Their Right to Make a Knowing and Intelligent Plea.**

The Defendants alternatively argue that they cannot be liable as supervisors with regard to Norton's deprivation of the Plaintiff's right to make a knowing and intelligent plea. As explained more fully in an accompanying brief, this claim is without merit. By engaging in misrepresentation, Norton violated the Plaintiffs' rights under *Brady v. United States*, 397 U.S. 742 (1970) and *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013). *See* Plaintiffs' Opposition to Defendant Norton's Motion to Dismiss at 8-12.

**3. The Plaintiffs State a Plausible Claim for a Deprivation of Their Liberty under the Fourteenth and/or Eighth Amendment.**

The Defendants also argue that they cannot be liable as supervisors with regard to Norton's deprivation of the Plaintiff's right to liberty under the Fourteenth and/or Eighth Amendment. As explained more fully in an accompanying brief, this claim is without merit. The Fourth Circuit has recognized that, where a person is entitled to be released from prison, but is not released due to the deliberate indifference of a state actor, that person has suffered a deprivation of liberty under the Fourteenth and/or Eighth Amendments. *See* Plaintiffs' Opposition to Defendant Norton's Motion to Dismiss at 12-16.

**C.  The Plaintiffs State a Plausible Claim for Supervisory Liability Against Defendants**

Given that the Plaintiffs state a claim against Norton in Counts I, II, and III, the Defendants can be held liable as supervisors.  The Defendants argue, however, that the Plaintiffs' fail to state a claim for supervisory liability.  In particular, the Defendants argue that: (1) the Plaintiffs fail to allege that they had knowledge of Norton's misconduct, (2) there are no allegations suggesting that Norton posed a pervasive and unreasonable risk of constitutional injury, (3) the Defendants were not deliberately indifferent to any risk of injury posed by Norton, and (4) the claim of bystander liability, if alleged, is not sufficient.  Each of these arguments is meritless.

**1.  The Plaintiffs Have Adequately Alleged That the Defendants Possessed Knowledge of Norton's Misconduct**

To survive a motion to dismiss on a supervisory claim, the Plaintiffs must allege information sufficient for a reasonable jury to find that the Defendants had knowledge that Norton engaged in practices would created a significant risk that persons in the Plaintiffs' position would be unlawfully detained.[3]  The Plaintiffs have done so.

The Defendants knowledge is established.  As explained more fully in an accompanying brief, there are six major circumstances or events that establish knowledge in this case:[4] (1) Norton engaged in highly suspicious activity with a confidential informant—including tipping the informant off to a likely arrest—in April 2010; (2) Norton was reprimanded in March 2011

---

[3]     A more complete explanation of the mental state required for the supervisory claims in this case is contained in an accompanying brief.  *See* Plaintiffs' Opposition to Defendant Norwood's Motion to Dismiss at 13-22.  As explained there, the proper standard is "deliberate indifference."  Under this standard, if a supervisory has actual knowledge that a subordinate's actions create serious risk of harm but yet does nothing, the supervisor is liable as long as the failure to act caused the ultimate constitutional deprivation.

[4]     These events and circumstances are fully discussed the Plaintiffs' Opposition to Defendant Norwood's Motion to Dismiss at 2-9.

for deceit with regard to a confidential informant; (3) a confidential informant was interviewed about his relationship with Norton in late 2011 as part of an IAD investigation; (4) the RPD's confidential informant program in mid-2012 lacked basic checks on integrity that would keep an officer from lying about the identity of an informant; (5) the FBI was investigating Norton for lying about the identity of his informants on warrant applications filed as early as 2009; and (6) Norton's colleagues and other supervisors thought he played "too fast and too loose," had encountered him lying on numerous occasions, and believed that "management" was letting Norton "hang himself" because he was "producing."

Given this, the question presented here: is which of these events or circumstances could a reasonable jury find created knowledge in Defendants Gleason, Sipple and Russell? The answer to this question depends in part on when the Defendants were supervisors. Defendant Gleason was Norton's direct supervisor "[f]rom 2009 through approximately June 2012." ¶ 16. Defendant Sipple served as Norton's Intermediate Supervisor in or before 2008 through, upon information and belief, April 2011." ¶ 17. Finally, Defendant Russell served head of the RPD's Special Investigations Division (the division in which Norton served) from July 2007 to April 2011 and since then has served as "Officer in Charge" of the RPD's Internal Affairs Division. ¶ 18. Given these periods of service and positions of authority, there can be no doubt that a reasonable jury could find that the Defendants possessed the requisite knowledge.

The first three of the six events noted above all occurred while Gleason, Sipple and Russel were Norton's supervisors. It is nearly inconceivable that Norton's suspicious and deceitful activity with a confidential informant in April 2010, his reprimands for deceit involving an informant in March 2011, and the IAD's investigation into him in late 2011 would have been unknown to the Defendants. Problems with Norton's performance on the job would, quite

naturally, be brought to the attention of his supervisors. Reasonable jurors, having employment experience of their own, would quite naturally expect that Norton's bosses would be aware of such problems.

The next three of these events would also create the requisite level of knowledge—especially when considered in combination with each other and the first three events. Looking first to Defendant Gleason, he would have awareness of the woeful mismanagement of the informant program when he left his position in June 2012. Corrigan was brought into clean up that program in August 2012, so Gleason would have had a first-hand look at the problems in the department, including the problems with N-10 forms and resume sheets.[5] Moreoever, a reasonable jury could conclude that Gleason would have heard about Corrigan's transfer into the unit and the reasons for the transfer. In addition to the problems with the informant program, Gleason would have also had knowledge of the federal investigation that started in the summer or early fall of 2012. Certainly, when FBI agents are investigating a particular police officer, that officers supervisors will have knowledge that an investigation is underway as well as the general scope and purpose of the investigation. And finally, Defendant Gleason would have heard, like so many others in the RPD did, the numerous reports about Norton's misconduct from his colleagues. One of these reports, in fact, implicates Gleason. Bruce Gochenour, Norton's partner for a time who thought that Norton was "flying too fast and too loose," "blamed RPD management for NORTON's situation." ¶ 137. "NORTON was producing for management," Gochenour reported, "*so [management] let him hang himself.*" As Norton's supervisor, Gleason

---

[5]       This is especially true given how widespread the problems with the N-10 forms were. See ¶ 142 (reporting comment by RPD officer that "***all the officers*** in the RPD Narcotics department" have signed an N-10 form indicating that they witnessed a payment ***without actually witnessing the payment***.

would have been part of "management."  In sum, not only do the first three of the six events create knowledge on the part of Gleason, the second three would as well.  A reasonable jury could thus find that the ***Gleason knew that Norton had regularly lied about his informants and thus engaged in conduct that posed a significant risk that persons in the Plaintiffs' postion were subject to unlawful detained.***

Turning to Defendant Sipple, the same conclusion applies as with Gleason.  Sipple left his supervisory position in April 2011, only two months before Gleason.  A jury could reasonably find that he knew the same information about Norton as Gleason, including the serious problems with the confidential informant program, the FBI investigation, and the widely shared reports about Norton's misconduct.  And as with Gleason, Sipple would have qualified as a member of management—the management force that "let [Norton] hang himself" because he was "producing for management."  Thus, just as with Gleason, a reasonable jury could find the Defendant Sipple knew that Norton had frequently lied about his informants, thus creating the significant risk that persons in the Plaintiffs' position were being unlawfully detained.

Finally, the case against Defendant Russell is even stronger than Gleason and Sipple. Defendant Russell left his supervisory position at the same time as Sipple—April 2011.  A jury could reasonable find, therefore, that Russell had the same knowledge as Sipple.  As head of the Special Investigations Division, Russell would certainly known of the serious problems with the confidential informant program. With regard to the federal investigation, however, the case against Russell is even stronger because when Russell left his position supervising Norton, he become "Officer in Charge" of the Internal Affairs Division.  Thus, when the FBI opened its investigation into Norton in the summer or fall of 2012, it is nearly certain Russell would have known about it.  It would be simply incredible if the Officer in Charge of IAD, and Norton's

former supervisor, had no idea that federal officials were investigating Norton.  And finally, just as with Gleason and Sipple, Russell too would have had knowledge of reports circulating about Norton's many problems.  Given this, a jury could reasonably find that Defendant Russell knew that Norton engaged in deceitful conduct with informants and that such conduct posed a significant risk that persons on the Plaintiffs' position would be unlawfully incarcerated.

The Defendants main argument against these points is that they did not have knowledge of Norton's problems when he defrauded the magistrates in his warrant applications.  There are two responses to this point.  First, with regard to Gilliam and Humphries, who were arrested in February 2012, the Defendants likely did have such knowledge.  As noted above, the first three of the six events had already occurred and a reasonable jury could find that those events were significant enough to established the Defendant's knowledge.  Second, with regard to all five Plaintiffs, it is irrelevant whether the Defendants had the requisite level of knowledge at the time of warrant applications.  This is because Norton's misconduct (whether pursuant to Counts I, II or III) caused *ongoing violations*.  Thus, even if the Defendants themselves did not have knowledge at the time of the arrests, the Defendants later acquired knowledge of unlawful detentions and thus had an obligation to act at that point.

It is difficult to say with certainty, of course, what "that point" is, whether it be in 2009, 2010, 2011, or 2012. In the end, however, is it unnecessary for Plaintiffs to pinpoint that exact date(s).  To state a plausible claim for relief, Plaintiffs need only show that Defendants had knowledge sufficient know of the risk of unlawful detention sometime *before* a reasonable person would have taken steps to intervene.  Put differently, the exact moment in which Defendants would have had "reason to doubt the accuracy" of Norton's warrant affidavits would impact the *quantity* of the remedy*, but not the *availability* of a remedy.  The quantity of the

remedy is, like in any ordinary personal injury suit, a matter to be worked out at trial. As long as Plaintiffs can show *some* injury at this stage, they have stated a claim for relief.

2. **The Plaintiffs Have Adequately Alleged That Norton Posed a Pervasive and Unreasonable Risk of Constitutional Injury**

The Defendants also argue that the Complaint lacks information sufficient for a jury to find that Norton posed a pervasive and unreasonable risk of constitutional injury. This argument is meritless for two reasons. First, with regard to Plaintiffs Gilliam and Humphries, the Defendants did have such knowledge. Prior to February 2012 (when Gilliam and Humphries were arrested), the Defendants had knowledge of Norton's April 2010 deceitful activities with an informant, Norton's March 2011 reprimands for deceitful activities with an informant, and the IAD's investigation of Norton in late 2011 for deceitful activities with an informant. When an officer deceives *again and again and again,* a reasonable supervisor would know that the officer is not going to stop of his own. Norton was bound to deceive again, which is in fact exactly what he did.

Second, with regard to all Plaintiffs, the Complaint contains sufficient allegations not only to show that Norton ***posed a risk of a constitutional violation, but that constitutional violations were ongoing***. Because they were wrongfully detained, the Plaintiffs were entitled to release. Each and every day that Norton kept his lies a secret, he violated their rights to be free from malicious prosecution, to make a knowing and intelligent plea and to liberty. Although supervisory claims typically involve the risk of future misconduct, it is nonsenical to think a supervisor is obligated to watch out for a future constitutional violation but that, once a violation is actually occurring, the supervisor can look the other way. To the extent that supervisory liability here might overlap with bystander liability, that issue is discussed in a separate section below.

### 3. The Plaintiffs Have Adequately Alleged that the Defendants Were Deliberately Indifferent.

Second, Plaintiffs have also adequately alleged "that [Defendants'] response to [their] knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices." Once Defendants had "reason to doubt the accuracy" of Norton's affidavits by the end of 2012 *at the latest* (and likely much earlier), Defendants apparently did nothing while most of the Plaintiffs remained in jail for another 2 1/2 years. This was clearly an insufficient response.

Consider the circumstances of Plaintiffs Ensley, Archer and Andrews. The Amended Complaint indicates that Defendants failed to take reasonable steps to alleviate the unlawful detention of persons. Although these Plaintiffs were arrested on three separate occasions in 2009 and prosecuted in federal court, the factors relevant to Defendants' liability are still the same. The Amended Complaint delineates numerous facts indicating to the Defendants that Norton was engaged in deceitful activities related to confidential informants. Instead of initiating some sort of action or inquiry in 2010, 2011, or 2012, Defendants did nothing. As a result, Ensley, Archer and Andrews had to wait until the *spring of 2015 to be released.*

It may be tempting to let the Defendants off the hook here because (1) it may have appeared to them that federal investigators were going to address the matter or, (2) the Defendants, as subordinates to Chief Norwood, did not have the capacity to take appropriate action. With regard to the federal investigation, an accompanying brief explains why that investigation did not relieve the Defendants of their own duty to act. *See* Plaintiff's Opposition to Defendant Norwood's Motion to Dismiss at 20-22. In brief, the federal investigation was not aimed (and the Defendants could have easily perceived that it was not aimed) solely on exonerating the Plaintiffs. Rather, it was a more comprehensive effort to uncover the scope of

Norton's misconduct.  Given this, the investigation went on much longer than necessary to achieve the constitutional requirement that the Plaintiffs be released.

With regard to the argument that, as subordinates, the Court should see this point for what it really is, an "it wasn't my job" argument. As officers of the law, each of the Defendants swore a personal oath to uphold the Constitution.  They did not swear an oath to uphold whatever decisions the Chief of Police has made. Indeed, questioning the legitimacy of an incarceration is one of the more important things that any officer can do.  This is not to say that officers must conduct their own personal investigation, regardless of the orders of the Chief of Police.  But it is to say that officers within a department bear as much responsibility for upholding the Constitution as anyone else and, where there is reason to believe that a constitutional violation is in process, officers have a duty to take reasonable steps to stop it.

### 4.  The Plaintiffs Have Adequately Alleged a Bystander Claim, to the Extent that One Applies.

The Defendants also argue that, to the extent that the Complaint alleges a bystander claim, such a claim is insufficient.  In an accompanying brief, the Plaintiffs have already addressed this argument.  *See* Plaintiffs Opposition to Defendant Norwood's Motion to Dismiss at 24-25.  In that brief, the Plaintiffs explained that, although they have framed their allegations to state a claim of supervisory liability, the allegations nonetheless state a claim of bystander liability because the Defendants knew of the constitutional violations being committed and yet did not reasonably response.  The Court should therefore reject this argument.

### D.  The Plaintiffs State a Non-Supervisory Claim Against the Defendants for a Deprivation of Liberty under the Fourteenth and/or Eighth Amendment.

The Defendants also argue that the Plaintiffs' non-supervisory liberty claims under the Fourteenth and/or Eighth Amendment should be dismissed.  This claim against the Defendants is

based on the same arguments as the supervisory claim, but the key difference is that the Defendants are liable directly under *Golson v. Department of Corrections*, 914 F.2d 1491 (4th Cir. 1990) (unpublished disposition).  As explained more fully in an accompanying brief, when a state actor is deliberately indifferent to the significant risk that a person is entitled to be released from jail, the state actor violations the Fourteenth and/or Eighth Amendments.  *See* Plaintiffs Opposition to Defendant Norton's Motion to Dismiss at 12-16.

### E.  The Defendants are Not Entitled to Qualified Immunity.

The Defendants' final argument is that they are entitled to qualified immunity.  This argument, however, is meritless for the same reasons that Defendant Norwood is not entitled to qualified immunity.  As more fully explained in an accompanying brief, the supervisors in this case (including Norwood and the Defendants here) would only be entitled to qualified immunity if they "bad guesses in gray areas," *Wilson v. Kittoe,* 337 F.3d 392, 403 (4th Cir. 2003) (internal quotation marks omitted).  But the Defendants here, just like Norwood, were not acting in a gray area. Each and every claim against the Defendants in this suit plausibly alleges that they had ***actual knowledge of a significant risk that persons in the Plaintiffs' circumstances were unlawfully in jail, but yet did not reasonably act to prevent or alleviate their harm.***  Failing to act in such circumstances is not a bad guess in a gray area; it is the wrong call in a black and white circumstance.

Thus, for the reasons more fully stated in an accompanying brief, the Defendants here are not entitled to qualified immunity.  *See* Plaintiffs Opposition to Defendant Norwood's Motion to Dismiss at 27-30.

## CONCLUSION

For the reasons stated above, the Plaintiffs respectfully request that the Court deny

Defendants' Motion to Dismiss in its entirety.

Respectfully submitted,

WILBUR ENSLEY,
COVEY ANDREWS,
SHAMAR ARCHER,
DEUNTE HUMPHRIES and
JAMAR GILLIAM

By: _____/s/ Mark J. Krudys_____
Counsel

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Email: mkrudys@krudys.com

John Frederick Preis (VSB# 45764)
7719 Rock Creek Road
Henrico, VA 23229
Phone: (804) 289-8682
Email: jpreis@richmond.edu

Amy L. Austin (VSB# 46579)
THE LAW OFFICE OF AMY L. AUSTIN, P.L.L.C.
101 Shockoe Slip, Suite M
Richmond, VA  23219
Phone: (804) 343-1900
Email: amyaustinlawyer@gmail.com

*Counsel for Plaintiffs Wilbur Ensley, Covey Andrews, Shamar Archer, Deunte Humphries, and Jamar Gilliam*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on May 12, 2017, I electronically filed the foregoing document with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to all

registered users.

By: <u>/s/ Mark J. Krudys</u>

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
Web: www.krudys.com