**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**WILBUR ENSLEY, et al.,**

       **Plaintiffs,**

                        **Civil Action No. 3:17-CV-024-MHL**

**v.**

**CITY OF RICHMOND, et al.,**

       **Defendants.**

## PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS BY DEFENDANTS ALSTON, CORRIGAN, HARRISON, AND BLACKWELL

In their Memorandum of Law in Support of Motion to Dismiss ("Defendants' Memorandum"), Defendants Michael Alston, Brian Corrigan, Martin Harrison, and William Blackwell (collectively referred to herein as "Defendants") seek to discount the Constitutional import of repeatedly and purposefully lying to judges in support of search warrants; incorrectly claim that Norton did not violate the U.S. Constitution; inaccurately state the applicable statute of limitations; falsely contend that a Section 1983 claim for supervisory liability has not been adequately pled against them; and mistakenly claim that they are shielded from liability in this matter by the doctrine of qualified immunity. The Defendants are wrong in their claims.

Further, the Defendants may not whitewash their constitutional failures by pointing to any alleged illegal conduct by the Plaintiffs. Constitutional search warrant mandates apply to all citizens at all times; they do not disappear merely when the police contend that a citizen is, in fact, guilty of a crime. Had the Constitutional protections enacted by the Founders been followed, the Plaintiffs would not have been arrested, and would not have spent any time in jail. Lying to judges in order to secure pleas can never be condoned, and the effects of such cannot be ignored, if we are truly to live in a constitutional republic. Defendants' constitutionally

proscribed conduct resulted in the Plaintiffs spending a total of 17 years in jail. The Plaintiffs are entitled to relief. This Court should deny Defendants' Alston, Corrigan, Harrison, and Blackwell's motion in its entirety.

<u>**STATEMENT OF FACTS**</u>

Norton, an officer with the Richmond Police Department ("RPD") from 2004 through 2013, apparently wanted to arrest certain persons, but he could not do so legally. Instead, he hatched a plan to deliberately and consciously lie in numerous applications for search warrants by attributing supposed knowledge of alleged criminal activity to an incorrect informant who either did not exist or was not reliable. He knowingly falsified the applications, and knowingly went before judges and lied. Lacking knowledge of these lies, state judges issued the warrants. Norton later executed the bogus warrants and arrested the Plaintiffs during the illegal searches he had expressly set up for that purpose. Because the searches were unconstitutional, any charges against the Plaintiffs should have been immediately dismissed. This did not happen, however. Instead, because Norton continued to lie and the moving Defendants (and others) disregarded their constitutional duties to step in, the charges remained, and the Plaintiffs, facing the risk of long prison sentences, pled guilty. Years later, after Norton continued to lie and defraud the justice system, and the moving Defendants (and others) continued to do nothing despite their constitutional duties, someone outside the RPD discovered Norton's lies. Eventually, due to this outside investigation (and not any action of any defendant in this case, despite their misguided argument that they somehow conveyed "benefit" on Plaintiffs), the Plaintiffs' convictions were voided and the Plaintiffs who were still in jail were released.

Defendants Alston, Corrigan, Harrison, and Blackwell served as Norton's supervisors. The Plaintiffs have adequately pled that the Defendants had "knowledge that [Norton] . . .

engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]." *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.1994). Importantly, the law does not require Plaintiffs to show that the Defendants knew *for sure* that Norton had lied on search warrants and caused the unlawful detention of many persons, but simply that they knew that Norton engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury. The facts laid out in the Amended Complaint strongly support the reasonable inference that Defendants Alston, Corrigan, Harrison, and Blackwell **knew that Norton regularly lied about his dealings with informants, which, because informants are regularly used to obtain warrants, posed a "pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]."**

The Amended Complaint states that during the years 2012 and 2013, Defendant Lt. Alston served as Norton's Direct Supervisor, and, during the same time period, Defendant Lt. Corrigan served as Norton's Intermediate Supervisor. Am. Complaint, ¶¶ 19-20 (unless otherwise stated, all paragraph references are to the Amended Complaint). Beginning in August 2012, Corrigan was also asked to clean up the RPD's confidential informant program, which he found had serious problems including failure to maintain accurate records of informants and the assistance they provided. ¶¶ 144-47. Defendant Harrison was also responsible for supervising Norton; from in or about 2011 through at least March 2013, Harrison also served as the Head of RPD's Special Investigations Division. According to the RPD website, Harrison currently leads the Department's Internal Affairs Division. ¶ 21. With regard to Defendant Cpt. Blackwell, he was responsible for supervising Norton as well. From in or about 2009 through 2011, Blackwell also oversaw the RPD's confidential informant program. ¶ 22.

The Amended Complaint asserts that during the relevant period, Norton had a well-deserved reputation as a sloppy, dishonest, and corrupt officer. According to FBI records, Norton's fellow officers had "heard rumors about NORTON from many people" and reported that "a lot of rumors about NORTON went around." ¶ 122; *see also* ¶¶ 123-26. These rumors indicated that Norton's paperwork was "garbage," ¶ 122; that Norton had a cozy relationship with his informants, ¶ 123; that Norton performed flagrantly illegal searches, ¶ 124; and that Norton was connected to a gang that the RPD was investigating, ¶ 126. FBI records indicate that it had been a "joke for years that Norton was dirty." ¶ 25. By mid-2012, Norton's "dirtiness" was so evident that the Federal Bureau of Investigation (FBI) began investigating him. What the FBI found is a shocking record of misconduct. ¶ 26. It is plausible for a jury to conclude that Defendants, who were Norton's supervisors, and, therefore, responsible for ensuring Norton's compliance with Constitutional protections, knew of Norton's dishonest and corrupt practices.

Supervisory knowledge of Norton's dishonest and corrupt practices is further established by the statement of Officer Tommy O'Connell, Norton's one-time partner. O'Connell "asked to stop working with Norton because he was a sinking ship." ¶ 127. Of course, O'Connell's request would have gone to a supervisor—someone with the authority to make such a change.

Further evidence that knowledge of Norton's problems climbed the chain of command comes in the form of comments by Bruce Gochenour, one of Norton's colleagues. Gochenour told FBI investigators that "NORTON's desk was littered with notices of information he received from informants," and that Norton was "flying too fast and too loose." ¶ 137. Gochenour "blamed RPD management for NORTON's situation." ¶ 137. "NORTON was producing for management," Gochenour reported, "*so [management] let him hang himself.*" Gochenour's statements show without a doubt that Norton's problems were well known to

management, which a reasonable jury could reasonably conclude included Defendants. Such knowledge, when combined with the numerous other bases for knowledge discussed above, would have led to the reasonable conclusion that persons like the Plaintiffs could have been wrongfully imprisoned. Surely, a reasonable jury could conclude that Defendants, who, during considerable periods of time were Norton's Direct Supervisor (Alston); Intermediate Supervisor (Corrigan; also specifically tasked with informant program cleanup); a supervisor and the Head of the Special Investigations Division who went on to head Internal Affairs (Harrison); and a supervisor who oversaw the confidential informant program prior to the August 2012 commencement of cleaning it up (Blackwell)– would be part of such "management."

In addition to the foregoing documented statements concerning Norton's corrupt and dishonest nature, the Amended Complaint details flagrant and repeated abuses that had to have been known by Norton's supervisors. One of Norton's most common frauds, for example, concerned the seizure of money during an arrest. ¶ 27. Over and over again, Norton would stop a car, search the car, and discover money and perhaps other contraband. He would seize the money as though it were evidence of a crime, but *would not* arrest the occupants of the car, issue a citation, or even, contrary to department policy, provide a receipt to the occupants confirming that he took the money. *Id.* By not issuing receipts, Norton was laying the groundwork for a scheme to unlawfully keep the money.

In addition to the foregoing, Norton engaged in extensive other misconduct in his use of confidential informants. ¶ 54. To obtain a court warrant, Norton routinely told courts that his knowledge of criminal activity derived from an informant. Norton knew, of course, that a warrant could only issue if he could establish the informant's reliability. Norton was apparently

so eager to make arrests, and so unconcerned with people's rights, that he frequently lied when establishing his informants' reliability. ¶ 68.

Norton's lies were of two types. ¶ 69. In some warrant applications, he attempted to establish the *same informant's reliability using entirely different sets of facts* and in other warrant applications, he attempted to establish *different informants' reliability using the exact same set of facts*. The *Richmond Times-Dispatch*, in its coverage of Norton's misconduct described the problem thus: Norton's warrant applications had "differing résumés . . . for the same informant and identical résumés . . . for purportedly different informants." *Id.*

Norton repeatedly lied in his applications for search warrants. ¶ 54. His lies concerned the identity and/or reliability of the confidential informants he offered to the court as evidence of probable cause. ¶ 72. In some cases, Norton provided different résumés for the same informant and in other instances provided the same résumé for different informants. In either case, Norton was lying about the identities or reliability of his informants, or sometimes lied about both. As a result, warrants based on his lies were completely invalid, as were the arrests and detentions of the Plaintiffs in this case: Wilbur Ensley, Covey Andrews, Shamar Archer, Deunte Humphries, and Jamar Gilliam. *Id.* As a result of the Defendants' lawless conduct, the five Plaintiff spent a total of 6,220 days in prison. ¶¶ 1-3.

On January 20, 2009 (when Blackwell was supervising Norton and overseeing the confidential informant program), state and federal officers arrested Wilbur Ensley at 16__ P____ Street in Richmond, Virginia. As the Amended Complaint details, Ensley's arrest was the result of blatant lies by Norton and thus completely unconstitutional. ¶ 73. Earlier that day, Norton applied for and obtained a warrant to search 16__ P_____ Street. ¶ 74. In applying for the warrant, Norton swore to the court that a "reliable confidential informant" told him that he "was

inside 16__ P_____ Street apartment A" and "observed two black males" allegedly engaged in criminal activity. *Id.* As required by the Constitution, Norton further explained to the court why his informant was reliable. ¶ 75.  Norton attributed the information to "CI #933," who, according to RPD records, is R. A.  However, R. A. did *not* provide any information to Norton about 16__ P_____ Street. ¶ 76.  According to an FBI interview of R. A.:

> "[R. A.] was shown three photographs of a house at 16__ P_____ Street, Richmond, Virginia. . . . [R. A.] stated that he does not know who lives at 16___ P____ Street, does not go there, and does not associate with the individuals at that location.  [R. A.] stated that he never called NORTON about drugs being stored inside 16__ P_____ Street and has never been there.  [R. A.] stated that he never gave NORTON information on any houses for warrants." *Id.*

Further evidence of Norton's fraud is evidenced on the N-10 form itself. The N-10 form associated with the search of 16__ P_____ Street indicates that "CI #933" provided Norton with information about criminal activity at the house.  An informant who receives payment for his assistance must sign an N-10 form acknowledging the payment.  According to an FBI investigation, the informant's signature on the N-10 "did not look anything like" R. A.'s signature; when R. A. was asked if he signed the form, he responded plainly, "'no sir.'" ¶ 77.

Another suspicious aspect of the N-10 form is the witness's verification of the payment. The witness on the N-10 form is Officer Brandon Black.  When shown the form, Black stated that the signature was his but that the date and time were not his.  ¶ 78. This information was probably filled in later, which was a common and troubling practice at the RPD.  As another RPD officer told the FBI during an investigation into Norton's frauds, **"all the officers in the RPD Narcotics Department have [signed the N-10] form without being present during the payment of money to the source."**  (Emphasis added.) *Id.*

Because Black did not appear to witness the payment of money to the informant, and the informant's signature is forged, it is unclear who actually received the $500 payment. Indeed, it

is quite possible that Norton simply pocketed the money himself. When the FBI asked one of Norton's fellow officers whether Norton might keep a payment instead of passing it on to an informant, the officer replied "I totally believe that could happen." *Id.*

Beyond these problems lies the additional problem that large portions of CI #933's resume in the warrant application for 16__ P_____ Street were identical to the resume of at least one other informant. Different informants should have different resumes, but Norton provided almost the exact identical resume for CI #933 as he did for CI#757. Finally, not only did Norton describe CI #933 in ways substantially similar to other informants, he also described CI #933 in different ways in different warrant applications. ¶ 79.

On or about September 11, 2009 (when Blackwell was supervising Norton and overseeing the confidential informant program), Norton came to believe that contraband was located in a silver Mercedes Benz parked at 30_ J_____ St. in Richmond that was in the possession of Covey Andrews. ¶¶ 91, 96. But just as in Ensley's case, Norton had a problem. He apparently lacked a credible informant. But this did not stop him. As in Ensley's case, Norton simply lied to the judge. ¶ 92. Norton told the judge that a "reliable" informant told him about the contraband in the car. *Id.* To evidence this reliability, Norton provided specific information to the judge to buttress his claim that he had information from a reliable informant. Norton's statements to the judge were not mistakes; they were intentional lies.

The false nature of these statements is evidenced in many ways. First, on the N-10 form signed by Norton the same day as the request for a search warrant, Norton stated that his informant was "CI #933," who, as noted above, is R. A. But the informant's signature on the N-10 form is most certainly *not* R. A.'s. ¶ 93. Rather, the signature (which is legible) appears to be

that of "J. C." *Id.*  But when the FBI interviewed J. C., "[J. C.] stated that he did not provide [the] information...  [J. C.] stated, 'that's not me,' that he did not sign the N-10 form..." *Id.*

Further evidence of the falsity of the warrant application leading to Andrews's arrest is the fact that Norton described CI #933 in dramatically different terms than he had previously in his January 20, 2009 warrant application (which led to the arrest of Wilbur Ensley).  ¶ 95.

On October 8, 2009 (when Blackwell was supervising Norton and overseeing the confidential informant program), Norton wished to search a dwelling located at 72_ A_____ Ave.  Plaintiff Shamar Archer lived in the house. Norton applied for a search warrant based on information he allegedly received from a confidential informant.  ¶ 100.  In his application, Norton described the reliability of his informant. As with his prior statements in other warrant applications, these statements to establish the reliability of his informant were intentional lies. ¶ 101.  The N-10 form for this warrant states that the informant is CI# 757, who is "J. D."  *Id.* Unlike the N-10 forms discussed in Ensley and Andrews's cases, the informant's signature on this N-10 form does appear to say "[J. D.]"  It turns out, however, the signature was forged. *Id.*

When the FBI interviewed J. D., he flatly denied any involvement in the case or signing the form. ¶ 102. According to FBI notes of an interview with J. D.:

> "[J. D.] was shown a photograph of [72_ A_____ Avenue], Richmond, Virginia. [J. D.] stated that, 'naw,' he had never been inside the home.  [J. D.] stated that he does not know anyone who ever lived at that location. [J. D.] stated that he never provided information that someone was dirty inside the house. [J. D.] was shown a RPD N-10 form, Report of the Expenditure of Special Investigative Funds, dated 10/16/2009.  [J. D.] stated that he did not remember the document.  [J. D.] stated that the signature on the form did not look like his signature.  [J. D.] could not remember being paid $250 on 10/16/2009."  *Id.*

J. D.'s statements are not the only reason to doubt the veracity of Norton's application for a warrant to search 72_ A_____ Ave.  Norton's description of his informant's reliability reveals two deeply troubling problems.  First, the resume Norton provided for CI #757 on October 8,

2009 was almost exactly the same as the resume Norton provided for CI #933 on January 20, 2009. ¶ 104. Second, the same informant should have the same resume, or at least a resume that logically changes over time; however, Norton provided radically different information for CI #757 on three different occasions over 2 ½ years. ¶ 105.

In February 2012 (when Alston, Corrigan and Harrison were supervising Norton), Norton lied on and affidavit leading to the arrest of Plaintiffs Deunte Humphries and Jamar Gilliam. Again, Norton lied about the reliability of his informant, secured a search warrant for 33_ _ Avenue, and executed it on February 24, 2012. True to form, Norton lied on the application for the search warrant by bolstering the reliability of his informant with a completely made up resume. A comparison of the resume of CI #757 Norton attested to in February 2012 to the resume of CI #1166 reveals Norton's deceit, as the resumes for the two informants are *identical*. Moreover, the resume Norton used for CI # 757 in February 2012 was entirely inconsistent with what he had sworn to in different cases wherein he purportedly used CI # 757. ¶¶ 113-118.

It is no surprise that in March 2011, Norton was formally reprimanded for his deceit in working with confidential informants in July 2010 and February 2009. ¶¶ 37; 133-36. With regard to the July 2010 matter, RPD officials discovered that the official records of Norton's work with informants contained two alarming problems. *Id.* First, some official records contained signatures that were purportedly made by the same person but did not look consistent. *Id.* This suggested that at least one of the signatures must have been a forgery—with Norton being the most likely forger. Second, other records contained signatures of persons who were not listed as informants in the case. *Id.* This suggested that the informants Norton was telling the court about in his warrant applications were not his actual informants- *the exact thing that occurred in Plaintiffs' cases*. Concerning the February 2009 matter, Norton had attempted to use

informants who had not yet been registered or established as reliable (in connection with his witnessing of a drug buy wherein he also corruptly did not arrest the persons involved). *Id*. As early as 2009, Norton was attempting to use informants who had not been established as reliable.

Not long after Norton's above reprimands, Norton was again the subject of a formal inquiry into his misconduct with informants. In this instance, which likely occurred in 2011, *see* ¶ 131, one of Norton's informants, R.A., was subjected to a recorded interview while he was in the hospital. The tape of the interview was later "given to 'IAD' (Internal Affairs Department)." ¶ 129. The interview concerned R.A.'s relationship with Norton and was conducted by an RPD officer as well as, in all likelihood, a member of the IAD. ¶ 130.

Therefore, Norton was on RPD's disciplinary radar in a serious way in 2011. The Defendants supervised Norton during various periods beginning in 2009 and ending in 2013. ¶¶ 19-22. Blackwell and Harrison were both supervising Norton at the time of the March 2011 reprimands and at the time of the 2011 Internal Affairs investigation where informant R.A. was interviewed about Norton. Further, Blackwell was at both times the head of the confidential informant program, in its "pre-cleanup" days. Blackwell was also in both roles –Norton supervisor and head of C.I. program- in 2009 and 2010 when the underlying conduct spurring the 2011 reprimands occurred. As the Direct and Intermediate supervisors of Norton in 2012 and 2013, Alston and Corrigan would have known of Norton's previous reprimands and an IAD investigation regarding his use of informants; both the seriousness of these issues and the officers' responsibilities over Norton would have insured such. Corrigan was also specifically assigned to clean up the informant program and testified about its glaring problems, indicating he would have had even more reason to know of Norton's warrant problems. A reasonable jury could conclude, therefore, that Defendants certainly knew about the relevant conduct displayed

by Norton that underlay his reprimands and IAD investigation.  Because such conduct specifically involved deceit regarding informants, a reasonable jury could also conclude that Defendants would have had knowledge sufficient to believe, and did in fact believe, that Norton regularly lied about his relationship with informants, thus creating the substantial risk persons like the Plaintiffs could have been wrongfully imprisoned.

As stated in the Amended Complaint, there were also two enormous and pervasive problems with the RPD's confidential informant program during the relevant period of time (so enormous that in August 2012, Defendant Corrigan was specifically assigned to clean it up). And as Defendant Corrigan has admitted, there was lots of cleaning to do.  First, there was a widespread custom in the RPD of lying on N-10 forms, which are forms used to verify the identity of informants receiving payment for information.  As one of Norton's colleagues reported to the FBI, "*all the officers* in the RPD Narcotics department" have signed an N-10 form indicating that they witnessed a payment *without actually witnessing the payment*.  ¶ 142. The importance of witnessing a payment cannot be overemphasized.  Requiring such witnessing not only prevents financial corruption (such as the officer pocketing the fee), *but it also obviously prevents officers from lying about the existence of informants to begin with*.

The second major problem Defendant Corrigan faced was the program's complete failure to maintain "resume sheets."  ¶ 145.  An informant's "resume sheet" lists the assistance that the informant has provided to officers in the past, thus allowing RPD supervisors to verify that an officer's statement - for example, that "Informant X has previously provided reliable information leading to five arrests" - *was actually true*.  ¶ 145.  Obviously, if an informant program is not using resume sheets, it lacks any serious commitment to accuracy and preventing fraud.

As supervisors of Norton, a detective working with confidential informants, it is reasonable for a jury to conclude that Defendants would have known about the widespread problems that pervaded the informant program in the period prior to the August 2012 "cleanup." The same goes double for Blackwell and Corrigan, persons who headed the program immediately before and after the charge to clean it up. When combined with the other knowledge Defendants had about Norton, a reasonable jury could find that Defendants would have had knowledge sufficient to believe, and did in fact believe, that Norton regularly lied about his relationship with informants, thus creating the substantial risk that persons like the Plaintiffs could have been wrongfully imprisoned.

Finally, Defendants, given their supervisory roles of Norton (and, for Blackwell and Corrigan, also their roles heading the confidential informant program during the relevant period) would have known that the FBI was investigating Norton, starting in mid-2012, for lying about the identity of his informants on warrant applications filed as early as 2009. ¶¶26, 138.

## ARGUMENT

Defendants Alston, Corrigan, Harrison, and Blackwell offer six arguments why they should not be held liable for the harm suffered by Plaintiffs. Each of these arguments is addressed below, but, before addressing them, it will be helpful to first explain the Plaintiffs' theory of the case as manifested in their Amended Complaint. Such will significantly assist the Court in seeing why Plaintiffs have stated a claim for relief against Defendants.

### A. The Plaintiffs' Theory of the Case Against Defendants

The statement of facts in the previous section evinces the heart of Plaintiffs' grievances, which is that Defendants likely knew that Norton lied about informants, but did nothing, despite

the fact that persons in the Plaintiffs' positions would be unlawfully detained. This misconduct translates into two types of claims: (1) supervisory claims and (2) non-supervisory claims.

### 1. The Supervisory Claims

The supervisory claims against Defendants are contained in Counts IV and V. In those claims, the Plaintiffs allege that Defendants failed to supervise Defendant Jason Norton with regard to his commission of the constitutional violations in Counts I, II and III. This, in turn, requires an understanding of what is alleged in Counts I, II and III, which is as follows:

- **Count I**: **Fourth Amendment Malicious Prosecution Claim**. Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning with their indictments and ending with their releases, because, as a result of Norton's lies in seeking search warrants, Plaintiffs were detained without probable cause and the criminal proceedings against them were terminated in their favor.
- **Count II**: **Knowing and Intelligent Plea Claim.** Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning at their pleas and ending when the criminal proceedings against them were terminated in their favor. This claim is based on Norton's failure to disclose his lies during the plea process, thus depriving the Plaintiffs of the right to make a knowing and intelligent plea under *Brady v. United States*, 397 U.S. 742 (1970).
- **Count III**: **Liberty Claim under the Fourteenth and/or Eighth Amendment.** Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning just after their pleas and ending when the criminal proceedings against them were terminated in their favor. This claim is based on Norton's failure to disclose his lies after the Plaintiffs pled guilty, thus depriving the Plaintiffs of the right to be free from unlawful detention.

Thus, in the supervisory claims alleged in Counts IV and V, Plaintiffs allege that Defendants failed to take reasonable steps to prevent or alleviate the harms suffered by Plaintiffs, despite Defendants' actual or constructive knowledge that Norton would violate, was violating, or had violated the Plaintiffs' rights to: (1) be free from malicious prosecution, (2) make knowing and intelligent pleas, and (3) enjoy liberty under the Fourteenth and/or Eighth Amendment.

There are two additional points about the supervisory claims that are significant. First, although most supervisory claims involve an allegation that the supervisor knew that the subordinate would commit a violation *in the future*, Plaintiffs have also alleged here that

Defendants failed to supervise *during or after* the violations. *See* ¶¶ 166-167. The reason for these "during or after" allegations is that the constitutional violations committed by Norton began at the time of the searches *and continued until Plaintiffs were released years later*. Thus, Defendants are liable to Plaintiffs not only because they failed to supervise Norton *before* the violations occurred, but also at the time when the violations were occurring or had occurred.[1]

Second, the supervisory claims all refer back to Counts I, II and III *as a group*, rather than separately, because it is generally unimportant to Plaintiffs' case against Defendants which constitutional violation(s) Norton actually committed.[2] If Norton committed the violation specified in Count I, but not in Counts II or III, Defendants would be just as liable to the Plaintiffs as they would had Norton committed the violation in Count II, but not Counts I and III. It is the Plaintiffs' position, of course, that Norton committed the violations named in all of Counts I, II and III, but because Defendants' liability does not hinge on which one of those Counts Norton violated, it was not necessary to separately allege Defendants' liability on a count-by-count basis. Consequently, *if Plaintiffs state a claim in <u>any of</u> Counts I, II or III against Norton, they state a claim for relief in Counts IV and V against Defendants as long as they can show that Defendants, in the face of sufficient knowledge of the violation, failed to respond appropriately.*

---

[1] There is no reason to think that a supervisory claim only extends to prospective constitutional violations, rather than ongoing constitutional violations. Indeed, it is nonsensical to think that a supervisor could be held liable for failing to interrupt a foreseeable constitutional violation, but escape liability for failing to intervene while the violation *was actually occurring*. To the extent that this understanding of supervisory liability overlaps with bystander liability, Plaintiffs have stated a claim on that ground as well, as more fully discussed, *infra*, p. 26.

[2] The only slight difference between the claims would be the length of incarceration that would be actionable against Defendants. As the explanation of Counts I, II, and III, above, shows, the length of unlawful incarceration differs slightly between the Counts.

### 2. The Non-Supervisory Claims

In addition to the supervisory claims in Counts IV and V, Plaintiffs also allege in Counts VII and VIII that Defendants deprived them of their rights to liberty under the Fourteenth and/or Eighth Amendments. These counts are similar to Counts IV and V in that they are based on Defendants' failures to act upon their likely knowledge, but are also importantly different: Counts VII and VIII are *not* supervisory claims. That is, Defendants' liability in this respect does not depend on their roles as supervisors, but simply on their failures to act given their knowledge that Norton's misconduct would likely have caused persons like Plaintiffs to be unlawfully jailed.

### B. The Plaintiffs State a Plausible Claim for Supervisory Liability Against Defendants With Regard to the Fourth Amendment Violations.

In their motion to dismiss, Defendants make five arguments why they are not liable as supervisors for the Fourth Amendment violations. Each of these arguments is meritless.

### 1. The Plaintiffs' Fourth Amendment Claims Are Not Time Barred.

Defendants first argue that Plaintiffs' Fourth Amendment claims are time-barred because, they assert, the Plaintiffs were on notice of their § 1983 claims "at the time of the allegedly illegal search and seizure." Br. at 12. Alternatively, Defendants argue that Plaintiffs' 1983 claims accrued "no later than the filing of their habeas Petitions and/or motions to vacate." Br. at 14. This claim has been fully addressed in an accompanying brief, and the Court should reject it. *See* Plaintiffs' Opposition to Defendant Norton's Motion to Dismiss at 22-27.

### 2. *Ashcroft v. Iqbal* Does Not Bar the Supervisory Claims Alleged Here.

Defendants suggest, in a footnote, that, even if Plaintiffs state a Fourth Amendment malicious prosecution claim, they may not be held liable as supervisors because, they contend, "[s]upervisory liability may no longer constitute a viable Section 1983 claim" under *Ashcroft v.*

*Iqbal*, 556 U.S. 662 (2009). Br. at 19, n.6. To the extent that Defendants make this argument, it fails because it misreads *Iqbal,* as well as the Fourth Circuit's reading of *Iqbal*. This argument has also been fully addressed in an accompanying brief, and the Court should reject it. *See* Plaintiff's Opposition to Defendant Norwood's Motion to Dismiss, at 14-16.

### 3. The Plaintiffs Have Stated a Plausible Supervisory Claim Against Defendants

Defendants next claim that because the Defendants "were not responsible for Norton at or around the time of Plaintiffs' respective arrests," the Plaintiffs' claims must fail. Br. 15-16. In support, Defendants argue that it is "black letter law" that a § 1983 claim cannot be brought for supervisory liability where the named defendant was not a supervisor at the time of events on which the claim is based and cite an unpublished decision in support. The case Defendants cite, *Brown v. Poplin*, 3:10cv565, 2011 WL 5119483 (W.D.N.C. July 29, 2011[3]), fails to support their argument. If any "black letter law" can be gleaned from *Brown*, it is the principle that a "claim for supervisory liability under Section 1983 [] must allege that [the defendant] had actual or constructive knowledge that his subordinates, . . . [was] engaged in conduct that posed a pervasive and unreasonable risk of personal injury to Plaintiff, that [defendant's] response was inadequate, and that there was a causal link between his inaction and the injury to Plaintiff." *Id.* at * 6. As discussed previously, Plaintiffs have alleged that Defendant Blackwell was supervising Norton and overseeing the confidential informant program itself in 2009 when Ensley, Archer and Andrews were arrested (and continuing until 2011), and that Defendants Harrison, Corrigan and Alston were all supervising Norton in 2012 when Gilliam and Humphries were arrested (and continuing to 2013); indeed, Alston was then Norton's Direct Supervisor and Corrigan his Intermediate Supervisor, and shortly after those arrests, Corrigan was assigned to

---

[3]  Defendants incorrectly cite the date of this decision as Oct. 27, 2011.

clean up the failing informant program. Moreover, at issue is not simply the time of the

Plaintiffs' wrongful arrests, but the continuing prosecution and incarceration of Plaintiffs for

years throughout Norton's tenure at RPD. During this period, there was inaction on the part of

Defendants and a lack of response in the face of Norton's misconduct that had caused and

continued to cause injury to the Plaintiffs.

To be clear, the Fourth Circuit has plainly stated that to state a claim for supervisory

liability, a plaintiff must plausibly plead:

> (1) that the supervisor had actual or constructive knowledge that his subordinate
> was engaged in conduct that posed a pervasive and unreasonable risk of
> constitutional injury to citizens like the plaintiff; (2) that the supervisor's response
> to that knowledge was so inadequate as to show deliberate indifference to or tacit
> authorization of the alleged offensive practices, and (3) that there was an
> affirmative causal link between the supervisor's inaction and the particular
> constitutional injury suffered by the plaintiff.

*Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994). Thus, a supervisor cannot be held liable unless

he or she possessed a mental state sufficient to state a claim on the underlying claim. The

underlying claim here is the malicious prosecution claim, which requires the Plaintiffs to "allege

that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported

by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Evans v.

Chalmers*, 704 F.3d 636, 647 (4th Cir. 2012). Fourth Circuit law is clear that a plaintiff can state

a malicious prosecution claim by pleading that the false statement leading to prosecution was

"made deliberately or with a reckless disregard for the truth, which may be proved by showing

that when viewing all the evidence, the affiant must have entertained serious doubts as to the

truth of his statements or had obvious reasons to doubt the accuracy of the information he

reported." *Massey v. Ojaniit*, 759 F.3d 343, 357 (4th Cir. 2014); *see also Miller v. Prince

George's Cty*, 475 F.3d 621, 627 (4th Cir. 2007) (plaintiff bringing malicious prosecution claim

against a police detective must show that the detective "deliberately or with a reckless disregard for the truth made material false statements in his affidavit"). By combining the mental state required of a malicious prosecution claim with the supervisory liability standard, it becomes clear that Plaintiffs state a claim against Defendants if they have plausibly alleged that:

> (1) Defendants "entertained serious doubts as to the truth of [Norton's] statements or had obvious reasons to doubt the accuracy of the information [Norton] reported" (2) that [Defendants'] response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between [Defendants'] inaction and the particular constitutional injury suffered by the plaintiff[s].

As explained below, the Plaintiffs have plausibly alleged each of these three elements.

First, Plaintiffs have adequately alleged that Defendants either "entertained serious doubts as to the truth of [Norton's] statements or had obvious reasons to doubt the accuracy of the information [Norton] reported." *Massey,* 759 F.3d at 357. The statement of facts contains numerous grounds for a reasonable jury to conclude Defendants had "reason to doubt the accuracy" of the information in Norton's warrant applications. In particular, Defendants would have had reason to doubt Norton's reliance on informants because they would have reasonably known, among other things, that: (1) Norton was reprimanded in March 2011 for deceit concerning confidential informants on multiple occasions; (2) a C.I. was interviewed about his relationship with Norton in late 2011 in an IAD investigation; (3) the RPD's confidential informant program in and prior to mid-2012 lacked basic checks on integrity that would keep an officer from lying about informants; (4) Norton's colleagues and other supervisors thought he played "too fast and too loose," had encountered him lying on numerous occasions, and believed that "management" was letting Norton "hang himself" because he was "producing"; and (5) the FBI began investigating him in mid-2012 for lies regarding informants/ warrants.

Given all these allegations, a reasonable jury could easily find that, long before the Plaintiffs were released from jail, Defendants had "reason to doubt the accuracy" of Norton's search warrant applications which, if inaccurate, would render the Plaintiff's incarcerations unlawful. It is difficult to pinpoint, of course, especially at this pre-discovery juncture, *exactly when* Defendants would have developed "reason to doubt the accuracy" of Norton's warrant affidavits. In the end, however, is it unnecessary for Plaintiffs to pinpoint that exact date(s). To state a plausible claim for relief, Plaintiffs need only show that Defendants had "reason to doubt the accuracy" of Norton's affidavits sometime *before* a reasonable person would have taken steps to intervene. Put differently, the exact moment in which Defendants would have had "reason to doubt the accuracy" of Norton's warrant affidavits would impact the *quantity* of the remedy*, but not the *availability* of a remedy. The quantity of the remedy is, like in any ordinary personal injury suit, a matter to be worked out at trial. As long as Plaintiffs can show *some* injury at this stage, they have stated a claim for relief.

Second, Plaintiffs have adequately alleged "that [Defendants'] response to [their] knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices." Once they had "reason to doubt the accuracy" of Norton's affidavits by the end of 2012 *at the latest* (and likely much earlier), Defendants apparently did nothing while most Plaintiffs remained jailed for another 2.5 years. This response was clearly deficient.

Consider, for example, Plaintiffs Gilliam and Humphries, who were arrested on February 23, 2012. By this time, Defendants would have reasonably known from (1) Norton's 2011 double-reprimand for deceit involving informants on separate occasions and (2) IAD's investigation of Norton regarding his work with an informant in late 2011 (in addition to information gleaned casually that Norton was "dirty," others "asked to stop working with Norton

because he was a sinking ship," his informant paperwork was "garbage," etc., and that the confidential informant program had serious integrity problems) that Norton posed a significant risk to persons in Gilliam and Humphries' circumstances—*i.e.*, persons arrested pursuant to information reportedly provided by a confidential informant working with Norton. The reasonable response to this risk would be to prohibit Norton from working with informants or, at the very least, prohibit him from relying on informants in applying for search warrants. This, on its own, would have prevented the harm suffered by Gilliam and Humphries. Even after their arrests, however, Defendants could have taken appropriate steps to minimize the period of their incarceration. As Defendants' knowledge of Norton's troubles grew in mid-2012, Defendants could certainly have instituted an internal investigation to determine whether persons like Gilliam and Humphries had been caught up in Norton's schemes. But Defendants did not do that. In particular, they did not investigate the wrongful detention of persons like Gilliam and Humphries until *after* federal authorities had concluded their investigation. ¶ 149. That investigation began, as noted above, in mid-2012 and did not terminate until the early spring of 2015. Once that investigation concluded, state officers sought the vacatur of Gilliam and Humphries' convictions and were able to procure them by the summer of that same year. ¶ 120. If Defendants had, as they certainly could have, pursued an investigation into Norton's state court convictions, persons like Gilliam and Humphries would have been released far sooner. There is simply no reason why Gilliam and Humphries should have had to wait for relief when Norton's misconduct would have been known to Defendants years earlier.

Turning to Plaintiffs Ensley, Archer and Andrews, with regard to Defendant Blackwell, one sees the same general problem: he was supervising Norton and running the confidential informant program when they were arrested in 2009. During this period, Norton was lying

repeatedly about the reliability of his informants, falsifying N-10 forms regarding the identity of the informants, forging, or having others forge, signatures of informants, and not following protocol with respect to having another officer witness payment of funds to the informants—all of which Blackwell plausibly had knowledge of and supervisory authority over at the time of Ensley's, Archer's and Andrews's arrest.  After 2011, Blackwell is not absolved of responsibility just because he moved to another department.  Indeed, it is Blackwell's lack of response and inaction that contributed directly to Humphries' and Gilliam's wrongful arrests, as he had knowledge of Norton's pattern of misconduct and that Norton was engaged in conduct that posed a pervasive and unreasonable risk of personal injury to the Plaintiffs and persons like them. Moreover, just as with Gilliam and Humphries, if Blackwell did not catch Norton's corrupt actions at the time of Ensley, Archer and Andrews's arrests, Blackwell would have known at least by 2011 that Norton was engaged in deceitful activities related to confidential informants. And then when they started supervising Norton, in 2011 for Harrison, and 2012 for Alston and Corrigan, these Defendants too would have known of Norton's multiple reprimands, IAD investigation, reputation and "garbage" paperwork concerning informants.  Corrigan, in particular, was specifically assigned to overhaul the shoddy confidential informant program; if the confidential informant program was "cleaned up," surely that included a review of the N-10 forms that evidenced Norton's repeated inconsistencies regarding confidential informants' names and the CI #'s associated with them.  The N-10 forms, in conjunction with the formal reprimands Norton received for misuse of confidential informants, would show that Corrigan had actual or constructive knowledge that a subordinate—Norton—was engaged in conduct that posed a pervasive and unreasonable risk of personal injury to persons like the Plaintiffs.  Then, by mid-2012, all of these Defendants would have known even more—*i.e.*, that not only did the RPD's

confidential informant program have serious integrity problems, *but that the FBI believed Norton had lied to obtain warrants*, thus putting people in jail in violation of law.

Instead of initiating their own investigation in 2011 or 2012, Defendants did nothing. As a result, Ensley, Archer and Andrews had to wait until the *spring of 2015 to be released.* It would be improper for Defendants to contend that they should be let off the hook because federal agents were already performing an investigation. First of all, the existence of a federal investigation does not in any way relieve Defendants of their *own* duty to help persons wrongfully put in jail by one of their *own* officers. Indeed, that is the very premise of supervisory liability: supervisors cannot hide from liability by simply saying "it wasn't my job." *See Slaken v. Porter,* 737 F.2d 368, 373 (1984) (stating that supervisory liability can reach the "highest levels of state government," including anyone "in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked").

Second, the federal investigation was almost certainly not aimed solely at the restoration of Plaintiffs' liberty. Rather, it was to uncover the entire scope of Norton's misconduct and determine whether to file criminal charges/take other action-- with a side effect of, if appropriate, restoring certain persons' liberty. Thus, although Ensley's incarceration (based on information wrongfully attributed to R.A.) was exposed as unlawful very early on in the investigation, Ensley remained in jail until investigators had completed the *entire investigation.* Why should Ensley have remained in jail after it was determined that Ensley should not be in jail?

Third, even if there were some reason to defer to federal investigators in this situation, a jury could reasonably conclude that Defendants *deferred for far too long.* If federal investigators spent a decade investigating this matter, would Defendants be justified in deferring for that long? Certainly not. A 2.5 year investigation is obviously much shorter than that, but in the eyes of

Plaintiffs Ensley, Archer and Andrews, it was intolerably—and with regard to Defendants' decisions, unconstitutionally—too long.  A focused review of Norton's search warrant affidavits would have, *on its own*, revealed the warrants' flaws.  The Plaintiffs' attorneys were able to perform much of the analysis simply by using an ordinary word processing tool that compares different versions of the same document and highlights the differences.  There can be no doubt FBI officials had that same expertise (if not considerably more) but yet continued their investigation because they wanted to know the *full story* about Norton—not simply enough of the story to justify the Plaintiffs' release from jail.

A final observation about the federal investigation is in order.  Plaintiffs are well aware that, to preserve the integrity of an investigation, an investigating officer may elect to continue the investigation even after conduct has been uncovered justifying a prisoner's release from jail.  It might sometimes be in the public interest to delay the release of information obtained during an investigation if doing so would compromise the obtaining of further information.  If this is so, however, it would seem entirely appropriate to *at least compensate persons who have remained in jail in the service of the public interest*.  Analogously, the Constitution allows state and federal governments to take "private property" for "public use"—but only with payment of "just compensation." U.S. Const., amend V.  It would be an extraordinary irony here were the Court to hold that, although a government must compensate a person when it takes the person's *property* for public use, it need not compensate a person when it takes his or her *liberty* for public use.  Obviously, the Plaintiffs' do not allege a Takings claim here, but the illustration may help the Court see the true nature of the Plaintiffs' claims.  If, for some overriding reason, the federal

investigation could not be interrupted, there is no reason that the Plaintiffs should be denied compensation for their contributions to the investigation.[4]

Third and finally, Plaintiffs have plausibly alleged that "there was an affirmative causal link between the [Defendants'] inaction and the particular constitutional injury suffered by the [Plaintiffs]." On this issue, there can be little debate. Had Defendants, after forming "reason to doubt the accuracy" of Norton's warrant affidavits, taken reasonable steps, Plaintiffs would have been released from jail sooner than they were. It is immaterial at this stage in the proceedings whether Plaintiffs would have been released a week earlier or three years earlier because being unlawfully detained for even a week is still a constitutional violation worthy of compensation. *See Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001) (holding that a detention as short as three hours stated a claim for relief). Thus, there can be little doubt that Plaintiffs have adequately alleged causation here.

### 4. Plaintiffs Have Stated a Plausible Claim Against Defendants Individually

The Defendants assert, "... all of the Defendants, except the City, are named in their individual, rather than official capacities, but the Amended Complaint does not allege personal involvement by anyone but Norton in the alleged constitutional violations." Br. at 2. Contrary to Defendants assertions, the Amended Complaint, and this brief, sets out with great specificity the Defendants' own constitutional shortfalls. Plaintiffs seek to hold the Defendants legally responsible for their *own* actions. Plaintiffs do not base their claims upon the doctrine of *respondeat superior*. *See* the discussion *supra.*

---

[4]     Of course, the Amended Complaint does not provide any ground to infer such an overriding reason, much less *require* a jury to accept that reason and reject any contrary inference. The Plaintiffs simply note the point to provide the Court with context.

### 5. Plaintiffs' allegations also state a claim for bystander liability

Defendants' are incorrect when they assert that they are not liable under the bystander liability doctrine. Br. at 26-28. "To succeed on a theory of bystander liability, a plaintiff must demonstrate that a law-enforcement officer (1) knew that a fellow officer was violating an individual's constitutional rights; (2) had a reasonable opportunity to prevent the harm; and (3) chose not to act." *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 417 (4th Cir. 2014) (internal quotation marks and modifications omitted). Although the Plaintiffs have framed their allegations as supervisory claims, the doctrines substantially overlap[5] and, not surprisingly, the Plaintiffs' allegations also state a claim for bystander liability.[6] As explained in the previous sections, the Complaint contains numerous allegations that would allow a reasonable jury to infer that Defendants had actual knowledge that Norton had lied in his application for search warrants—especially once the federal investigation was underway. Such lies rendered the Plaintiffs' incarceration unlawful, thus imposing on Norton a duty to come clean about his frauds. Norton's failure to come clean amounted to a violation of the Plaintiffs' Fourteenth and/or Eighth Amendment rights—a violation of which Defendants would have been aware of as a bystander. Defendants had a "reasonable opportunity to prevent the harm" but "chose not to act." As such, even if the Plaintiffs' supervisory claim is framed as a bystander claim, it still states a claim upon which relief can be granted.

### 6. There are No Intervening Causes that Separate Defendants' Inaction from Plaintiffs' Injuries

---

[5] *See, e.g., Morrison v. Jordan*, No. CIV.A 7:08-CV-00643, 2009 WL 4363922, at *5 (W.D. Va. Dec. 1, 2009) (treating allegations against supervisor as "claims of bystander liability *and* supervisory liability").

[6] It is irrelevant whether the Plaintiffs used the magic words "bystander liability" in the Complaint because the elements of the action were nonetheless plead in the Complaint. *See Stevenson*, 743 F.3d at 418 (holding that a plaintiff need not "recite expressly the elements of bystander liability" to properly allege a bystander liability claim).

Defendants argue that they cannot be liable as supervisors for the Fourth Amendment claim for three purported reasons: because Plaintiffs purportedly did not demonstrate widespread conduct; the Amended Complaint allegedly makes allegations showing actions Defendants think are sufficient with regard to supervising Norton; and Plaintiffs' arrests and guilty pleas. With regard to the first two arguments, as Plaintiffs have shown throughout this brief and the Amended Complaint, there was plenty of wrongful conduct for Defendants to review – not just multiple reprimands and an internal investigation regarding deceit with informants, not just a plethora of information apparently known casually by everyone who worked with Norton and other supervisors, not just that the confidential informant program itself had widespread integrity and monitoring problems that would enable acts like Norton's, and finally not just that the FBI eventually started investigating Norton – but that all of Norton's faulty paperwork was available to Defendants and could have been reviewed by them at many times when they reasonably should have believed Norton posed a risk of constitutional injury to persons like Plaintiffs. It is simply not true that Defendants only had the ability to review the paperwork at the time when it was created (or even, as shown, that simply doing so then would not have been sufficient to catch certain lies). Moreover, any argument that simply reprimanding Norton (without even stopping him from working with informants) or "cleaning up" the program with regard to future informant transactions – *but not investigating who might be currently jailed due to wrongful actions already taken* – actually meets the constitutional burden here is meritless. With regard to the fruit of the poisonous tree arguments and the guilty plea arguments (the later of which ignores that Plaintiffs allege Defendants deprived them of their ability to make knowing and intelligent pleas), as explained at length in an accompanying brief, the Court should reject these arguments. *See* Plaintiffs' Opposition to Defendant Norton's Motion to Dismiss at 2-12.

## C. Defendants Are Not Entitled to Qualified Immunity.

Defendants finally argue that they are entitled to qualified immunity because "[u]nder an objective standard, the conduct of these Officers was reasonable." Br. at 27. This argument is without merit because, although qualified immunity protects officers from liability where they make "bad guesses in gray areas," *Wilson v. Kittoe,* 337 F.3d 392, 403 (4th Cir. 2003) (internal quotation marks omitted), Defendants were not at all acting in a gray area. Each and every claim against them in this suit plausibly alleges that they had ***actual knowledge of a significant risk that persons in the Plaintiffs' circumstances were unlawfully in jail, but yet did not reasonably act to prevent or alleviate their harm.*** Failing to act in such circumstances is not a bad guess in a gray area; it is the wrong call in a black and white circumstance.

With regard to the malicious prosecution claim, Defendants are not entitled to qualified immunity. On this claim, the question before the Court is whether Defendants acted in a "gray area" when, despite "obvious reasons to doubt the accuracy of the information" leading to an unlawful incarceration, they were "deliberate[ly] indifferen[t]" to that knowledge by failing to take steps to prevent or shorten the incarceration. *See infra* at 18-20 (stating the supervisory liability standard applicable to the malicious prosecution claim). When there are "obvious reasons" to doubt someone's incarceration, officials hardly face a close call in determining what to do. The *obvious* thing to do is to initiate an investigation to determine whether the incarceration is lawful or not. Defendants did not do that. Finally, to the extent that Defendants might argue that the application of the fruit of poisonous tree doctrine to Plaintiffs' claims entitles them to qualified immunity, that issue is fully discussed in an accompanying brief. *See* Norton Opposition 2-8, 16-21; Norwood Opposition at 28-30.

Second, Defendants cannot claim qualified immunity for the knowing and intelligent plea claim. On this claim, the question again before the Court is whether Defendants acted in a "gray area" when, despite Defendants' "actual . . . knowledge" that one of their subordinates engaged in conduct (*i.e.*, the misrepresentation of information relevant to a guilty plea) that "posed a pervasive and unreasonable risk of constitutional injury to citizens" like Plaintiffs, Defendants failed to take reasonable steps to prevent or shorten the incarceration. This is most certainly not a "gray area." *Brady v. United States*, 397 U.S. 742 (1970), clearly holds that an officer's misrepresentation can render a guilty plea invalid and *Fisher v. United States*, 711 F.3d 460 (4th 2013) makes plain the obvious implication of this, which is that, by withholding lies underlying a search warrant, an officer engaged in misrepresentation under *Brady*. Given this, Defendants are not entitled to qualified immunity.[7]

Third and finally, Defendants cannot claim qualified immunity on Plaintiffs' liberty claim in violation the Fourteenth and Eighth Amendments. On this claim, the question before the Court is much like the others, namely whether Defendants acted in a "gray area" when, despite their "actual . . . knowledge" that one of their subordinates engaged in conduct that "posed a pervasive and unreasonable risk of constitutional injury to citizens" like Plaintiffs, they failed to take reasonable steps to prevent or shorten the incarceration. For the reasons already stated, Defendants may not claim qualified immunity here because it is hardly a "gray area." *Golson v. Department of Corrections*, 914 F.2d 1491 (4th Cir. 1990) demonstrates that clear law existed on this issue at the time of Defendants' violations. The court in *Golson* stated as clearly as possible that, when a person has reason to believe that someone is in jail but ought not to be, that person

---

[7]     To the extent that Defendants might contend that *Fisher* established new law, and thus that there was no clearly established law *prior to Fisher*, Defendants would still lack qualified immunity for failing to take reasonable steps *after Fisher,* which was decided in April 2013.

has a duty to act. Defendants might argue that *Golson*'s facts are not similar enough to those here, but this argument is unavailing because "'the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity.'" *Id*. at 403 (internal quotation marks omitted). This is because the goal of qualified immunity is to "ensure that before they are subjected to suit, officers are on *notice* their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (emphasis added) (quoting *Saucier v. Katz,* 533 U.S., at 206). The identical-case argument thus ignores that officers do not need additional "notice" on how to "apply[] familiar legal principles to new situations." *Wilson*, 337 F.3d at 403 (quoting *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001) (Michael, J., concurring)). It is certainly a "familiar legal principle[]" (stated in *Golson*, among other places) that, where a police officer lies and persons are detained as a result, the Constitution has been violated, and officer supervisors in Defendants' circumstances would hardly find themselves in uncharted terrain if they discovered those lies.

## CONCLUSION

For the reasons stated above, the Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted,

WILBUR ENSLEY,
COVEY ANDREWS,
SHAMAR ARCHER,
DEUNTE HUMPHRIES and
JAMAR GILLIAM

By: _____/s/ Mark J. Krudys_____
Counsel

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
919 E. Main Street, Suite 2020
Richmond, VA 23219
Phone: (804) 774-7950
Email: mkrudys@krudys.com

John Frederick Preis (VSB# 45764)
7719 Rock Creek Road
Henrico, VA 23229
Phone: (804) 289-8682
Email: jpreis@richmond.edu

Amy L. Austin (VSB# 46579)
THE LAW OFFICE OF AMY L. AUSTIN, P.L.L.C.
101 Shockoe Slip, Suite M
Richmond, VA 23219
Phone: (804) 343-1900
Email: amyaustinlawyer@gmail.com

*Counsel for Plaintiffs Wilbur Ensley, Covey Andrews, Shamar Archer, Deunte Humphries, and Jamar Gilliam*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on May 12, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered users.

By: <u>/s/ Mark J. Krudys</u>

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
Web: www.krudys.com