**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**WILBUR ENSLEY, et al.,**

        **Plaintiffs,**

                                   **Civil Action No. 3:17-CV-024-MHL**

**v.**

**CITY OF RICHMOND, et al.,**

        **Defendants.**

## PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS BY DEFENDANTS ALSTON, CORRIGAN, HARRISON, AND BLACKWELL

In their Memorandum of Law in Support of Motion to Dismiss ("Defendants' Memorandum"), Defendants Michael Alston, Brian Corrigan, Martin Harrison, and William Blackwell (collectively referred to herein as "Defendants") seek to discount the Constitutional import of repeatedly and purposefully lying to judges in support of search warrants; incorrectly claim that Norton did not violate the U.S. Constitution; inaccurately state the applicable statute of limitations; falsely contend that a Section 1983 claim for supervisory liability has not been adequately pled against them; and mistakenly claim that they are shielded from liability in this matter by the doctrine of qualified immunity. The Defendants are wrong in their claims.

Further, the Defendants may not whitewash their constitutional failures by pointing to any alleged illegal conduct by the Plaintiffs. Constitutional search warrant mandates apply to all citizens at all times; they do not disappear merely when the police contend that a citizen is, in fact, guilty of a crime. Had the Constitutional protections enacted by the Founders been followed, the Plaintiffs would not have been arrested, and would not have spent any time in jail. Lying to judges in order to secure pleas can never be condoned, and the effects of such cannot be ignored, if we are truly to live in a constitutional republic. Defendants'

constitutionally proscribed conduct resulted in the Plaintiffs spending a total of 17 years in jail. The Plaintiffs are entitled to relief. This Court should deny Defendants' Alston, Corrigan, Harrison, and Blackwell's motion in its entirety.

## STATEMENT OF FACTS

Norton, an officer with the Richmond Police Department ("RPD") from 2004 through 2013, apparently wanted to arrest certain persons, but he could not do so legally. Instead, he hatched a plan to deliberately and consciously lie in numerous applications for search warrants by attributing supposed knowledge of alleged criminal activity to an incorrect informant who either did not exist or was not reliable. He knowingly falsified the applications, and knowingly went before judges and lied. Lacking knowledge of these lies, state judges issued the warrants. Norton later executed the bogus warrants and arrested the Plaintiffs during the illegal searches he had expressly set up for that purpose. Because the searches were unconstitutional, any charges against the Plaintiffs should have been immediately dismissed. This did not happen, however. Instead, because Norton continued to lie and the moving Defendants (and others) disregarded their constitutional duties to step in, the charges remained, and the Plaintiffs, facing the risk of long prison sentences, pled guilty. Years later, after Norton continued to lie and defraud the justice system, and the moving Defendants (and others) continued to do nothing despite their constitutional duties, someone outside the RPD discovered Norton's lies. Eventually, due to this outside investigation (and not any action of any defendant in this case, despite their misguided argument that they somehow conveyed "benefit" on Plaintiffs), the Plaintiffs' convictions were voided and the Plaintiffs who were still in jail were released.

Defendants Alston, Corrigan, Harrison, and Blackwell served as Norton's supervisors. The Amended Complaint states that during the years 2012 and 2013, Defendant Lt. Alston

served as Norton's Direct Supervisor, and, during the same time period, Defendant Lt. Corrigan served as Norton's Intermediate Supervisor. Am. Complaint, ¶¶ 19-20 (unless otherwise stated, all paragraph references are to the Amended Complaint). Beginning in August 2012, Corrigan was also asked to clean up the RPD's confidential informant program, which he found had serious problems including failure to maintain accurate records of informants and the assistance they provided. ¶¶ 144-47. Defendant Harrison was also responsible for supervising Norton; from in or about 2011 through at least March 2013, Harrison also served as the Head of RPD's Special Investigations Division. According to the RPD website, Harrison currently leads the Department's Internal Affairs Division. ¶ 21. With regard to Defendant Cpt. Blackwell, he was responsible for supervising Norton as well. From in or about 2009 through 2011, Blackwell also oversaw the RPD's confidential informant program. ¶ 22.

The Plaintiffs have adequately pled that the Defendants had "knowledge that [Norton] . . . engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]." *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994). Importantly, the law does not require Plaintiffs to show that the Defendants knew *for sure* that Norton had lied on search warrants and caused the unlawful detention of many persons, but simply that they knew that Norton engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury. The facts laid out in the Amended Complaint strongly support the reasonable inference that Defendants Alston, Corrigan, Harrison, and Blackwell **knew that Norton regularly lied about his dealings with informants, which, because informants are regularly used to obtain warrants, posed a "pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]."**

Allegations establishing this knowledge include Norton's two formal reprimands in 2011 for lying about informants, ¶¶35, 37, 133-36, an Internal Affairs Department investigation into Norton likely conducted in late 2011 regarding his misconduct with informants, ¶¶ 129-31, 148, problems with the RPD's confidential informant program that were so severe that the RPD attempted to clean up the program in the summer of 2012, ¶¶ 144-47, the initiation of a federal investigation into Norton for lying about informants on warrant affidavits in the summer or fall of 2012, ¶138, and widespread rumors of Norton's misconduct- rumors that RPD "management" would have known about because, according to at least one officer, "NORTON was producing for management, so they let him hang himself." ¶¶ 137; 25, 34, 36, 122-28.

Given the above, Defendants would have known of Norton's misconduct involving informants by at least the summer of 2012 and likely much sooner. Yet Plaintiffs were not released until spring and summer 2015. During this period of years (6,220 days in total), Defendants failed to take adequate steps to prevent or alleviate constitutional violations suffered by Plaintiffs. Defendants violated Plaintiffs' constitutional rights and should be held accountable.

## ARGUMENT

Defendants Alston, Corrigan, Harrison, and Blackwell offer six arguments why they should not be held liable for the harm suffered by Plaintiffs. Each of these arguments is addressed below, but, before addressing them, it will be helpful to first explain the Plaintiffs' theory of the case as manifested in their Amended Complaint. Such will significantly assist the Court in seeing why Plaintiffs have stated a claim for relief against Defendants.

### A. The Plaintiffs' Theory of the Case Against Defendants

The statement of facts in the previous section evinces the heart of Plaintiffs' grievances, which is that Defendants likely knew that Norton lied about informants, but did nothing, despite

the fact that persons in the Plaintiffs' positions would be unlawfully detained. This misconduct translates into two types of claims: (1) supervisory claims and (2) non-supervisory claims.

### 1. The Supervisory Claims

The supervisory claims against Defendants are contained in Counts IV and V. In those claims, the Plaintiffs allege that Defendants failed to supervise Defendant Jason Norton with regard to his commission of the constitutional violations in Counts I, II and III. This, in turn, requires an understanding of what is alleged in Counts I, II and III, which is as follows:

- **Count I**: **Fourth Amendment Malicious Prosecution Claim**. Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning with their indictments and ending with their releases, because, as a result of Norton's lies in seeking search warrants, Plaintiffs were detained without probable cause and the criminal proceedings against them were terminated in their favor.
- **Count II**: **Knowing and Intelligent Plea Claim.** Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning at their pleas and ending when the criminal proceedings against them were terminated in their favor. This claim is based on Norton's failure to disclose his lies during the plea process, thus depriving the Plaintiffs of the right to make a knowing and intelligent plea under *Brady v. United States*, 397 U.S. 742 (1970).
- **Count III**: **Liberty Claim under the Fourteenth and/or Eighth Amendment.** Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning just after their pleas and ending when the criminal proceedings against them were terminated in their favor. This claim is based on Norton's failure to disclose his lies after the Plaintiffs pled guilty, thus depriving the Plaintiffs of the right to be free from unlawful detention.

Thus, in the supervisory claims alleged in Counts IV and V, Plaintiffs allege that Defendants failed to take reasonable steps to prevent or alleviate the harms suffered by Plaintiffs, despite Defendants' actual or constructive knowledge that Norton would violate, was violating, or had violated the Plaintiffs' rights to: (1) be free from malicious prosecution, (2) make knowing and intelligent pleas, and (3) enjoy liberty under the Fourteenth and/or Eighth Amendment.

There are two additional points about the supervisory claims that are significant. First, although most supervisory claims involve an allegation that the supervisor knew that the subordinate would commit a violation *in the future*, Plaintiffs have also alleged here that

Defendants failed to supervise *during or after* the violations. *See* ¶¶ 166-167. The reason for these "during or after" allegations is that the constitutional violations committed by Norton began at the time of the searches *and continued until Plaintiffs were released years later.* Thus, Defendants are liable to Plaintiffs not only because they failed to supervise Norton *before* the violations occurred, but also at the time when the violations were occurring or had occurred.[1]

Second, the supervisory claims all refer back to Counts I, II and III *as a group*, rather than separately, because it is generally unimportant to Plaintiffs' case against Defendants which constitutional violation(s) Norton actually committed.[2] If Norton committed the violation specified in Count I, but not in Counts II or III, Defendants would be just as liable to the Plaintiffs as they would had Norton committed the violation in Count II, but not Counts I and III. It is the Plaintiffs' position, of course, that Norton committed the violations named in all of Counts I, II and III, but because Defendants' liability does not hinge on which one of those Counts Norton violated, it was not necessary to separately allege Defendants' liability on a count-by-count basis. Consequently, *if Plaintiffs state a claim in <u>any of</u> Counts I, II or III against Norton, they state a claim for relief in Counts IV and V against Defendants as long as they can show that Defendants, in the face of sufficient knowledge of the violation, failed to respond appropriately.*

### 2. The Non-Supervisory Claims

---

[1] There is no reason to think that a supervisory claim only extends to prospective constitutional violations, rather than ongoing constitutional violations. Indeed, it is nonsensical to think that a supervisor could be held liable for failing to interrupt a foreseeable constitutional violation, but escape liability for failing to intervene while the violation *was actually occurring*. To the extent that this understanding of supervisory liability overlaps with bystander liability, Plaintiffs have stated a claim on that ground as well, as more fully discussed, *infra*, p. 26.

[2] The only slight difference between the claims would be the length of incarceration that would be actionable against Defendants. As the explanation of Counts I, II, and III, above, shows, the length of unlawful incarceration differs slightly between the Counts.

In addition to the supervisory claims in Counts IV and V, Plaintiffs also allege in Counts VII and VIII that Defendants deprived them of their rights to liberty under the Fourteenth and/or Eighth Amendments. These counts are similar to Counts IV and V in that they are based on Defendants' failures to act upon their likely knowledge, but are also importantly different: Counts VII and VIII are *not* supervisory claims. That is, Defendants' liability in this respect does not depend on their roles as supervisors, but simply on their failures to act given their knowledge that Norton's misconduct would likely have caused persons like Plaintiffs to be unlawfully jailed.

**B. The Plaintiffs State a Plausible Claim for Supervisory Liability Against Defendants With Regard to the Fourth Amendment Violations.**

In their motion to dismiss, Defendants make five arguments why they are not liable as supervisors for the Fourth Amendment violations. Each of these arguments is meritless.

**1. The Plaintiffs' Fourth Amendment Claims Are Not Time Barred.**

Defendants first argue that Plaintiffs' claims are time-barred because, they assert, the Plaintiffs were on notice of their § 1983 claims "at the time of the allegedly illegal search and seizure." Br. at 12. Alternatively, Defendants argue that Plaintiffs' 1983 claims accrued "no later than the filing of their habeas Petitions and/or motions to vacate." Br. at 14. Each of these arguments is meritless under *Heck v. Humphrey*, 512 U.S. 477, 481 (1994).

In *Heck*, the Supreme Court held that "habeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release." *Heck v. Humphrey*, 512 U.S. 477, 481 (1994) (restating the holding in *Preiser v. Rodriguez,* 411 U.S. 475 (1973)). The "*Heck* bar," as it is commonly known, bars a § 1983 suit that would "necessarily imply the invalidity of his conviction or sentence." Such a suit is only viable "unless and until the conviction is . . . invalidated." *Heck*, 512 U.S. at 487, 489. In this

case, the best indication that Plaintiffs' claims would have invalidated their convictions is that ***the Commonwealth's Attorney for the City of Richmond, the U.S. Attorney for the Eastern District of Virginia, and a state and federal court unanimously agreed that the allegations underlying this suit merited the invalidation of the Plaintiffs' convictions.*** Thus, if Plaintiffs had pursued their § 1983 claims while in prison, there can be little doubt that a court would have barred the claims because they "necessarily impl[ied] the invalidity of [the Plaintiffs'] conviction[s] or sentence[s]." It was only after Plaintiffs' convictions were invalidated on April 2, 2015 (for Ensley, Archer and Andrews), August 3, 2015 (for Humphries), and September 16, 2015 (for Gilliam) that they could have brought their § 1983 actions. Because Plaintiffs all brought suit within two years of the invalidation of their convictions, their claims are timely.[3]

The Defendants fare no better in their claim that Plaintiffs' claims accrued "no later than the filing of their habeas Petitions and/or motions to vacate." Br. at 14. *Heck* holds that, because their claims would have "impl[ied] the invalidity of [their] conviction[s] or sentence[s]," the claims accrued on the date their "conviction[s] [were] . . . invalidated," not on some prior date. *Heck*, 512 U.S. at 487, 489.

**2.** ***Ashcroft v. Iqbal* Does Not Bar the Supervisory Claims Alleged Here.**

Using eleven words and a citation to a single case, the Defendants also argue "[s]upervisory liability *may* no longer constitute a viable Section 1983 claim" under *Ashcroft v.*

---

[3]     Defendants mistakenly rely on *Cramer v. Crutchfield*, 648 F.2d 943, 945 (4th Cir. 1981). In *Cramer*, a driver was prosecuted for a crime using evidence obtained in an allegedly unlawful search. The charges were later dropped and the driver filed a search-and-seizure claim as well as a malicious prosecution claim. The court held that the search and seizure claim was time-barred, but, importantly, *did not hold* that the malicious prosecution claim was time barred. *Id.* Thus, *Cramer* holds that a search or seizure claim begins accruing when the unlawful search or seizure happens, but says nothing at all about when a malicious prosecution claim accrues. Because the Plaintiffs do not bring search or seizure claims in this case, *Cramer* offers no support to Norton.

*Iqbal*, 556 U.S. 662 (2009). Br. at 19, n.6 (emphasis added). The Defendants wisely put little stock in this argument because it misreads both *Iqbal* and Fourth Circuit precedent.

Numerous courts of appeal have evaluated *Iqbal*'s effect on supervisory claims and determined that such claims are still viable provided that the supervisor's mental state is identical to the mental state required of the subordinate. *See Barkes v. First Corr. Med., Inc*., 766 F.3d 307, 319 (3d Cir. 2014), reversed on unrelated grounds, 135 S. Ct. 2042 (2015); *Starr v. Baca,* 652 F.3d 1202, 1207 (9th Cir. 2011); *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010); *Whitson v. Stone County Jail,* 602 F.3d 920, 922, 927–28 (8th Cir. 2010); *Sandra T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010); *Sanchez v. Pereira–Castillo,* 590 F.3d 31, 49 (1st Cir. 2009). While the Fourth Circuit has not directly addressed the issue, *Danser v. Stansberry*, 772 F.3d 340 (4th Cir. 2014), strongly suggests that the Fourth Circuit sees *Iqbal* and supervisory liability as entirely compatible. In *Danser,* the Court analyzed a Plaintiff's supervisory claim under *Iqbal* and then separately analyzed the claim under the Fourth Circuit's supervisory liability doctrine established in *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994). If supervisory liability is no longer viable after *Iqbal*, then *Danser* makes absolutely no sense. The Defendants' half-hearted argument under *Iqbal* should thus be rejected.

### 3. The Plaintiffs Have Stated a Plausible Supervisory Claim Against Defendants

Defendants next claim that because the Defendants "were not responsible for Norton at or around the time of Plaintiffs' respective arrests," the Plaintiffs' claims must fail. Br. 15-16. In support, Defendants argue that it is "black letter law" that a § 1983 claim cannot be brought for supervisory liability where the named defendant was not a supervisor at the time of events on which the claim is based and cite an unpublished decision in support. The case Defendants cite,

*Brown v. Poplin*, 3:10cv565, 2011 WL 5119483 (W.D.N.C. July 29, 2011[4]), fails to support their argument. If any "black letter law" can be gleaned from *Brown*, it is the principle that a "claim for supervisory liability under Section 1983 [] must allege that [the defendant] had actual or constructive knowledge that his subordinates, . . . [was] engaged in conduct that posed a pervasive and unreasonable risk of personal injury to Plaintiff, that [defendant's] response was inadequate, and that there was a causal link between his inaction and the injury to Plaintiff." *Id.* at * 6. As discussed previously, Plaintiffs have alleged that Defendant Blackwell was supervising Norton and overseeing the confidential informant program itself in 2009 when Ensley, Archer and Andrews were arrested (and continuing until 2011), and that Defendants Harrison, Corrigan and Alston were all supervising Norton in 2012 when Gilliam and Humphries were arrested (and continuing to 2013); indeed, Alston was then Norton's Direct Supervisor and Corrigan his Intermediate Supervisor, and shortly after those arrests, Corrigan was assigned to clean up the failing informant program. Moreover, at issue is not simply the time of the Plaintiffs' wrongful arrests, but the continuing prosecution and incarceration of Plaintiffs for years throughout Norton's tenure at RPD. During this period, there was inaction on the part of Defendants and a lack of response in the face of Norton's misconduct that had caused and continued to cause injury to the Plaintiffs.

To be clear, the Fourth Circuit has plainly stated that to state a claim for supervisory liability, a plaintiff must plausibly plead:

 (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an

---

[4]    Defendants incorrectly cite the date of this decision as Oct. 27, 2011.

affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994). Thus, a supervisor cannot be held liable unless he or she possessed a mental state sufficient to state a claim on the underlying claim. The underlying claim here is the malicious prosecution claim, which requires the Plaintiffs to "allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Evans v. Chalmers*, 704 F.3d 636, 647 (4th Cir. 2012). Fourth Circuit law is clear that a plaintiff can state a malicious prosecution claim by pleading that the false statement leading to prosecution was "made deliberately or with a reckless disregard for the truth, which may be proved by showing that when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Massey v. Ojaniit*, 759 F.3d 343, 357 (4th Cir. 2014); *see also Miller v. Prince George's Cty*, 475 F.3d 621, 627 (4th Cir. 2007) (plaintiff bringing malicious prosecution claim against a police detective must show that the detective "deliberately or with a reckless disregard for the truth made material false statements in his affidavit"). By combining the mental state required of a malicious prosecution claim with the supervisory liability standard, it becomes clear that Plaintiffs state a claim against Defendants if they have plausibly alleged that:

> (1) Defendants "entertained serious doubts as to the truth of [Norton's] statements or had obvious reasons to doubt the accuracy of the information [Norton] reported" (2) that [Defendants'] response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between [Defendants'] inaction and the particular constitutional injury suffered by the plaintiff[s].

As explained below, the Plaintiffs have plausibly alleged each of these three elements.

First, Plaintiffs have adequately alleged that Defendants either "entertained serious doubts as to the truth of [Norton's] statements or had obvious reasons to doubt the accuracy of the information [Norton] reported." *Massey,* 759 F.3d at 357. The statement of facts contains numerous grounds for a reasonable jury to conclude Defendants had "reason to doubt the accuracy" of the information in Norton's warrant applications. In particular, Defendants would have had reason to doubt Norton's reliance on informants because they would have reasonably known, among other things, that: (1) Norton was reprimanded in March 2011 for deceit concerning confidential informants on multiple occasions; (2) a C.I. was interviewed about his relationship with Norton in late 2011 in an IAD investigation; (3) the RPD's confidential informant program in and prior to mid-2012 lacked basic checks on integrity that would keep an officer from lying about informants; (4) Norton's colleagues and other supervisors thought he played "too fast and too loose," had encountered him lying on numerous occasions, and believed that "management" was letting Norton "hang himself" because he was "producing"; and (5) the FBI began investigating him in mid-2012 for lies regarding informants/ warrants.

Given all these allegations, a reasonable jury could easily find that, long before the Plaintiffs were released from jail, Defendants had "reason to doubt the accuracy" of Norton's search warrant applications which, if inaccurate, would render the Plaintiff's incarcerations unlawful. It is difficult to pinpoint, of course, especially at this pre-discovery juncture, *exactly when* Defendants would have developed "reason to doubt the accuracy" of Norton's warrant affidavits. In the end, however, is it unnecessary for Plaintiffs to pinpoint that exact date(s). To state a plausible claim for relief, Plaintiffs need only show that Defendants had "reason to doubt the accuracy" of Norton's affidavits sometime *before* a reasonable person would have taken steps to intervene. Put differently, the exact moment in which Defendants would have had

"reason to doubt the accuracy" of Norton's warrant affidavits would impact the *quantity* of the remedy*,* but not the *availability* of a remedy. The quantity of the remedy is, like in any ordinary personal injury suit, a matter to be worked out at trial. As long as Plaintiffs can show *some* injury at this stage, they have stated a claim for relief.

Second, Plaintiffs have adequately alleged "that [Defendants'] response to [their] knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices." Once they had "reason to doubt the accuracy" of Norton's affidavits by the end of 2012 *at the latest* (and likely much earlier), Defendants apparently did nothing while most Plaintiffs remained jailed for another 2.5 years. This response was clearly deficient.

Consider, for example, Plaintiffs Gilliam and Humphries, who were arrested on February 23, 2012. By this time, Defendants would have reasonably known from (1) Norton's 2011 double-reprimand for deceit involving informants on separate occasions and (2) IAD's investigation of Norton regarding his work with an informant in late 2011 (in addition to information gleaned casually that Norton was "dirty," others "asked to stop working with Norton because he was a sinking ship," his informant paperwork was "garbage," etc., and that the confidential informant program had serious integrity problems) that Norton posed a significant risk to persons in Gilliam and Humphries' circumstances—*i.e.*, persons arrested pursuant to information reportedly provided by a confidential informant working with Norton. The reasonable response to this risk would be to prohibit Norton from working with informants or, at the very least, prohibit him from relying on informants in applying for search warrants. This, on its own, would have prevented the harm suffered by Gilliam and Humphries. Even after their arrests, however, Defendants could have taken appropriate steps to minimize the period of their incarceration. As Defendants' knowledge of Norton's troubles grew in mid-2012, Defendants

could certainly have instituted an internal investigation to determine whether persons like Gilliam and Humphries had been caught up in Norton's schemes. But Defendants did not do that. In particular, they did not investigate the wrongful detention of persons like Gilliam and Humphries until *after* federal authorities had concluded their investigation. ¶ 149. That investigation began, as noted above, in mid-2012 and did not terminate until the early spring of 2015. Once that investigation concluded, state officers sought the vacatur of Gilliam and Humphries' convictions and were able to procure them by the summer of that same year. ¶ 120. If Defendants had, as they certainly could have, pursued an investigation into Norton's state court convictions, persons like Gilliam and Humphries would have been released far sooner. There is simply no reason why Gilliam and Humphries should have had to wait for relief when Norton's misconduct would have been known to Defendants years earlier.

Turning to Plaintiffs Ensley, Archer and Andrews, with regard to Defendant Blackwell, one sees the same general problem: he was supervising Norton and running the confidential informant program when they were arrested in 2009. During this period, Norton was lying repeatedly about the reliability of his informants, falsifying N-10 forms regarding the identity of the informants, forging, or having others forge, signatures of informants, and not following protocol with respect to having another officer witness payment of funds to the informants—all of which Blackwell plausibly had knowledge of and supervisory authority over at the time of Ensley's, Archer's and Andrews's arrest. After 2011, Blackwell is not absolved of responsibility just because he moved to another department. Indeed, it is Blackwell's lack of response and inaction that contributed directly to Humphries' and Gilliam's wrongful arrests, as he had knowledge of Norton's pattern of misconduct and that Norton was engaged in conduct that posed a pervasive and unreasonable risk of personal injury to the Plaintiffs and persons like them.

Moreover, just as with Gilliam and Humphries, if Blackwell did not catch Norton's corrupt actions at the time of Ensley, Archer and Andrews's arrests, Blackwell would have known at least by 2011 that Norton was engaged in deceitful activities related to confidential informants. And then when they started supervising Norton, in 2011 for Harrison, and 2012 for Alston and Corrigan, these Defendants too would have known of Norton's multiple reprimands, IAD investigation, reputation and "garbage" paperwork concerning informants. Corrigan, in particular, was specifically assigned to overhaul the shoddy confidential informant program; if the confidential informant program was "cleaned up," surely that included a review of the N-10 forms that evidenced Norton's repeated inconsistencies regarding confidential informants' names and the CI #'s associated with them. The N-10 forms, in conjunction with the formal reprimands Norton received for misuse of confidential informants, would show that Corrigan had actual or constructive knowledge that a subordinate—Norton—was engaged in conduct that posed a pervasive and unreasonable risk of personal injury to persons like the Plaintiffs. Then, by mid-2012, all of these Defendants would have known even more—*i.e.*, that not only did the RPD's confidential informant program have serious integrity problems, *but that the FBI believed Norton had lied to obtain warrants*, thus putting people in jail in violation of law.

Instead of initiating their own investigation in 2011 or 2012, Defendants did nothing. As a result, Ensley, Archer and Andrews had to wait until the *spring of 2015 to be released.* It would be improper for Defendants to contend that they should be let off the hook because federal agents were already performing an investigation. First of all, the existence of a federal investigation does not in any way relieve Defendants of their *own* duty to help persons wrongfully put in jail by one of their *own* officers. Indeed, that is the very premise of supervisory liability: supervisors cannot hide from liability by simply saying "it wasn't my job." *See Slaken*

*v. Porter,* 737 F.2d 368, 373 (1984) (stating that supervisory liability can reach the "highest levels of state government," including anyone "in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked").

Second, the federal investigation was almost certainly not aimed solely at the restoration of Plaintiffs' liberty. Rather, it was to uncover the entire scope of Norton's misconduct and determine whether to file criminal charges/take other action-- with a side effect of, if appropriate, restoring certain persons' liberty. Thus, although Ensley's incarceration (based on information wrongfully attributed to R.A.) was exposed as unlawful very early on in the investigation, Ensley remained in jail until investigators had completed the *entire investigation.* Why should Ensley have remained in jail after it was determined that Ensley should not be in jail?

Third, even if there were some reason to defer to federal investigators in this situation, a jury could reasonably conclude that Defendants *deferred for far too long*. If federal investigators spent a decade investigating this matter, would Defendants be justified in deferring for that long? Certainly not. A 2.5 year investigation is obviously much shorter than that, but in the eyes of Plaintiffs Ensley, Archer and Andrews, it was intolerably—and with regard to Defendants' decisions, unconstitutionally—too long. A focused review of Norton's search warrant affidavits would have, *on its own*, revealed the warrants' flaws. The Plaintiffs' attorneys were able to perform much of the analysis simply by using an ordinary word processing tool that compares different versions of the same document and highlights the differences. There can be no doubt FBI officials had that same expertise (if not considerably more) but yet continued their investigation because they wanted to know the *full story* about Norton—not simply enough of the story to justify the Plaintiffs' release from jail.

A final observation about the federal investigation is in order. Plaintiffs are well aware that, to preserve the integrity of an investigation, an investigating officer may elect to continue the investigation even after conduct has been uncovered justifying a prisoner's release from jail. It might sometimes be in the public interest to delay the release of information obtained during an investigation if doing so would compromise the obtaining of further information. If this is so, however, it would seem entirely appropriate to *at least compensate persons who have remained in jail in the service of the public interest*. Analogously, the Constitution allows state and federal governments to take "private property" for "public use"—but only with payment of "just compensation." U.S. Const., amend V. It would be an extraordinary irony here were the Court to hold that, although a government must compensate a person when it takes the person's *property* for public use, it need not compensate a person when it takes his or her *liberty* for public use. Obviously, the Plaintiffs' do not allege a Takings claim here, but the illustration may help the Court see the true nature of the Plaintiffs' claims. If, for some overriding reason, the federal investigation could not be interrupted, there is no reason that the Plaintiffs should be denied compensation for their contributions to the investigation.[5]

Third and finally, Plaintiffs have plausibly alleged that "there was an affirmative causal link between the [Defendants'] inaction and the particular constitutional injury suffered by the [Plaintiffs]." On this issue, there can be little debate. Had Defendants, after forming "reason to doubt the accuracy" of Norton's warrant affidavits, taken reasonable steps, Plaintiffs would have been released from jail sooner than they were. It is immaterial at this stage in the proceedings whether Plaintiffs would have been released

---

[5]     Of course, the Amended Complaint does not provide any ground to infer such an overriding reason, much less *require* a jury to accept that reason and reject any contrary inference. The Plaintiffs simply note the point to provide the Court with context.

a week earlier or three years earlier because being unlawfully detained for even a week is still a constitutional violation worthy of compensation. *See Young v. City of Little Rock*, 249 F.3d 730 (8th Cir. 2001) (holding that a detention as short as three hours stated a claim for relief). Thus, there can be little doubt that Plaintiffs have adequately alleged causation here.

### 4. Plaintiffs Have Stated a Plausible Claim Against Defendants Individually

The Defendants assert, "... all of the Defendants, except the City, are named in their individual, rather than official capacities, but the Amended Complaint does not allege personal involvement by anyone but Norton in the alleged constitutional violations." Br. at 2. Contrary to Defendants assertions, the Amended Complaint, and this brief, sets out with great specificity the Defendants' own constitutional shortfalls. Plaintiffs seek to hold the Defendants legally responsible for their *own* actions. Plaintiffs do not base their claims upon the doctrine of *respondeat superior*. *See* the discussion *supra*.

### 5. Plaintiffs' allegations also state a claim for bystander liability

Defendants' are incorrect when they assert that they are not liable under the bystander liability doctrine. Br. at 26-28. "To succeed on a theory of bystander liability, a plaintiff must demonstrate that a law-enforcement officer (1) knew that a fellow officer was violating an individual's constitutional rights; (2) had a reasonable opportunity to prevent the harm; and (3) chose not to act." *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 417 (4th Cir. 2014) (internal quotation marks and modifications omitted). Although the Plaintiffs have framed their

allegations as supervisory claims, the doctrines substantially overlap[6] and, not surprisingly, the

Plaintiffs' allegations also state a claim for bystander liability.[7]  As explained in the previous

sections, the Complaint contains numerous allegations that would allow a reasonable jury to infer

that Defendants had actual knowledge that Norton had lied in his application for search

warrants—especially once the federal investigation was underway.  Such lies rendered the

Plaintiffs' incarceration unlawful, thus imposing on Norton a duty to come clean about his

frauds.  Norton's failure to come clean amounted to a violation of the Plaintiffs' Fourteenth

and/or Eighth Amendment rights—a violation of which Defendants would have been aware of as

a bystander.  Defendants had a "reasonable opportunity to prevent the harm" but "chose not to

act."  As such, even if the Plaintiffs' supervisory claim is framed as a bystander claim, it still

states a claim upon which relief can be granted.

### 6. There are No Intervening Causes that Separate Defendants' Inaction from Plaintiffs' Injuries

Defendants argue that they cannot be liable as supervisors for the Fourth Amendment

claim for three purported reasons: because Plaintiffs purportedly did not demonstrate widespread

conduct; the Amended Complaint allegedly makes allegations showing actions Defendants think

are sufficient with regard to supervising Norton; and Plaintiffs' arrests and guilty pleas.  With

regard to the first two arguments, as Plaintiffs have shown throughout this brief and the

Amended Complaint, there was plenty of wrongful conduct for Defendants to review – not just

---

[6]    *See, e.g., Morrison v. Jordan*, No. CIV.A 7:08-CV-00643, 2009 WL 4363922, at *5 (W.D. Va. Dec. 1, 2009) (treating allegations against supervisor as "claims of bystander liability *and* supervisory liability").

[7]    It is irrelevant whether the Plaintiffs used the magic words "bystander liability" in the Complaint because the elements of the action were nonetheless plead in the Complaint.  *See Stevenson*, 743 F.3d at 418 (holding that a plaintiff need not "recite expressly the elements of bystander liability" to properly allege a bystander liability claim).

multiple reprimands and an internal investigation regarding deceit with informants, not just a plethora of information apparently known casually by everyone who worked with Norton and other supervisors, not just that the confidential informant program itself had widespread integrity and monitoring problems that would enable acts like Norton's, and finally not just that the FBI eventually started investigating Norton – but that all of Norton's faulty paperwork was available to Defendants and could have been reviewed by them at many times when they reasonably should have believed Norton posed a risk of constitutional injury to persons like Plaintiffs. It is simply not true that Defendants only had the ability to review the paperwork at the time when it was created (or even, as shown, that simply doing so then would not have been sufficient to catch certain lies). Moreover, any argument that simply reprimanding Norton (without even stopping him from working with informants) or "cleaning up" the program with regard to future informant transactions – *but not investigating who might be currently jailed due to wrongful actions already taken* – actually meets the constitutional burden here is meritless.

With regard to the fruit of the poisonous tree argument, the Court should reject this argument because the exclusionary rule (which encompasses the fruit of the poisonous tree doctrine) has no place in a suit where a police officer intentionally lies to a magistrate to obtain a search warrant. In garden variety § 1983 suits, courts do not normally apply the fruit of the exclusionary rule. This is because the deterrent force of the rule in the criminal setting is normally sufficient to "take[] away an obvious incentive—the successful prosecution of crime—that may otherwise induce the government to ignore constitutional rights." *Lingo v. City of Salem,* 832 F.3d 953, 958 (9th Cir. 2016). Further, applying the rule in the § 1983 setting could potentially impose "an extreme cost [on] law enforcement officers." *Id.*; *see also Black v. Wiggington*, 811 F.3d 1259, 1268 (11th Cir. 2016) ("The cost of applying the exclusionary rule

in [the § 1983] context is significant ... [a]nd the deterrence benefits are miniscule."); *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999) (explained that applying the exclusionary rule in § 1983 cases "would vastly over deter police officers and would result in a wealth transfer that is peculiar, if not perverse"); *Wren v. Towe*, 130 F.3d 1154, 1158 (5th Cir. 1997) (per curiam); *Hector v. Wyatt*, 235 F.3d 154, 159 (3rd Cir. 2000) (refusing to apply exclusionary rule because an "officer who took a frisk one modest step too far could face vast liability").

The instant suit is not a garden variety suit, however. That is because ***the exclusionary rule has little deterrent effect on officers who are willing lie to obtain or preserve an arrest.*** This has been common knowledge for years in the field of law enforcement—so common, in fact, that officers in New York City had their own term for it: "testilying."[8] "Testilying" arose largely as a result of the Supreme Court's decision in *Mapp v. Ohio*, 347 U.S. 643 (1961), which extended the exclusionary rule to state criminal proceedings. Before *Mapp*, officers were likely to admit that they found the contraband on the suspect's person or at his residence—even if the search of the person or place was unconstitutional. Without the exclusionary rule, there was no reason to pretend otherwise. But after *Mapp* came down, there was a "suspicious rise" in so-called "dropsy" cases—cases in which "officers alleged that the defendant dropped the contraband on the ground."[9] The phenomenon of "testilying" did not tail off once *Mapp* was absorbed into the legal landscape. For example, in 1994, a blue-ribbon commission charged with

---

[8]     MILTON MOLLEN ET AL.,COMM'N TO INVESTIGATE ALLEGATIONS OF POLICE CORRUPTION AND THE ANTI-CORRUPTION PROCS. OF THE POLICE DEP'T, CITY OF N.Y., ANATOMY OF FAILURE: A PATH FOR SUCCESS 36 (1994).

[9]     Comment, *Effect of* Mapp v. Ohio *on Police Search-and-Seizure Practices in Narcotics Cases*, 4 COLUM. J.L. & SOC. PROBS. 87, 95 (1968); *see also* Irving Younger, *The Perjury Routine*, Nation, May 8, 1967, at 597 (explaining that, after *Mapp*, "police made the great discovery that if the defendant drops the narcotics on the ground, after which the police man arrests him, the search is reasonable and the evidence is admissible."

studying corruption in the New York City Police Department concluded that "testilying" was "probably the most common form of police corruption, particularly in connection with arrests for possession of narcotics and guns."[10] And more recent studies confirm that the problem is still wide-spread.[11] Indeed, those who oppose the exclusionary rule cite "testilying" as one of the chief reasons that the rule fails to deter.[12]

Thus, in contrast to the criminal setting, applying the exclusionary rule (and its component, the fruit of the poisonous tree doctrine) in the civil setting in a case where an officer has intentionally defrauded the legal system actually ***creates deterrence were little existed before***. An officer like Norton, for whom the exclusionary rule was apparently of no consequence in the criminal context because he was already willing to simply fabricate "evidence" and repeatedly lie to magistrates to "justify" searches, might not be so keen to continue to do so if he faced personal civil liability for such actions.[13]

---

[10] MOLLEN ET AL., at 36.

[11] Christopher Slobogin, *Testilying: Police Perjury and What to Do About It*, 67 COLO. L. REV. 1037, 1041-48 (1996) ("Whether it is conjecture by individual observers, a survey of criminal attorneys, or a more sophisticated study, the existing literature demonstrates a widespread belief that testilying is a frequent occurrence.").

[12] Christopher Slobogin, *Why Liberals Should Chuck the Exclusionary Rule,* 1999 U. ILL. L. REV. 363, 387-88. Further, the pressure to lie in a suppression hearing is augmented by the interests of "judges, prosecutors, and fellow police," all of whom have "some independent 'stake'" in putting an apparently guilty man in jail. *Id.* This "independent stake" too frequently makes these actors all willing to engage in "subtle or not-so-subtle collusion" with a lying officer. *Id. See also* Myron W. Orfield, Jr., *Deterrence, Perjury, and the Heater Factor: An Exclusionary Rule in the Chicago Criminal Courts*, 63 COLO. L. REV. 75, 109-11 (1992) (in a study of prosecutors, defense attorneys and judges, reporting that 52% of respondents believed that, at least "half of the time," the prosecutor "knew or had reason to know" that police fabricate evidence during suppression hearings; that 93% of respondents (including 89% of the prosecutors) believed that prosecutors knew of police perjury "at least some of the time").

[13] Indeed, the importance of deterrence through a § 1983 action is magnified here because the only other tool of deterrence—criminal punishment—is apparently not in play here. Norton has not be charged with any crimes and, in the City of Richmond's opinion, that is likely warranted. *See* City of Richmond's Motion to Dismiss at 1.

Of course, the value of such deterrence is not sufficient on its face to justify the rule, for the rule could be outweighed by costs to law enforcement, and, thus, society as a whole. Such costs, however, would be extraordinarily limited because they would be borne *only* by officers who insisted on willfully deceiving a magistrate. Such limitations are entirely appropriate because the vast majority of law enforcement officers are honest, diligent, and dedicated to the public good—*and are not going to intentionally deceive*. Like all fields of work, however, a few will occasionally stray from the straight and narrow. When that occurs in the policing context, and liberty is consequently lost, *some* amount of deterrence is needed to protect the public.

In sum, the exclusionary rule and fruit of the poisonous tree doctrines should apply in a suit where an officer has intentionally lied to obtain a search warrant. Applying the doctrines would impose deterrent force where none existed before and impose no additional cost on officers acting in good faith.

**C.  Defendants Are Not Entitled to Qualified Immunity.**

Defendants finally argue that they are entitled to qualified immunity because "[u]nder an objective standard, the conduct of these Officers was reasonable." Br. at 27. This argument is without merit because, although qualified immunity protects officers from liability where they make "bad guesses in gray areas," *Wilson v. Kittoe,* 337 F.3d 392, 403 (4th Cir. 2003) (internal quotation marks omitted), Defendants were not at all acting in a gray area. Each and every claim against them in this suit plausibly alleges that they had ***actual knowledge of a significant risk that persons in the Plaintiffs' circumstances were unlawfully in jail, but yet did not reasonably act to prevent or alleviate their harm.*** Failing to act in such circumstances is not a bad guess in a gray area; it is the wrong call in a black and white circumstance.

With regard to the malicious prosecution claim, Defendants are not entitled to qualified immunity. On this claim, the question before the Court is whether Defendants acted in a "gray area" when, despite "obvious reasons to doubt the accuracy of the information" leading to an unlawful incarceration, they were "deliberate[ly] indifferen[t]" to that knowledge by failing to take steps to prevent or shorten the incarceration. *See infra* at 18-20 (stating the supervisory liability standard applicable to the malicious prosecution claim). When there are "obvious reasons" to doubt someone's incarceration, officials hardly face a close call in determining what to do. The *obvious* thing to do is to initiate an investigation to determine whether the incarceration is lawful or not. Defendants did not do that.

Finally, to the extent that Defendants might argue that the application of the fruit of poisonous tree doctrine to Plaintiffs' claims entitles them to qualified immunity, that argument fails because the qualified immunity inquiry focuses only on whether a particular "constitutional right[]" was "clearly established," *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (emphasis added), but "the exclusionary rule is 'not a personal constitutional right.'" *Davis v. United States*, 564 U.S. 229, 248 (2011) (quoting *Stone v. Powell,* 428 U.S. 465, 486 (1976)). Put differently, the non-application of the exclusionary rule does not violate the Constitution; it simply reflects a judicial appraisal of the need to deter police misconduct in a specific setting. Were it otherwise, the Fourth Amendment would hardly make sense given the numerous situations in which the Supreme Court has declined to apply the rule. *See, e.g., Pennsylvania Board of Probation and Parole v. Scott*, 524 U.S. 357 (1998) (permitting illegally seized evidence to be used during parole hearings); *United States v. Leon*, 468 U.S. 897 (1984) (permitting evidence obtained pursuant to an invalid warrant to be used provided the officer acted in good faith); *I.N.S. v. Lopez–Mendoza*, 468 U.S. 1032 (1984) (permitting illegally obtained evidence to be used in a

civil deportation hearing). In such situations, rather than narrowing the reach of a constitutional right, courts have simply adjusted an evidentiary rule used to adequately deter misbehaving officers.

Given that the proper question regarding qualified immunity here pertains only to whether Norton violated "clearly established statutory or constitutional rights of which a reasonable person would have known," the analysis is simple. By intentionally deceiving a magistrate in his applications for search warrants, Norton violated a clearly established constitutional right. Whether or not an evidentiary rule may render him liable for that misconduct is entirely beside the point. The Court should thus deny Norton's claim to qualified immunity for Count I.

Second, Defendants cannot claim qualified immunity for the knowing and intelligent plea claim. On this claim, the question again before the Court is whether Defendants acted in a "gray area" when, despite Defendants' "actual . . . knowledge" that one of their subordinates engaged in conduct (*i.e.*, the misrepresentation of information relevant to a guilty plea) that "posed a pervasive and unreasonable risk of constitutional injury to citizens" like Plaintiffs, Defendants failed to take reasonable steps to prevent or shorten the incarceration. This is most certainly not a "gray area." *Brady v. United States*, 397 U.S. 742 (1970), clearly holds that an officer's misrepresentation can render a guilty plea invalid and *Fisher v. United States*, 711 F.3d 460 (4th 2013) makes plain the obvious implication of this, which is that, by withholding lies underlying a search warrant, an officer engaged in misrepresentation under *Brady*. Given this, Defendants are not entitled to qualified immunity.[14]

---

[14]      To the extent that Defendants might contend that *Fisher* established new law, and thus that there was no clearly established law *prior to Fisher*, Defendants would still lack qualified immunity for failing to take reasonable steps *after Fisher,* which was decided in April 2013.

Third and finally, Defendants cannot claim qualified immunity on Plaintiffs' liberty claim in violation the Fourteenth and Eighth Amendments. On this claim, the question before the Court is much like the others, namely whether Defendants acted in a "gray area" when, despite their "actual . . . knowledge" that one of their subordinates engaged in conduct that "posed a pervasive and unreasonable risk of constitutional injury to citizens" like Plaintiffs, they failed to take reasonable steps to prevent or shorten the incarceration.  For the reasons already stated, Defendants may not claim qualified immunity here because it is hardly a "gray area."  *Golson v. Department of Corrections*, 914 F.2d 1491 (4th Cir. 1990) demonstrates that clear law existed on this issue at the time of Defendants' violations.  The court in *Golson* stated as clearly as possible that, when a person has reason to believe that someone is in jail but ought not to be, that person has a duty to act. Defendants might argue that *Golson*'s facts are not similar enough to those here, but this argument is unavailing because "'the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity.'" *Id.* at 403 (internal quotation marks omitted). This is because the goal of qualified immunity is to "ensure that before they are subjected to suit, officers are on *notice* their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (emphasis added) (quoting *Saucier v. Katz,* 533 U.S., at 206).  The identical-case argument thus ignores that officers do not need additional "notice" on how to "apply[] familiar legal principles to new situations." *Wilson*, 337 F.3d at 403 (quoting *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001) (Michael, J., concurring)). It is certainly a "familiar legal principle[]" (stated in *Golson*, among other places) that, where a police officer lies and persons are detained as a result, the Constitution has been violated, and officer supervisors in Defendants' circumstances would hardly find themselves in uncharted terrain if they discovered those lies.

## CONCLUSION

For the reasons stated above, the Plaintiffs respectfully request that the Court deny

Defendants' Motion to Dismiss in its entirety.

Respectfully submitted,

WILBUR ENSLEY,
COVEY ANDREWS,
SHAMAR ARCHER,
DEUNTE HUMPHRIES and
JAMAR GILLIAM

By: _____/s/ Mark J. Krudys_____
Counsel

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
919 E. Main Street, Suite 2020
Richmond, VA 23219
Phone: (804) 774-7950
Email: mkrudys@krudys.com

John Frederick Preis (VSB# 45764)
7719 Rock Creek Road
Henrico, VA 23229
Phone: (804) 289-8682
Email: jpreis@richmond.edu

Amy L. Austin (VSB# 46579)
THE LAW OFFICE OF AMY L. AUSTIN, P.L.L.C.
101 Shockoe Slip, Suite M
Richmond, VA 23219
Phone: (804) 343-1900
Email: amyaustinlawyer@gmail.com

*Counsel for Plaintiffs Wilbur Ensley, Covey Andrews, Shamar Archer, Deunte Humphries, and Jamar Gilliam*

**CERTIFICATE OF SERVICE**

I certify that on May 12, 2017, I electronically filed the foregoing document with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to all

registered users.

By: /s/ Mark J. Krudys

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
Web: www.krudys.com